# Exhibit 3

| In the Matter of an Arbitration Between | |
|---|---|
| **WILTON RANCHERIA** Tribe<br>- and -<br>**UNITE HERE International** Union | **AWARD & OPINION**<br><br>NB 4229<br>AAA-01-23-00003-6907<br>Sky River Casino |

**Arbitrator:**　　　　**Norman Brand, Esq.**

**Appearances:**

**For** Wilton Rancheria
Carroll & Associates, PC
**By Sheila Lamb Carroll, Esq.**
　　**Dacia J. Senat, Esq.**

**For** UNITE HERE International
McCracken, Stemerman, Holsberry, LLP
**By Kristin L. Martin, Esq.**

**Date:　March 17, 2024**

1

## Background

By letter dated November 8, 2023, the American Arbitration Association ("AAA") informed the Arbitrator he had been chosen from the Tribal Labor Panel to serve in this dispute between the Wilton Rancheria d/b/a Sky River Casino ("Tribe") and UNITE HERE International Union ("Union").[1] After making disclosures, on December 15, 2023, the Arbitrator held a case management call to resolve a dispute over the issue. Based on the Tribe's description of the issue in the demand it filed with AAA[2], the Arbitrator deemed the dispute was whether the election/certification procedure in the Tribal Labor Relations Ordinance ("TLRO") enacted April 18, 2019, or the card check/recognition procedure in the Memorandum of Agreement ("MOA") signed August 7, 2017, must be followed. The Union proposed that if the Arbitrator determines the MOA applies, he should conduct the review of authorization cards required by the MOA, as well as decide another pending issue under the MOA. The Tribe asserted no issue could be added to its demand for arbitration without its approval and refused to approve. The

---

[1] On November 18, the Union notified the Arbitrator, through his website calendar, that he had been chosen by the parties to arbitrate this dispute. Both the TLRO and the MOA contain arbitration clauses. While the TLRO requires a member of the Tribal Labor Panel, the MOA permits any agreed upon arbitrator. Both documents contain limited waivers of sovereign immunity, for compelling or confirming an arbitration award. Thus, regardless of which document, the Arbitrator has authority to hear and decide this dispute.

[2] Grievance: Pursuant to the Tribal-State Gaming Compact between the State of California and Wilton Rancheria, Wilton Rancheria was required to adopt and maintain Tribal Law identical to the Tribal Labor Relations Ordinance attached to the Compact. To comply with this requirement, Wilton Rancheria enacted the Tribal Labor Relations Ordinance of 2019 ("TLRO"), codified as Chapter 3 of the Wilton Rancheria Labor Code, on April 18, 2019. The TLRO provides for a two-step certification process before an arbitrator from the Tribal Labor Panel: (1) dated and signed authorization cards from thirty percent (30%) or more of the Eligible Employees; and (2) a secret ballot election requiring more than fifty percent (50%) of Eligible Employees. The TLRO requires all issues to be resolved by a resolution by the Tribal Labor Panel. Respondent refuses to comply with the two-step certification process and the dispute resolution mechanism identified in the TLRO, relying on a Memorandum of Agreement (MOA) signed by the parties on August 7, 2017, prior to the enactment of the Tribe's TLRO.

Arbitrator declined to decide any additional issues under the MOA, if it applies, or to review the authorization cards.

The parties agreed to pre-hearing briefs and reply briefs, all of which were timely filed in accordance with their agreed upon timetable. The Arbitrator held a hearing on February 8, 2024, in Sacramento, CA. Both parties were present and represented by counsel.  Each had a full opportunity to examine and cross-examine witnesses, present evidence, and argue its position.  Neither party objected to the conduct of the hearing. A court reporter recorded the proceedings.  At the close of the evidentiary hearing the parties asked to schedule a further date to make oral closing arguments. The Arbitrator heard oral arguments on February 15, 2024, and declared the hearing closed when he received the transcript of the closing oral arguments on February 28, 2024.


