Exhibit 4

**ARBITRATION PROCEEDINGS**

|  |  |  |
|---|---|---|
| In the Matter of the | ) | Anthony Miller |
|   Arbitration Between | ) | Arbitrator |
|  | ) | 805/657-8794 |
|     UNITE HERE | ) |  |
|  | ) |  |
|        Union, | ) |  |
|  | ) |  |
|       And | ) | Award: Authorization Card Review |
|  | ) |  |
|     WILTON RANCHERIA | ) |  |
|  | ) | Date: April 28, 2025 |
|        Employer, | ) |  |
|  | ) |  |

**COUNSEL FOR THE PARTIES**

*For the Union*

Kristin L. Martin, Esq.
McCracken, Stemerman & Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612

*For the Employer*

Steven G. Biddle, Esq.
Melissa L. Shingles, Esq.
Littler Mendelson, P.C.
2425 E. Camelback Rd., Ste. 900
Phoenix, AZ 85016

1

INTRODUCTION

The parties, UNITE HERE (Union) and Wilton Rancheria (Employer), have selected the Arbitrator, Anthony Miller, to hear disputes and review authorization cards collected during the Union's campaign to organize the employees of the Sky River Casino in Elk Grove, California, and to ultimately gain recognition as the exclusive representative of those employees in collective bargaining. The Memorandum of Agreement between the parties has authorized me, as the Arbitrator, to "conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees." The parties have also agreed that, "If that review establishes that a majority of such Employees has designated the Union as their exclusive collective bargaining representative or joined the Union, the Tribe and the Operator will recognize the Union as such representative of such Employees."[1] Additionally, the parties have also agreed that I have the "authority to determine the arbitration procedures to be followed" and "to order the noncompliant party to comply with this Agreement." And, finally, the parties agreed "to comply with any order of the arbitrator, which shall be final and binding.[2]

Up to this point the resolution of the issues presented in this matter have been handled somewhat informally. There have been several informal discussions, and the parties have filed several preliminary briefs which I have carefully considered. In response to these briefs, I have issued preliminary awards, all of which are hereby incorporated into the present opinion and award. Most importantly, a hearing was conducted with a Reporters Transcript on March 14, 2025. At that time, I established basic procedures and rules for the review of the authorization

---

[1] Memorandum of Agreement, Paragraph 7.
[2] Id., Paragraph 11.

2

cards presented by the Union. In summary form, here are the provisions I established at that time. First, I stated that my primary allegiance was to the Memorandum of Agreement which does not make any express provision for a signature check[3] of the authorization cards presented by the Union. Second, I believed that the Union had agreed to participate in the signature check. Thirdly, the burden clearly falls on the Employer to provide signature templates that can be used in the signature check. Fourth, while time is of the essence in doing the review of the cards, the Employer had four additional weeks to provide signature templates to be used in the signature check. Fifth, while waiting for the signature templates, I would proceed with the preliminary counting of the authorization cards. Sixth, I would count the authorization cards twice, first, using only cards that had been dated withing the 12-month period ending with March 14, 2025 and, second, using all the cards that the Union presented to me. Seventh, both parties were allowed to file additional briefs. And, finally, in determining if there was a majority in favor of Union representation, I would use an employee list updated as of March 14, 2025

### RELEVANT PROVISION OF THE MEMORANDUM OF AGREEMENT

> 7. The Union is not presently recognized as the exclusive collective bargaining representative of the Employees. The Union may request recognition as the exclusive collective bargaining agent for such Employees. The arbitrator identified in Paragraph 1 1, or another person mutually agreed to by parties, will conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees. If that review establishes that a majority of such Employees has designated the Union as their exclusive collective bargaining representative or joined the Union, the Tribe and the Operator will recognize the Union as such representative of such Employees. The Tribe and the Operator will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this agreement. The parties agree that if any other person or entity petitions the National Labor Relations Board for any election as a result of or despite rec recognition of the Union

---

[3] In my original statement I used the term card check, but, as Ms. Martin helpfully pointed out, I was actually referring to the signature check which Mr. Biddle had proposed in the course of the hearing.

