Exhibit 5

# IN ARBITRATION PROCEEDING BEFORE

# ANTHONY MILLER, ARBITRATOR

| | |
|---|---|
| **UNITE HERE**<br><br>and<br><br>**WILTON RANCHERIA** | **WILTON RANCHERIA'S ARBITRATION POST-HEARING BRIEF** |

Wilton Rancheria ("Wilton" or the "Tribe") respectfully submits this Post-Hearing Brief regarding the arbitration hearing held on March 14, 2025.

## I.   INTRODUCTION

For multiple reasons, issuing a final award, or even an interim determination regarding the Union's status at Sky River Casino ("Sky River" or "Casino"), is premature. Most fundamentally, the position that the Union presses here—that the MOA takes precedence over an affirmatively ratified Tribal Law—would undermine the paramount principle of Tribal Sovereignty. Starting with first principles, Wilton Rancheria is a federally recognized, sovereign Indian Nation with its own Constitution and a Sovereign Tribal Government made up of executive, legislative, and judicial branches. The Tribe, just like all similarly-situated Tribal Nations, is a Sovereign Tribal Nation governed by its own laws recognized and protected by United States federal law and court decisions.

Congress recognized the core principle of Tribal Sovereignty when it passed the Indian Gaming Regulatory Act ("IGRA") in 1988, and federal courts have echoed that recognition consistently, both before and after IGRA. It is critical that this arbitration recognizes, respects, and preserves the sovereignty of the Tribe and ensures that the laws of this Tribal Sovereign Nation

are not made subordinate to a private Agreement between Tribal and non-tribal, non-governmental, or non-sovereign entities.

Beyond that fundamental principle, proceeding directly to determining the Union's status would frustrate the August 7, 2024, Order of the Federal Court that referred this matter to arbitration. That Order made clear that the Tribe remains empowered to challenge the legitimacy and enforceability of the underlying contract—the Memorandum of Agreement ("MOA"). But proceeding directly to determining the Union's status under the card check procedure ostensibly permitted under the MOA would extinguish the Tribe's challenge before the Tribe receives a fair chance to present it. That outcome comports with neither due process nor the Federal Court's August 7 Order.

For these reasons, fleshed out below, the Union's status under the MOA's card check procedure is not yet ripe for determination. Instead, the Arbitrator should order additional, preliminary proceedings to hear and determine the Tribe's challenge to the MOA—a challenge rooted in the fundamental principle of Tribal Sovereignty and actions of a Tribal Sovereign Government.

If, instead, the Arbitrator opts to indulge the Union's plea to undercut the Tribe's sovereignty and disregard the Tribe's challenge to the MOA, the Arbitrator should limit his count. Specifically, he should exclude any cards signed more than a year before March 14, 2025, and all cards signed by individuals who were no longer employed by the Casino on that date.

## II. RELEVANT BACKGROUND

### A. IGRA Establishes a Comprehensive Framework for Regulating Tribal Nations' Casinos and that Framework is Rooted in Congress's Recognition of Tribes as Sovereign Entities.

Congress passed IGRA to regulate tribal casinos through a framework that recognizes the sovereignty of both Tribal Nations and the states that surround them. Congress required the Tribal

2

Nations and States to enter into compacts—effectively treaties—that the Secretary of the Interior ultimately reviews and approves. 25 U.S.C. § 2710(d)(8). These Tribal–State compacts may address subjects that are directly related to the operation of gaming activities, including labor relations. *See Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 699 (9th Cir. 2022). Through this system of cooperative federalism, three separate sovereigns (Tribal Nations, the federal government, and the states) each play a role in working together to establish the rules under which tribal casinos will operate.

Notably, the IGRA framework empowers only those sovereigns. It neither empowers nor authorizes private entities like corporations or unions to play any role in establishing the rules applicable to tribal casinos. And IGRA certainly does not empower those private actors to trench on tribal sovereignty by undermining the compacts negotiated by state and tribal sovereigns.