## Issue

The parties agreed the issue is:

Whether the Union must comply with the TLRO promulgated April 18, 2019, or the Tribe must comply with the MOA signed by the parties on August 7, 2017.[3]

---

[3] The issue was stated broadly to allow agreement, but the essential dispute is narrower. The TLRO contains provisions for an organizing campaign leading to an election and potential certification of the Union and negotiation/mediation of a first agreement. The MOA contains provisions for an organizing campaign leading to a neutral review of authorization cards and potential recognition of the Union and negotiation/mediation of a first agreement. Both contain essentially similar dispute resolution provisions. Each provides a complete process from organizing through establishment of a first collective bargaining agreement. Those competing processes are at issue. The TLRO, however, has additional provisions that – as became clear at the hearing – are not at issue (e.g. §3-203 "Non-Interference with Regulatory or Security Activities;" §3-209 "Indian Preference Explicitly Permitted;" and, §3-212 Decertification of a Bargaining Agent.") Thus, compliance with the MOA does not affect compliance with those provisions.

## History

Two histories are relevant to this dispute: 1) the history of the creation of the mandatory model TLRO in State of California/Tribal Compacts; and 2) the negotiating history of the MOA between the Tribe and Union. There was testimony about both.

### Mandatory Model TLRO

Howard Dickstein, who has been practicing Indian law for over 40 years, represented the United Auburn Indian Community, Yocha Dehe Wintun Nation (then called Rumsey Rancheria), Pala Band of Mission Indians, and Jackson Rancheria in the 1999 Compact negotiations with the State of California. (Tr. 95:3-5; 97:15-25)[4] He was the only lawyer on the tribal side, and he negotiated what became the model Compact that approximately 60 tribes entered into. (Tr. 104:10-11; 98:7-10) The negotiations had to be completed and the Compacts signed in time for the legislature to approve them. This was particularly important because US Attorneys were "breathing down the necks" of tribes conducting Class 2 gaming without a Compact, threatening to shut them down unless they had Compacts. Negotiations concluded just an hour or two before the legislature adjourned. (Tr. 99:10-25)

According to Dickstein, the legislature had taken the position that it would not ratify Compacts that failed to give unions organizational and representational rights at the casinos established under those Compacts. Negotiations on union organizational

---

[4] There are two transcripts with non-sequential page numbering. The citation "Tr." refers to the transcript of the hearing on February 8, 2024. The citation "Tr.II" refers to the transcript of closing arguments on February 15, 2024.

and representational rights were not completed before the legislature adjourned. Consequently, the legislature approved Compacts that contained language nullifying them unless such rights were subsequently made part of the Compact.[5] (Tr. 101:19-102:5) The negotiations over union organizational rights continued after the legislature adjourned. The parties agreed on a "Model Tribal Labor Relations Ordinance," providing union organizational and representational rights, later in September.[6] There was no bilateral mechanism to put these rights into effect after the Compacts had been approved by the legislature. Therefore, there had to be unilateral action by the Tribes to effectuate the rights contained in the Model TLRO that was part of each compact. Dickstein explained:

> it would be unilateral at that point, so it was called an ordinance really for that reason, so the tribe could implement it, but the tribe was implementing it as really a part of the compact and the negotiation of the compact .... It was unlike any ordinance that you would otherwise see because it was an ordinance in form, in name, but it was actually negotiated pursuant to the compact, and then made a part of the compact with its own dispute resolution mechanisms... So it was not an ordinance like any other I'd ever seen. (Tr. 102:16-103:2)

Once it had been negotiated, the State required all Tribes to adopt the TLRO and maintain it in effect to avoid termination of its Compact.[7] Dickstein was "the only

---

[5] See, e.g. Pala/State Compact Sec. 10.7. Labor Relations.
Notwithstanding any other provision of this Compact, this Compact shall be null and void if, on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility. State/Pala Compact, September 10, 1999.

[6] The negotiating parties apparently reached agreement on September 14, 2099, since that is the date on the first Model TLRO. See, e.g. "Tribal-State Compact between the State of California and the Agua Caliente Band of Cahuilla Indians" http://www.cgcc.ca.gov/?pageID=compacts accessed March 17, 2024.

[7] In compliance with Section 10.7 of the Compact, the Tribe agrees to adopt an ordinance identical to the Model Tribal Labor Relations Ordinance attached hereto, and to notify the State of that adoption no later than October 12,1999. If such notice has not been received by the State by October 13, 1999, this Compact shall be null and void Failure of the Tribe to maintain the Ordinance in effect during the term of

attorney [on the tribal side] who negotiated that TLRO…" (Tr. 104:10-11) At the time it

was assumed the National Labor Relations Act ("NLRA") did not apply to tribal casinos.