3

pursuant to this Paragraph, (a) the parties will each request that the NLRB dismiss the petition on grounds of recognition bar or, if they have agreed to a collective bargaining agreement covering Employees at the time the petition is filed, on grounds of contract bar, (b) if the petition is not dismissed, the parties shall agree to a full consent election agreement under Section 1 02.62(c) of the NLRB's Rules and Regulations, and (c) the parties shall at all times abide by the provisions of this Agreement except that the Union may file unfair labor practice charges. Except as provided above, the parties will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration under Paragraph 11 shall be the exclusive remedy.

      11. The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration. The Tribe's and the Union's representatives shall meet within fourteen (14) calendar days after the receipt of a panel of arbitrators from the Federal Mediation and Conciliation Service ("FMCS"). Selection of a sole and impartial arbitrator shall be made by the Tribe and the Union representatives each alternately striking, with Union making the first strike, one (1) name from a seven (7) member panel of arbitrators, received from the ("FMCS"), who are members of the National Academy of Arbitrators and who reside in California, Arizona, New Mexico or Nevada. The person whose name remains will be requested to serve as the impartial arbitrator. By mutual agreement, the parties may waive the use of the panel named above and refer the matter in dispute to an arbitrator selected from any other source. The arbitrator shall have the authority to determine the arbitration procedures to be followed. The arbitrator shall also have the authority to order the noncompliant party to comply with this Agreement. The parties hereto agree to comply with any order of the arbitrator, which shall be final and binding. The United States District Court for the Eastern District of California shall have exclusive jurisdiction in any action concerning arbitration under this Agreement. The parties consent to the entry of any order of the arbitrator as the order or judgment of the Court, without entry of findings of fact and conclusions of law.

DISCUSSION

*Materials Used*

The parties supplied me with the basic material to review the authorization cards. From the Employer, I received an Excel spreadsheet listing all of the employees in the bargaining unit as of March 14, 2025 and a PDF file containing documents with employee signatures. The list contained <u>658</u> employees. As to the file, I did not count the number of employee signature templates, but I know that there was no signature template supplied for a number of employees.

4

The Union supplied me with a PDF file containing the signed and dated employee authorization cards. The authorization cards came in two forms. One card states, "I authorize UNITE HERE to be my representative, and I will proudly become a member of UNITE HERE Local 49" [4] and the other, "I hereby authorize UNITE HERE International Union to represent me for the purposes of collective bargaining." It is my conclusion that both of these statements are adequate to establish the signer's intent to have the Union represent them in collective bargaining. The total number of Authorization Cards presented was 457.

*Non-Employees*

From the total number of cards, I excluded from the count 25 cards. Each of these cards was signed by an employee whose name did not appear on the March 14, 2025 list of employees provided by the Employer. Presumably, these cards were signed by former employees who left the company prior to March 14, 2025 and no longer worked for the Employer. I have accepted the Employer's implied representation that the March 14th list of employees was accurate, and, indeed, have no way to check its accuracy. At this time, I do not believe this issue is critical in light of the conclusions that I have reached in favor of the Union.

*Signature Check*

I have also excluded 12 cards because I could not verify the authenticity of them. Paragraph 7 of the Memorandum of Agreement clearly establishes that the Arbitrator selected under Paragraph 11 should review the authorization cards. The Employer has asserted that this review should include the process of matching the signature on the authorization cards to other examples of the employee's signature. At the March 14th hearing, I concluded that the Employer

---

[4] Some of these cards were printed in Chinese logographic script. The cards have not been translated, nor have they been challenged by the Employer. I have included those cards in my count.

5

had the burden of producing signature samples for purposes of comparison. At this time, it is my conclusion that, absent additional evidence of fraud or forgery, the Employer has the burden of proving via the samples that an authorization card is invalid.