### B. The Compact Between the Tribe and the State of California Requires the Tribe to Adopt a Tribal Labor Relations Ordinance and that Ordinance Provides for Secret Ballot Elections.

As a result of IGRA, the State of California and dozens of Tribal Nations entered into Tribal–State Compacts to authorize regulated Tribal Gaming. Although not all of the California Compacts are the same, for any Tribal Nation with 250 or more persons employed in their gaming facility, the Compacts include a model Tribal Labor Relations Ordinance that the Tribal Nations are requested to adopt. . Again, although not identical, the model TLRO addresses organizational and representational rights of the employees and grants unions access to eligible employees to discuss organization.[1]

---

[1] Tribal Alliance of Sovereign Indian Nations, Labor Relations Policy Issues, accessible at (https://www.tasin.org/policy-issues/labor-relations#:~:text=The%20Compact%20required%20tribal%20governments,discuss%20organization%20and%20representation%20issues.)

3

Consistent with its government-to-government Tribal–State Compact, Wilton passed the Tribal Labor Relations Ordinance of 2019, 7 WRC § 3-101, et seq. (enacted April 18, 2019) ("TLRO"). In Section 2-310, the TLRO provides, in part, "[d]ated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer **will result** in a secret ballot election." (emphasis added). The TLRO, which is a Tribal statute, contains no exception for any previously signed MOA.

### C. The Union Sought to Organize Employees Using a Card Check Procedure Under a MOA that Predates the TLRO.

Before the Tribe passed its statute governing labor relations at the Casino, it had negotiated and entered the MOA with the Union and the Casino operator, Boyd Gaming. In paragraph 2, the MOA expressly adopted the not-then-enacted TLRO into the MOA:

> The parties agree that the **Tribal Labor Relations Ordinance governs labor relations at the Casino**, and to hereby establish the following procedure for the purpose of ensuring an orderly environment **for Employees to exercise their rights under the Tribal Relations Ordinance to organize collectively**, should employees choose to do so, and to avoid picketing and/or other economic action directed at the Tribe in the event the Union decides to conduct an organizing campaign among the Employees.

(emphasis added) Yet, and contrary to the TLRO, the MOA also contemplates a card check procedure, whereby collecting authorization cards from more than 50% of eligible employees would lead to union recognition.

Even though the TLRO provided for recognition only after a secret ballot election, the Union demanded recognition under the card check procedure. Unsurprisingly, this tactic led to a dispute. Because the Union sought to end-run the Tribe's affirmatively ratified Tribal Law—and thus sought to undermine the Tribe's sovereignty—the Tribe objected to the Union's efforts. That objection yielded an arbitration and a federal lawsuit.

4

In late 2023 and early 2024, the Parties participated in an arbitration with Arbitrator Norman Brand. Arbitrator Brand determined the MOA had an enforceable arbitration provision and the Parties were required to arbitrate the card count and other outstanding issues. But before Arbitrator Brand reached that issue, the Union filed a lawsuit in Federal District Court seeking to compel the Tribe to arbitrate the dispute over the card check procedure. On August 7, 2024, the Federal Court ordered the Parties to arbitrate their disputes regarding the MOA, including the extent to which the MOA or TLRO controls the Union's organization process. The Court specifically held the Tribe could challenge "the agreement [MOA] as a whole" and assert the TLRO as "a defense to enforcement" of the MOA in the instant arbitration. Accordingly, the Parties are before this Arbitrator to have him resolve the remaining issues between them.

Wilton and the Union participated in an arbitration hearing before this Arbitrator on Friday, March 14, 2025. The narrow issue covered in the hearing related to the Arbitrator's decision to count the union authorization cards signed by Sky River employees.

### III.   ARGUMENT

####     A.   This Arbitration is Not Limited to the Narrow Issue Currently Under Consideration and the Tribe's Challenge to the MOA is an Issue that Logically Must be Resolved First.

The District Court's August 7 Order directed the Arbitrator to rule on multiple issues. Although the issues for arbitration include reviewing and counting the cards collected by the Union, that is not the only issue for resolution in this proceeding.