(Tr. 103:6-10)[8] Dickstein, who had experience with the NLRA, knew the State

administration and unions wanted to replicate the NLRA and the TLRO was "modeled

on it." (Tr. 103:14-20) Dickstein was aware of what the NLRA "said about elections and

card check agreements" and he and his tribal clients understood it. In response to a

question about whether the TLRO language meant card check would not be allowed, he

said the TLRO "was a floor from which tribes could take off … because that was the

way the NLRA had interpreted it …" (Tr. 104:13-25)[9],[10]

Raymond C. Hitchcock, as Chairperson of Wilton Rancheria, signed the Compact

between the State of California and Wilton Rancheria on June 29, 2017. The Compact

provides, at Section 12.10 Labor Relations:

> The Gaming Activities authorized by this Compact may only commence
> after the Tribe has adopted an ordinance identical to the Tribal Labor
> Relations Ordinance attached hereto as Appendix C, and the Gaming
> Activities may only continue as long as the Tribe maintains the ordinance.
> The Tribe shall provide written notice to the State that it has adopted the
> ordinance, along with a copy of the ordinance, before commencing the
> Gaming Activities authorized by this Compact.

On April 18, 2019, the Tribe adopted the required TLRO. While it is identical to the

ordinance required by the Compact, the Tribe added four prefatory sections,

denominated "Article 1". (Exhibit 4 to Tribe's Opening Brief) What is denominated

---

[8] this Compact shall constitute a material breach entitling the State to terminate this Compact No
amendment of the Ordinance shall be effective unless approved by the State. *State/Pala Compact,*
September 28, 1999. The Tribe notified the State it had adopted the TLRO that same day.
[8] *See,* Fort Apache Timber Co., 226 N.L.R.B. 503 (N.L.R.B-BD 1976)
[9] "It is a long established Board policy to promote voluntary recognition and bargaining between
employers and labor organizations…" *MGM Grand Hoel, Inc. 329 NLRB 464, 466 (1999)*
[10] Dickstein's description of negotiations is consistent with the more contemporary description in *Coyote
Valley Band of Pomo Indians v. Cal. (In re Indian Gaming Related Cases Chemehuevi Indian Tribe),* 331
F.3d 1094 (9th Cir. 2003)

"Article II" of the TLRO is explained in the third prefatory section, 3-103 Background, which recites:

> Article II of this Ordinance is identical to the ordinance attached to the Tribe's January 22, 2018, compact. [11]

The fourth prefatory section in Article I, Section 3-104 Scope reads:

> This Ordinance shall be narrowly construed to apply to Eligible Employees to the extent the Ordinance provisions are lawfully required by an effective tribal-state gaming compact between the Tribe and the State of California.

By limiting the TLRO to what can be "lawfully required by an effective tribal-state gaming compact," the Tribe recognized it had ceded its sovereign power to legislate labor relations in its Compact with the State. Nevertheless, it attempts to limit that grant of sovereign power by making it contingent on what the State can lawfully require it to do in a Compact. This appears to be an attempt to provide an avenue to change terms of the TLRO if the State's power to negotiate labor relations provisions is limited in the future.[12]

## MOA between the Tribe and Union

Mr. Kevin Kline, a vice president of UNITE HERE International Union, and Mr. Brian Larson, a vice president of Boyd Gaming, negotiated the MOA between the Tribe

---

[11] The ordinance recites the effective date of the Compact, January 22, 2018, when it was published in the Federal Register, rather than the date it was signed.

[12] While the validity of negotiating any labor relations provision in a compact was decided in *Coyote Valley Band of Pomo Indians v. Cal. (In re Indian Gaming Related Cases Chemehuevi Indian Tribe)*, 331 F.3d 1094 (9th Cir. 2003), it does not appear that the specifics of such provisions have been challenged. The question of NLRA preemption of TLROs continues to be litigated. *See, Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695 (9th Cir. 2022). Additionally, regular attempts have been made to legislate a change to the NLRA to exclude tribes from its coverage. *See,* e.g. Tribal Labor Sovereignty Act of 2015, S.248 https://www.congress.gov/bill/114th-congress/senate-bill/248 last visited March 17, 2024 and Tribal Labor Sovereignty Act of 2023, S. 1328 https://www.govtrack.us/congress/bills/118/s1328/ summary  last visited March 17, 2024.