Although I have no training in handwriting analysis, I did my (very time-consuming) best to compare the authorization cards to the samples. The employees on both the authorization cards and on the signature samples had widely differing views of what constituted a signature. There were signatures that were carefully written in cursive but others were printed. There were many signatures that appeared to be hastily written. There were "signatures" which amounted to just initials or what merely appeared to be symbolic or logographic. Signatures appear in the "print name" fields and printed names in the "signature" fields." Despite, these different approaches, the vast majority of signatures cards neatly matched the samples, and the rest, except for the twelve I have excluded from the count, were sufficiently similar so I did not question their authenticity.

*The One Year Count*

The Union has provided 356 employee signed authorization cards that were signed within the year preceding March 14, 2025. The Employer requested that the count be based upon this time frame. This number of cards constitutes 54.10% of the 658 employees on the March 14, 2025 list. This majority has designated the Union to represent them in collective bargaining, and the Memorandum of Agreement requires the Employer to recognize them as the exclusive representative of the employees.

*The Count of All Authorization Cards*

If all the authorization cards presented by the Union are counted, the total number of the employees authorizing the Union to represent them is 420 which constitutes 63.83% of the 658

Employees. The number 420 includes the 356 employees mentioned in the paragraph above and 64 authorization cards that were signed prior to March 14, 2024. I believe that none of these cards were signed before June of 2023.

The Employer has argued that this approach to counting runs counter to both the Tribal Labor Relations Ordinance (TLRO) and the practice of the National Labor Relations Board in dealing with card counts. I have already concluded that my jurisdiction is based upon the Memorandum of Agreement and my responsibility is to apply that agreement fairly. As to the NLRB practice the Employer states, "cards signed more than a year prior to the union's demand for recognition may be considered 'stale' and thus not count toward the union's majority." After review of the authority provided by the Employer, I am convinced that the operative word in this statement is "may." In the present case, where there has been protracted litigation of the issues presented, I have concluded that fairness to those employees who signed authorization cards early in the campaign demands that their authorization cards be considered. The Employer has rightfully taken advantage of various legal procedures and challenges to the right of the Union to represent the employees in collective bargaining based upon authorization cards. That is how it should be. But the delays that these procedures and challenges have caused should not now be used as a basis to disenfranchise employees from having their preference for Union representation and collective bargaining counted. It is my conclusion that both the "one year" count and the "all cards" count establish that a majority of the Employees have authorized Union representation in the collective bargain process.

## FINDINGS AND CONCLUSIONS

After careful consideration of the information and materials that were supplied to me, I have made the following findings of fact:

7

1. As of March 14, 2025, there were 658 employees in the bargaining unit that the Union seeks to represent.

2. As of March 14, 2025, employees had signed 457 cards authorizing the Union to represent the bargaining unit employees in collective bargaining.

3. 25 of the authorization cards were excluded from the overall count because the names of the employees who signed the cards were not on the list of the employees as of March 14, 2025.

4. 12 of the authorization cards were excluded because they did not sufficiently match what I considered valid samples provided by the Employer.

5. There was a total of 356 employee authorization cards signed by employees in the year prior to March 14, 2025. This number of cards constitutes 54.10% of the 658 employees on the March 14, 2025 list of employees.

6. There was a total of 420 employee authorization cards signed by the employees during the course of the entire period in which the Union conducted its organizational campaign. This number of cards constitutes 63.83% of the 658 employees on the March 14, 2025 list of employees.

It is my conclusion, using either of the time frames discussed above, that a majority of employees in the bargaining unit have "designated the Union as their exclusive collective bargaining representative" and that the Memorandum of Agreement requires the Employer to "recognize the Union as such representative of such Employees" and to engage in collective bargaining. Additionally, I am convinced that the Memorandum of Agreement gives me the power to order compliance with the results of this process; Paragraph 11 clearly states that "the arbitrator shall also have the authority to order the noncompliant party to comply with this

Agreement." I have not chosen to do so simply because at this time no one is technically "noncompliant." And, it is my sincere hope based upon the conclusions I have reached, that the Employer will recognize the Union and the process of collective bargaining will begin. Nevertheless, I hereby retain jurisdiction to resolve any issues that arise as a result of the conclusions that I have reached and to issue appropriate orders if the need arises.

Dated: April 28, 2025

_____
Anthony Miller
Arbitrator