From the outset, the Tribe has challenged the validity of the MOA. The Court recognized that challenge and concluded that it must be decided in this arbitration.

Determining the validity of the MOA and whether that MOA can supersede the TLRO, a Tribal Sovereign Law, is logically necessary prior to any counting of cards. After all, if the Tribe's challenge to the MOA succeeds, the card check process cannot apply and counting of cards will

5

be necessary only to determine whether the Union can surpass the 30% threshold necessary to trigger a secret ballot election under the TLRO. Accordingly, the Tribe's challenge to the MOA's validity must be resolved first.

Resolving that challenge will require the Arbitrator to address issues including, but not limited to: (1) whether this Arbitrator has the authority to conduct the card check process outlined in the MOA in disregard of the TLRO's requirement to have a secret ballot election; (2) the extent to which the TLRO or MOA govern, or the proper order in which the MOA and TLRO govern if both are appropriately considered; and (3) whether the authorization cards are still valid and, if they are only valid in part, what is the appropriate cutoff date. The Tribe maintains that it has not had a full and fair opportunity to present its case and the Arbitrator has not fully and fairly considered and decided these issues, including by inappropriately deciding that the card count provision in the MOA supersedes the mandated secret ballot election in the TLRO – that paragraph 2 of the MOA recognizes as controlling – and by not holding a comprehensive hearing.

### B. The Arbitrator Must Follow Tribal Law (the TLRO) and Not a Private Contract (the MOA) and Refrain from Conducting a Card Count.

Again, Wilton Rancheria is a federally recognized, Sovereign Indian Nation. Its Constitution and associated Tribal Laws authorize its Legislative Branch, the seven-member Tribal Council, to propose and pass Tribal laws. Its Constitution and Laws further authorize the Tribe's Executive Branch—the Chairperson—to either affirm a Tribal Council's action, thereby ratifying it as Tribal Law, or veto a Tribal Council action, thus defeating it. Here, the Tribal Council passed the TLRO and the Chairperson signed that legislation into law. The TLRO is an exercise of the Tribe's Sovereign power.

Although the National Labor Relations Act ("NLRA") governs, and the National Labor Relations Board ("NLRB") has jurisdiction over labor issues on Tribal land, the Parties

nevertheless agreed to a third-party procedure to check the cards, but simply to confirm whether the 30% threshold to trigger a secret ballot election is met as outlined in the TLRO. That procedure can be accomplished by using the card check provision in the MOA to count the cards, which will then trigger the secret ballot election under the TLRO that the Parties explicitly referenced in the MOA and to which they plainly intended to provide some deference. Otherwise, there is no reason for its inclusion in the MOA. This procedure is also consistent with the secret ballot election procedure referred to in the NLRA. Therefore, the MOA provides the framework to complete the gateway issue of whether an election is necessary before the MOA defers to the TLRO's secret ballot procedures.

At its core, IGRA reflects a compromise solution to the difficult problem involving tribal gaming and came into existence to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." *Artichoke Joe's v. Norton,* 216 F.Supp.2d 1084, 1092 (E.D. Cal. 2002) (alteration in original). Thus, IGRA provides an example of "cooperative federalism that seeks to balance the competing sovereign interests of the federal government, state government and Indian tribes, by giving each a role of the regulatory scheme." *Id.*

When interpretating laws that implicate the balancing of these competing sovereign interests, courts have developed and relied on "well-established canons of statutory construction" in determining issues of Indian affairs. Courts have consistently applied the principle that statutes passed for the benefit of Indian tribes and communities are to be "liberally construed in favor of the Indians, and any doubt as to the statute's proper construction is to be resolved in their favor." *Coyote Valley Band of Pomo Indians v. United States,* 639 F. Supp. 165, 170 (E.D. Cal. 1986); *see also Bryan v. Itasca County,* 426 U.S. 373, 392 (1976). Moreover, courts have routinely been

7

guided by the principle that "treaties and agreements are to be construed as the Indians would have understood them, and tribal … sovereignty [is] preserved unless Congress's intent to the contrary is clear and unambiguous." *Crow Tribe of Indians v. Repsis*, No. 1:92-CV-01002-ABJ, 2024 WL 1478580, at *8 (D. Wyo. Mar. 28, 2024) (quoting Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 2.02, at 113–14).