and the Union.[13] They had previously negotiated card check agreements for commercial casinos managed by Boyd in Tunica and Biloxi Mississippi. (Tr. 75:8-23)[14] Kline had also negotiated a card check agreement in June 2016 with Penn National, another national gaming company in Las Vegas, which managed the casino for the Jamal Indian Village of California. (Union Ex E)[15]  Because both Kline and Larson are in Las Vegas, they conducted the negotiations at Boyd's offices in Las Vegas. Kline never met or communicated with any other representative of the Tribe. (Tr. 77:18-78:5)

Kline did not have copies of the versions of the MOA that were exchanged prior to agreeing on the final version of the MOA. (Tribe Ex. 2) Larson did not testify. The Tribe's General Counsel at the time, Ms. Rose Weckenmann, participated in the negotiations on behalf of the Tribe by redlining a copy of the Union's initial MOA proposal with Larson. (Tr. 25:15-26:16) She did not testify. Mr. Raymond Hitchcock, Chairperson of the Tribe from 2014 to 2020, was the only witness for the Tribe. He was not present at any negotiations. Hitchcock testified that when he was no longer Chairperson, he "lost access" to emails and that he "gained some access to emails" when he became the "Wilton Rancheria gaming authority … but there's a lot of missing stuff there." (Tr. 25:15-28:12) The Tribe provided no emails or earlier drafts of the MOA, either from its own, or Boyd's, records. It relied solely on Hitchcock's testimony.

---

[13] Boyd Gaming became the "development partner" and manager of the Sky River casino for the first seven years of its operation as the result of providing "a lot of money to help the tribe get recognized." (Tr. 17:14-23; 26:9-16) Neither Mr. Larson, nor anyone else from Boyd Gaming testified.

[14] The term "card check agreement" denominates an arrangement in which an employer agrees that it will recognize a union if the union presents union authorization cards from a majority of all Eligible Employees. This contrasts with a secret ballot election, where only a majority of those voting is required. (Tr. 76:8-19) The agreement itself generally contains many other terms, but the essence is substituting the card check process for an election.

[15] Between 2001 and 20012, Mr. Jack Gibbons, the Union's California Political Director, negotiated five card check MOAs with California tribes. (Union Exs. F, G, H, I, K) In 2019 Mr. David Gleason, the Union's Organizing Director, negotiated a card check MOA with the Buena Vista Rancheria. (Union Ex. J)

Kline presented the first proposal for an MOA to Larson in July 2017. Paragraph 1, which recites that the MOA "covers all employees defined as Eligible Employees by the Tribal Labor Relations Ordinance..." was "originally very general" but was negotiated to the MOA language. (Tr. 78:25-79:12) The final language defines specific excluded classifications and "confidential employees as defined in Section 2(11)" of the NLRA to exclude others. [16] Kline testified that paragraph 7 ("¶7"), which requires the Tribe to recognize the Union as the Eligible Employees' collective bargaining representative if a majority have chosen the Union through authorization cards or membership, is unchanged from the Union's original proposal.

Hitchcock contradicted Kline, testifying that the Union wanted to be recognized if 30% of the employees chose it, but the Tribe insisted on 50%. (Tr. 31:1-12) It is not believable that a sophisticated Union negotiator would propose this to an experienced management lawyer, both of whom would know NLRA requirements. As Kline testified, that testimony makes "zero sense because we have to have a majority status to be recognized. (Tr. 80:25-81:10) In his Declaration, Hitchcock claimed to have heard "cautionary stories" of union representatives aggressively soliciting employees from "officials and leaders of other tribes." Because of these stories, he claimed, he would not have signed the MOA if he did not believe it provided for secret ballot elections. When asked who he claimed to have spoken with, he first evaded the question, then refused to answer, insisting "you'll have to subpoena."[17] (Tr. 36:4-38:1)

---

[16] The parties stipulated that the initial draft of what became the MOA did not contain a reference to the TLRO in paragraph 2 ("¶2"). (Tr. 48:1-6)

[17] Declaration, Paragraph10.