As mentioned, it is incumbent upon the Arbitrator to hear and resolve multiple issues related to the TLRO and MOA prior to a card count. These issues include: (1) if both the TLRO and MOA govern, to what extent does each apply; (2) if the TLRO at least partially applies, what is the basis for such application; (3) whether a private agreement (MOA) can take precedence over either Tribal Law (the TLRO) and the Compact between this Sovereign Tribe and the State of California; (4) the effect of paragraph 2 of the MOA that provides for the TLRO to govern labor relations at the Casino; and (5) the resulting remedy if the Arbitrator elects to utilize paragraph 16 of the MOA that gives the Arbitrator the ability to formulate a substitute provision for a provision invalidated by applicable legislation.

The District Court's August 7, 2024, Order authorized Wilton to present the TLRO to the Arbitrator as "challenge to the agreement as a whole" or as "a defense to enforcement" of the MOA. That authorization raises the question of whether the MOA controls certain aspects of the Union's organization efforts, but the TLRO nonetheless remains binding on other aspects. Answering that question demands a specific factual and legal analysis that Arbitrator Brand did not conduct and that Wilton believes has not been undertaken by the Arbitrator here. Wilton has thus far been denied in its request that this Arbitrator hold a hearing to allow the Tribe an opportunity to present its case that the TLRO's union-organizing procedures apply rather than those of the MOA, a decision the Court stated is for this Arbitrator to decide.

As further explained below, if anything, the Arbitration should resort to the MOA's card count language only to confirm that at least 30% of the employees of the Casino expressed interest in exploring unionization, which would serve as the gateway to authorizing a secret ballot election under the TLRO. Allowing the Union to represent the employees based only on a card count would give precedence to the MOA, a private contract between a non-sovereign entity and a Tribal Sovereign Government, over sovereign Tribal Law (the TLRO). That approach contradicts the foundational principles of Wilton's status as a Sovereign Government and is inconsistent with longstanding canons of statutory construction. Further, that approach would subvert Congressional intent and the superseding Tribal–State Compact between Wilton and the State of California—a Compact directed and approved by the federal government. Put differently, the TLRO itself derives from the Compact, which derives from IGRA, so the TLRO, rather than the MOA, must control. Further, the TLRO must be construed in favor of the Tribe to preserve Tribal Sovereignty, as directed by the Supreme Court, the Ninth Circuit, and federal district courts in California. In other words, the TLRO is the "law of the land" unless the sovereign says otherwise.

      **C.    Secret Ballot Elections Are the Preferred Means for Determining Union Majority Status.**

Beyond the plain fact that the TLRO mandates a secret ballot election, such an election—and not a card count—is the preferred means of gauging employee sentiment regarding union representation. Specifically, card counts lack the employee protections of a secret ballot election. An election helps insulate employees from coercion and threats. An election also allows employees to express a preliminary showing of interest and nonetheless privately exercise their free choice regarding representation. Here, fundamental fairness demands that the employees be given the right to have a secret ballot election to decide whether to be represented by the Union.

9

Indeed, for more than five decades, the Supreme Court has recognized that secret-ballot elections are preferred by federal labor law over card checks. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 602 (1969) ("secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has a majority support"); *see also Brooks v. NLRB*, 348 U.S. 96, 99 (1954) ("an election is a solemn and costly occasion, conducted under safeguards to voluntary choice"). The NLRB has more recently reiterated federal labor law's preference for secret ballot elections over card checks. *See Levitz Furniture Co.*, 333 NLRB 717 (2001) (an employer's unilateral determination as to employee support or opposition to union representation is disfavored); *Underground Serv. Alert*, 315 NLRB 958, 960–61 (1994) (same). Any decision to replace or preempt employee free choice should be reserved for extreme circumstances (if ever).