Kline testified that toward the end of their bargaining Larson requested examples of other card check agreements the Union had negotiated. Kline provided the MOA between the Union and the Federated Tribes of Graton Rancheria, under which the Union had gained recognition through a card check procedure. (Tr. 81:20-82:15; 74:2-18) That MOA differs in at least two ways from what the parties had negotiated up to that point. First, there is an explicit promise to politically support the Tribe's effort to enter the gaming market and to oppose its competitors. It reads:

> The Union hereby agrees to actively support before the appropriate federal, state, and local administrative, bureaucratic, regulatory, and legislative bodies for the Tribe's efforts to remain competitive in, and gain entry to, casino and related markets in which the Tribe chooses to participate pursuant to the IGRA. For purposes of this Agreement "active support" includes letter writing, consultation with and lobbying of elected and appointed officials, availability of members for events in furtherance of the Tribe's goals, opposition to competitor's efforts to prohibit the Tribe's entry into tribal government gaming on its lands in Sonoma or Marin Counties, California, and assistance with local government relations. (Union F, paragraph 9)

Second, the Graton MOA explicitly refers to the TLRO in multiple sections and incorporates it into the MOA:

> 1. Purpose
> The purpose of the Agreement is <u>to ensure an orderly environment for the exercise by Eligible Employees of their rights under the Tribal Labor Relations Ordinance</u>…

> 4.    Applicability
> All card check procedures and any recognition of the Union provided for by this Agreement shall be in accordance with and applicable only to "Eligible Employees" of the Casino as defined in the TLRO, <u>which will be attached hereto as Attachment 1, and made part of this Agreement.</u>

> 13.    Compliance with TLRO
> Nothing herein shall be construed to be inconsistent with or derogate from the obligation of the Union and the Tribe to conform to the TLRO.

After reviewing the Graton MOA, the Tribe proposed and the Union agreed to paragraph 14 (Tr. 83:5-16), which contains substantially similar language to the Graton MOA:

> 14. The Union hereby agrees to actively support before the appropriate federal, state, and local administrative, bureaucratic, regulatory, and legislative bodies, the Tribe's efforts to obtain ratification of the Compact by the California legislation, and to take all reasonable and necessary steps to assist the Tribe in connection therewith. For purposes of this Agreement, "active support" includes letter writing, consultation with and lobbying of elected and appointed officials, availability of members for events in furtherance of the Tribe's goals, opposition to competitor's efforts to prohibit the Tribe's entry into tribal government gaming on its lands in Elk Grove, California, and assistance with local government relations.

Hitchcock asserted that neither the Tribe nor its attorney reviewed the Graton MOA. Instead, he insisted that the Tribe looked only at TLROs from other tribes. (Tr. 32:21-33:19) Given the uniformity of State required TLROs, and their irrelevance to negotiating the MOA, that testimony is implausible. The Arbitrator accepted Hitchcock's Declaration (Tribe 10), only after striking paragraph 10 (42:21) and paragraph 6. (Tr. 46:13-14) The Arbitrator noted further:

> …the declaration is a piece of paper. There is a person here who is live and under oath and I will regard what he says here today and is able to be cross-examined on as the evidence before me. (Tr. 15:10-13)

After considering his declaration and testimony the Arbitrator finds that Hitchcock was an unreliable witness whose testimony was not credible. Kline's testimony is the only credible evidence concerning the negotiation of the MOA.

Kline testified that when the Tribe proposed the political support language, it also proposed:

> …something about tribal authority … we didn't want in … this was our counter to that … traditional language we have in a lot of our card check agreements in tribal country referring to the TLRO because that's … part of the compact … they have to have that.  (Tr. 84:13-85:2)

11

The parties agreed to the Union's counter on paragraph 2:

> The parties agree that the Tribal Labor Relations Ordinance governs labor relations at the Casino, and <u>to hereby establish the following procedure for the purpose of ensuring an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance</u> to organize collectively, should employees choose to do so, and to avoid picketing and/or other economic action directed at the Tribe in the event the Union decides to conduct an organizing campaign among the Employees.

Neither Larson nor anyone else from Boyd suggested this language invalidated the card check provision. Kline testified that he would not have signed the MOA if they had because the "whole goal was to get a card check neutrality agreement. That's the purpose of our bargaining and our negotiations." (Tr. 85:12-25) The parties signed the MOA in August 2017.


**<u>Additional Facts</u>**

In the 2017 MOA the Union agreed to support the Tribe in its effort to get legislative approval for its Compact with the State, which would allow it to build and run a casino with Class III gaming. (¶14) The evidence shows the Union fulfilled its agreement to provide legislative support by appearing at committee hearings and arguing for approval of the Compact. In the MOA the Tribe agreed the Union could seek recognition as the collective bargaining representative through a card check procedure, with the Tribe "taking a neutral approach to unionization of Employees." (¶7)

What has occurred was described in the uncontradicted testimony of Mr. Aamir Deen, president of UNITE HERE Local 49. He met with Mr. Gibase, the general manager of the Sky Casino, shortly after the casino opened in August 2022. Gibase agreed to provide a list of employees and investigate access to employee for the Union.