Here, Section 3-210(A) of the TLRO requiring secret ballot elections was central to the negotiations of the Tribal–State Compact. Indeed, the MOA explicitly references and recognizes that the TLRO governs labor relations, showing the Parties intended to incorporate and defer to the TLRO. Otherwise, there would not be any reference to the TLRO at all. Deferring entirely to a card count to determine certification of a union would render the reference to the TLRO entirely meaningless and ignore why it was included at all. As such, the TLRO, rather than the MOA, ultimately governs labor relations and the process for a secret ballot election for union organization and should be construed in accordance with longstanding canons of construction regarding Tribal affairs.

Proceeding with the card count to determine whether the Union should represent the employees also would contravene historical principles of Tribal Sovereignty, and thereby fail to credit the superseding TLRO and its provision for a secret ballot election. Accordingly, if the

10

Arbitrator chooses that path, the Tribe requests that the Arbitrator provide a reasoned, legally supported ruling explaining the bases for departing from these well-established legal principles and explaining why the TLRO does not apply and why the employees should be stripped of their fundamental right to a secret ballot election. Instead, a rational reading of the TLRO and MOA together provides a procedure under which arbitrator oversight is sought to complete a card count and establish or disprove the requisite 30% showing of interest needed to trigger a representation election, conducted under the TLRO's provisions for a secret ballot election. Given the inclusion of both in the MOA and the various procedures provided by the MOA and the TLRO, this solution gives appropriate weight to all language included in the MOA without entirely removing the references to the TLRO, while protecting Wilton's Tribal Sovereignty guaranteed by the federal government in IGRA. Moreover, it also protects the employees' free choice to select or decline union representation.

> **D.    If the Arbitrator Decides to Conduct the Card Count, He Should Consider Only Those Cards Signed Within the Past Year and Compare Employee Signatures.**

If the Arbitrator decides to utilize a card count, either to justify an election under the TLRO or to replace an election (in contradiction with the TLRO and disregarding IGRA and Tribal Sovereignty), the issue of which cards are active remains. Pursuant to Section 3-210(A) of the 2019 TLRO, "[d]ated and signed authorization cards from thirty (30%) or more of the eligible employees within the bargaining unit verified by the elections officer will result in a secret ballot election." An "eligible employee" is defined as "any person who *is* employed within a tribal casino in which Class III gaming is conducted pursuant to a tribal-state compact or other related facility, the only significant purpose of which is to facilitate patronage of the Class III gaming operations." 7 WRC § 3-202(A) (emphasis added). The use of the present tense in the TLRO's definition of

"eligible employees" contemplates that only authorization cards of presently employed employees be verified to trigger a secret ballot election.

Moreover, even if the Arbitrator maintains his decision to go forward with the card count to replace an election, NLRB precedent requires that the cards counted be limited to those received within a reasonable time of their verification. By the Union's own admission, some of the cards presented by the Union are several months, and even more than a year, old and may not accurately reflect the current sentiments of the employees. Indeed, both the staleness of some cards and the high employee turnover rate raise doubt about whether cards signed in the past 12 months correctly indicate employees' current sentiment regarding union representation.

The Union sought to have the Arbitrator count cards signed by employees well beyond the previous one-year period. At the hearing, the Union explicitly requested that the Arbitrator:

> [L]ook at the cards that had those March dates on them or March for – March going forward, excuse me. And if the union has a majority among folks who signed cards in the past 12 months, that's one question. If the union doesn't have majority among folks who signed cards in the past 12 months, please look at the cards dated prior to March of 2024.

Arbitration Hearing Transcript ("Tr.") 32:20-33:2. The Arbitrator determined at the hearing that he would "do the card count twice. The first will be using the cards from the last 12 months. The second time will be using all the cards." Tr. 89:17-20. The Arbitrator further stated that, following the counts, he "will address the issue of which one of those is appropriate to use." Tr. 89:20-22.