The Union received the list and access in April 2023 and began collecting cards in June 2023.[18] On June 20, 2023, Deen wrote Gibase and the Casino's VP Human resources. Deen asserted the Union had collected authorization cards from a majority of employees in the bargaining unit and requested recognition in accordance with ¶7 of the MOA. The Tribe has taken no steps toward recognizing the Union under ¶7.  (Tr. 133:23-143:3) Thus, the evidence shows the Tribe has not followed the MOA.


## Discussion

The Tribe makes four arguments to support its position that it did not agree the Union could organize employees and potentially obtain recognition through a card check.[19] First, the Tribe asserts as a general matter that:

> The purpose of the MOA, as stated by the MOA, is to memorialize the tribe's promise to maintain neutrality while allowing the union to organize in exchange for the union's support of ratification of the compact. (Tr.II 8:5-8)

While the TLRO makes it an unfair labor practice to "to interfere  with, restrain, coerce eligible employees in the exercise of their rights …Paragraph 3 of the MOA goes farther and that's where the consideration comes in." (Tr. II 10:4-8) That is, the Union got a neutrality provision in return for supporting the Tribe politically. The Tribe agreed to the MOA because it understood ¶2 negated ¶7. Hitchcock signed the MOA because he

---

[18] In November 2022, Gibase wrote Deen saying there appeared to be conflicts between the MOA and the compact. (Union Ex. M)

[19] The Arbitrator has not considered the Tribe's argument that it did not know what a card check agreement was, or that because the MOA is not titled "card check agreement" it was misled. The negotiations were conducted by the Tribe's partner, an attorney at Boyd who had negotiated other card check agreements with Kline. The Tribe's own Counsel redlined the proposed agreement with Larson. It is not plausible that the actual negotiators were misled because of their naivete.

reasonably believed that it meant the election procedures in the TLRO would be followed. (Tr.II 12:17-13:4)

Second, the Tribe asserts that the word "governs," in the phrase "The parties agree that the Tribal Labor Relations Ordinance governs labor relations at the Casino," is dispositive. Taken together with the statement that the "purpose" of the MOA is to ensure "an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance," ¶2 means that the entire MOA is subordinate to the "mandatory and all-inclusive" TLRO. Because the TLRO governs and it does not specifically provide for a card check, the Union cannot use the card check procedure negotiated in ¶7. The Union can only use the election procedure in §3-210 of the TLRO.

Third, in its opening brief the Tribe asserts the TLRO provides for a mandatory two-step certification process which, if not followed, "could subject the Tribe to a claim for breaching its Compact with the State of California." (Brief, 15:23-24) In closing argument, the Tribe said:

> We are not saying that the State of California does not allow a card check process. It does. We are saying that Wilton Rancheria is not allowing a card check process without a secret ballot because that is in the TLRO and that is a right it didn't give up. (TrII. 60:8-12)

Consequently, the Arbitrator does not address the argument about potentially breaching the Compact.

Fourth, the Tribe asserts that the TLRO it enacted in 2019 is the act of a sovereign. Because the MOA does not limit the Tribe's authority to regulate union activities in "unmistakable terms," as a sovereign the Tribe was free to enact a law that is inconsistent with the MOA and which takes precedence over it. *United States v. Winstar Corp.*, 518 U.S. 839, 868 (1996) Thus, regardless of what it might have agreed

14

to in the MOA, the Union must follow the election process in the TLRO because that is enacted Tribal law.

The Union makes five arguments. First, it asserts the Tribe's reading of the MOA disregards its core promise. In ¶2 the parties agreed that the purpose of the MOA is to ensure "an orderly environment for Employees to exercise their rights" under the TLRO to "organize collectively." In ¶7 the parties agreed on the method by which employees would exercise their TLRO right to organize collectively. Having agreed to card check recognition as a method for employees to exercise their rights under the TLRO in 2017, the Tribe cannot claim in 2023 that its unexpressed intent in 2017 was to require a secret ballot election.

Second, there is no conflict between the TLRO's election procedure and the MOA's card check procedure. They are simply alternative means for the Union to achieve recognition. Section 10 of the TLRO, which was negotiated as part of the Compacts in 1999, contains the same four step procedure for an election as the NLRA: notification of interest by the Union, a 30% showing of interest, a secret ballot election conducted by a neutral party ("election officer" or NLRB), and certification of the Union as the exclusive representative if it has majority support. Both the NLRA and TLRO are silent about card check recognition.