The Tribe's position is that cards signed earlier than one year ago should not be counted or considered at all. This position is supported by NLRB precedent. In general, when considering a union's demand for recognition, the NLRB will only review cards signed by employees within a "reasonable time" prior to their submission, normally set at one year. *See, e.g., Sertafilm, Atlas Microfilming Div.*, 267 NLRB 682 (1983), *enforced*, 753 F.2d 313, 118 LRRM 2628 (3d Cir. 1985)

12

(cards signed more than a year prior to the union's demand for recognition may be considered "stale" and thus not count toward the union's majority); *Blade-Tribune Publ'g Co.*, 161 NLRB 1512 (1966). *See also Audubon Reg'l Med. Ctr.,* 331 NLRB 374 (2000) (one-year time period is considered a reasonable time to consider signed cards).

As Josh Yeltman, the Casino's Vice President of Human Resources, testified at the March 14 hearing, employee turnover since the opening of the Casino has been significant. The turnover rate is about 4% per month or 48% annually. (Tr. 40:23-40:25; 41:1-4) This, of course, also affects whether the signed cards accurately reflect Casino employees' current sentiments. Consequently, if the Arbitrator decides to count the cards presented by the Union, he should only rely on cards signed by *current* employees within the *one* year preceding March 14, 2025. Given this turnover and the overarching concerns regarding erosion of the Tribe's sovereignty by this tribunal, it would be more equitable and, indeed, consistent with the Tribe's laws, for the Arbitrator to use a card check to determine simply whether an election is warranted rather than to replace a secret ballot election outright.

**E.     The Arbitrator Should Compare Card Signatures to Those on Signed Employee Documents.**

Leading up to the March 14 hearing, a final key concern held by the Tribe was the lack of an agreed-upon process for ensuring the cards' authenticity. Typically, the signatures on cards are compared to the employees' signatures on other documents. As Wilton has argued throughout this arbitration, and as Mr. Yeltman testified at the hearing, gathering signatures from all employees is a burdensome, time consuming, and labor-intensive task. (Tr. 51:19-51:25; 52:1-52:24) Based on the logistical challenges involved in collecting such documents, the Arbitrator rightly ruled during the hearing that the Tribe may provide employee signatures from other sources by April 11, 2025,

13

that he will then compare to the signatures on the relevant and valid cards to ensure their authenticity.

### III.  CONCLUSION

Wilton Rancheria requests that the Arbitrator consider this matter within the context of the long and complex history between the United States and Tribal Nations. Courts have recognized and respected this history through the development and refinement of longstanding legal principles necessary to ensure that the rights and sovereignty of both nations are recognized and maintained. The TLRO at issue in this matter is the result of one of the legal compromises reached between the State of California and Wilton, a Sovereign Tribal Nation, and must be construed in accordance with the principles of cooperative federalism. This history and established procedure for protecting Tribal Nations should not be cast aside in favor of a simple contract that includes two non-sovereign entities, especially where that contract explicitly references and defers to the TLRO to protect the Tribe's sovereignty. Consequently, and based on the foregoing arguments, the March 14 hearing, and the Tribe's prior submissions, the Tribe once again requests that the Arbitrator consider the direction given by the Federal Court in its August 7 Order that does not require that he count the cards produced by the Union to determine whether the employees will be represented by the Union and, instead, reconsider the Tribe's arguments on the issues outlined herein before making his final decision.

Respectfully submitted this 4th day of April 2025.

/s/ Steven G. Biddle
LITTLER MENDELSON, P.C.
Steven G. Biddle
2425 East Camelback Road, Suite 900
Phoenix, AZ 85016
Sbiddle@littler.com
*Attorneys for Wilton Rancheria*

## **CERTIFICATE OF SERVICE**

I certify that Wilton Rancheria's Post-Hearing Brief was served via email on April 4, 2025, to the following:

Anthony Miller, Arbitrator
Anthony.Miller@pepperdine.edu

Kristin L. Martin
McCracken, Stemerman & Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612
klm@msh.law

*/s/ Tisha A. Davis*
4901-8367-9538.1 / 124796.1001

15