Although the NLRA both contains an election procedure and is silent about voluntary recognition through a card check procedure, that silence is not evidence that voluntary recognition is forbidden. To the contrary.  As one court said:

> Voluntary recognition by employers of bargaining units would be discouraged, and the objectives of our national labor policy thwarted if recognition were to be limited to Board-certified elections *NLRB v. Broad St. Hosp. & Med. Ctr.*, 452 F.2d 302, 305 (3d Cir. 1971)

Similarly, the TLRO's silence about a voluntary card check procedure is not evidence that it is forbidden. Assuming arguendo the TLRO governs, there is no conflict between it and the MOA. They are simply alternatives. Viewing them as alternate paths to recognition avoids making ¶7 surplusage and is consistent with contract construction principals: "a document should be read to give effect to all its provisions and to render them consistent with each other. *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63, (1995) The Tribe's interpretation of the MOA gives no effect to ¶7.

Third, the Tribe must comply with the MOA even if the TLRO precludes card check recognition because: a) the Tribe surrendered any right it had to regulate union organizing at its casino when it entered the Compact; b) federal law would preempt the TLRO if it were Tribal law and not an agreement between the State and Tribe; and, c) the TLRO is not a law at all, but an agreement with the State. The Tribe is not excused from complying with the MOA because it entered into another inconsistent agreement. *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 767 (1983)

The Arbitrator finds the Tribe must comply with the MOA signed by the parties on August 7, 2017. There are three reasons for this finding.

First, the Tribe agreed to the MOA, whose essential promises are Tribal neutrality in an organizing campaign and card check recognition, in return for the Union's support in the Tribe's efforts to have the legislature approve its compact with the State. The credible bargaining history is unequivocal. The testimony of Hitchcock, who was not at the negotiations, about what he "believed" was neither competent, nor credible. The Tribe's assertion that it was misled on labor relations matters through

naivete, ignores the experience of its negotiator – a lawyer who had previously

negotiated card check agreements with the Union. Nothing suggests the Tribe was

unaware that it was agreeing to permit the Union to organize its employees and gain

recognition through the card check process described in ¶7.

Second, the Tribe's contention that the purpose of the MOA is:

...to memorialize the tribe's promise to maintain neutrality while allowing
the union to organize in exchange for the union's support of ratification of
the compact. (Tr.II 8:5-8)

finds no support in the evidence, logic, or the MOA. Kline credibly testified that the

whole purpose of the negotiation was to get a card check agreement. That position is

logical because the Union could have most of what it negotiated in the MOA – without

supporting ratification of the Compact – if it sought certification through an election

under the TLRO.  Section 3-207 provides an opportunity for union that seeks

recognition through an election to create a bilateral contract with the Tribe, by agreeing

to certain non-onerous condition.[20] That contract requires the Tribe to provide a list of

eligible employees, access, resolve all issues through arbitration, and provide limited

neutrality.[21] Thus, it would be illogical for a Union to spend months negotiating a

---

[20] Not engage in strikes, picketing, boycotts, attack websites, or other
economic activity at or in relation to the tribal casino or related facility; and
refrain from engaging in strike-related picketing on Indian lands as defined in 25
U.S.C. § 2703(4);
b.      Not disparage the Tribe for purposes of organizing Eligible Employees;
c.      Not attempt to influence the outcome of a tribal government election; and
2.      Resolve all issues, including collective bargaining impasses, through the binding
dispute resolution mechanisms set forth in Section 3-213 herein.
[21] Tribe will not do any action nor make any statement that directly or indirectly states or implies any
opposition by the Tribe to the selection by such employees of a collective bargaining agent, or preference
for or opposition to any particular union as a bargaining agent. This includes refraining from making
derisive comments about unions; publishing or posting pamphlets, fliers, letters, posters, or any other
communication which could reasonably be interpreted as criticizing the union or advising Eligible
Employees to vote "no" against the union.

17

comprehensive MOA providing political support for the Tribe in order to receive so little in return.

Moreover, the Tribe's argument about the meaning of ¶2 is unconvincing for at least two reasons. First, the Tribe relies on an improbable analysis of the language of ¶2 of the MOA. The paragraph says the parties agree the TLRO "governs labor relations at the Casino" and they:

> establish the following procedure for the purpose of ensuring an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance to organize collectively …

Taken together, the Tribe says, the two phrases mean the Union agreed that it must follow the election procedure in the TLRO because that procedure is exclusive. That reading is implausible and inconsistent with the interpretation of other card check MOAs. All six card check MOAs in evidence assert their purpose is to ensure an orderly environment for employees to exercise their rights under the TLRO (or Ordinance). Graton goes further and makes the TLRO part of the MOA and says nothing will be done in derogation of it (Union Ex. F); Red Hawk says the TLRO is part of the MOA (Union Ex. I); Enterprise attaches the TLRO, saying it will be adopted. (Union Ex. K) None of these other tribes claimed incorporating or acknowledging the TLRO vitiates the card check process that is part of their MOA.

Additionally, the Tribe's interpretation of ¶2 makes the entirety of ¶7 surplusage. Canons of construction counsel avoiding an interpretation of one part of a contract that makes another part surplusage.

> " '[i]f possible, significance should be given to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose' " and " 'a construction making some words surplusage is to be avoided.' " [citation omitted] see Code Civ. Proc., § 1858 ["In the construction of a statute … where there are several provisions or particulars, such a

construction is, if possible, to be adopted as will give effect to all."].*Picayune Rancheria of Chukchansi Indians v. Brown*, 229 Cal. App. 4th 1416, 1428, (2014)

The Tribe's interpretation of ¶2 is implausible and unconvincing.

Third, the Tribe fails to show that the TLRO is a law it made as a sovereign that takes precedence over the MOA. The TLRO is in the Tribe's compact with the State that allows it to operate a casino with Class III gaming. In agreeing to that compact, the Tribe voluntarily gave up its right to legislate about labor relations. It explicitly agreed:

> The Gaming Activities authorized by this Compact may only commence after the Tribe has adopted an ordinance identical to the Tribal Labor Relations Ordinance attached hereto as Appendix C, and the Gaming Activities may only continue as long as the Tribe maintains the ordinance. The Tribe shall provide written notice to the State that it has adopted the ordinance, along with a copy of the ordinance, before commencing the Gaming Activities authorized by this Compact. (Compact, Section 12.10)

In passing the TLRO as an Ordinance, the Tribe created a framework in "Article 1" that explicitly recognizes the TLRO exists only because the Tribe ceded its power to regulate labor relations to the State:

> This Ordinance shall be narrowly construed to apply to Eligible Employees to the extent the Ordinance provisions are lawfully required by an effective tribal-state gaming compact between the Tribe and the State of California.

This framework allows the Tribe to attempt to repudiate any portion of the TLRO that is found to be beyond the State's power to require. It further demonstrates that passing the TLRO was not a sovereign act. As Dickstein, who negotiated the TLRO on behalf of the tribes, observed:

> it was called an ordinance …so the tribe could implement it, but the tribe was implementing it as really a part of the compact and the negotiation of the compact, … because it was an ordinance in form, in name, but it was actually negotiated pursuant to the compact… So it was not an ordinance like any other I'd ever seen. (Tr. 102:16-103:2)

The evidence shows that by passing the TLRO the Tribe was not engaging in a sovereign act but acting on a requirement of its compact with the State in which it had

19

agreed to give up its sovereign power legislate labor relations in return for a compact that permitted it to engage in Class III gaming in its casino.

The credible evidence shows that the Tribe agreed to the 2017 MOA with the Union. The MOA provide for, among other things, card check recognition of the Union as the exclusive collective bargaining representative the employees. In its compact with the State, the Tribe agreed to enact a specific TLRO as a condition of opening a casino with Class III gaming. In making that agreement, the Tribe ceded its sovereign right to control labor relations in the casino.  Consequently, enacting the TLRO in 2019 was not a sovereign act but a compact obligation to the State. Therefore, enacting the TLRO did not affect the Tribe's obligations under the MOA it negotiated with the Union.  The evidence shows the Union fulfilled its obligation to support legislative passage of the compact. It also shows the Tribe has not fulfilled its reciprocal obligation under ¶7 of the MOA. It has not appointed an arbitrator to review authorization cards and membership information, to decide the Union's claim to represent a majority of the employees. The Tribe is obliged to do so under the MOA.


**Award**


**The Tribe must comply with the MOA signed by the parties on August 7, 2017.**


**San Francisco, California**
**March 17, 2024**                                          **Norman Brand**