Exhibit 6

## ARBITRATION PROCEEDINGS

| | | |
|---|---|---|
| In the Matter of the<br>Arbitration Between | ) <br> ) <br> ) | Anthony Miller<br>Arbitrator<br>805/657-8794 |
| UNITE HERE | ) <br> ) | |
| Union, | ) <br> ) | |
| And | ) <br> ) | Award: Orders |
| WILTON RANCHERIA | ) <br> ) | |
| Employer, | ) <br> ) <br> ) | Date: June 17, 2025 |

**COUNSEL FOR THE PARTIES**

*For the Union*

Kristin L. Martin
McCracken, Stemerman & Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612

*For the Company*

Steven G. Biddle, Esq.
Melissa L. Shingles, Esq.
Littler Mendelson, P.C.
2425 E. Camelback Rd., Ste. 900
Phoenix, AZ 85016

1

#### INTRODUCTION

In my previous Award, dated April 28, 2025, I concluded that "a majority of Employees in the bargaining unit have 'designated the Union as their exclusive collective bargaining representative' and that the Memorandum of Agreement requires the Employer to 'recognize the Union as such representative of such Employees' and to engage in collective bargaining." As part of that Award, I retained my jurisdiction in this matter to "resolve any issues that arise as a result of the conclusions that I have reached and to issue appropriate orders if the need arises." Both parties, UNITE HERE (Union) and Wilton Rancheria (Employer), have submitted responses to my decision.

As part of its submission, the Union has presented documents which indicated that, although they have requested recognition and the start of collective bargaining, neither has taken place. As a result, the Union has made three requests in its response:

1. Order the Tribe, and its Operator Boyd Gaming, to commence "negotiations for a collective bargaining agreement . . . immediately and conducted diligently and in good faith to the end of reaching agreement expeditiously."

2. Release the Union from its obligation to comply with Paragraph 9 of the agreement until the Tribe and its Operator commence negotiations.

3. Order the Tribe to restore the Union's access to the Casino in accordance with Paragraph 5 of the Agreement.

In its response, the Employer has requested the opportunity to exam the authorization cards signed by the employees and to compare the signatures of the employees to the signatures on the authorization cards. The Employer has also opposed each of the requests for orders made by the Union. In addition, the Employer has also reiterated its argument that the Tribal Labor Relations Ordinance (TLRO) rather than the Memorandum between the parties controls this matter and requested that I present a reasoned explanation as to why the TLRO does not apply.

2

**RELEVANT PROVISIONS OF THE MEMORANDUM OF AGREEMENT**

5. If the Union provides written notice to the Tribe or the Operator of its intent to organize Employees covered by this Agreement, the Tribe and the Operator shall provide access to its premises and to such Employees by the Union. The Union may engage in organizing efforts in nonpublic areas of the Casino during employees' non-working times (before work, after work, and during meals and breaks) and/or during such other periods as the parties may mutually agree upon. "Organizing" includes communicating with Employees before and after recognition of the Union as provided in Paragraph 7.

7. The Union is not presently recognized as the exclusive collective bargaining representative of the Employees. The Union may request recognition as the exclusive collective bargaining agent for such Employees. The arbitrator identified in Paragraph 11, or another person mutually agreed to by parties, will conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees. If that review establishes that a majority of such Employees has designated the Union as their exclusive collective bargaining representative or joined the Union, the Tribe and the Operator will recognize the Union as such representative of such Employees. The Tribe and the Operator will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this agreement. The parties agree that if any other person or entity petitions the National Labor Relations Board for any election as a result of or despite recognition of the Union pursuant to this Paragraph, (a) the parties will each request that the NLRB dismiss the petition on grounds of recognition bar or, if they have agreed to a collective bargaining agreement covering Employees at the time the petition is filed, on grounds of contract bar, (b) if the petition is not dismissed, the parties shall agree to a full consent election agreement under Section 1 02.62(c) of the NLRB's Rules and Regulations, and (c) the parties shall at all times abide by the provisions of this Agreement except that the Union may file unfair labor practice charges. Except as provided above, the parties will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration under Paragraph 11 shall be the exclusive remedy.

9. During the term of this Agreement, the Union will not engage in any strike, picketing or other adverse economic or public relations' activity at, or in connection with, the Casino, and the Tribe and the Operator will not engage in a lockout of the Employees. Notwithstanding the termination provision above, if the Tribe or the Operator recognizes any union besides Union as the exclusive collective bargaining representative of Employees, or any of them, this paragraph shall terminate immediately and without notice.

11. The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration. The Tribe's and the Union's representatives shall meet within fourteen (14) calendar days after the receipt of a panel of arbitrators from the Federal Mediation and Conciliation Service ("FMCS"). Selection of a sole and impartial arbitrator shall be made by the Tribe and the Union representatives each alternately striking, with Union making the first strike, one (1) name from a seven (7) member panel of arbitrators, received from the ("FMCS"), who are members of the National Academy of Arbitrators and who reside in California, Arizona, New Mexico or Nevada. The person whose name remains will be requested to serve as the impartial arbitrator. By mutual agreement, the parties may waive the use of the panel

3

named above and refer the matter in dispute to an arbitrator selected from any other source. The arbitrator shall have the authority to determine the arbitration procedures to be followed. The arbitrator shall also have the authority to order the noncompliant party to comply with this Agreement. The parties hereto agree to comply with any order of the arbitrator, which shall be final and binding. The United States District Court for the Eastern District of California shall have exclusive jurisdiction in any action concerning arbitration under this Agreement. The parties consent to the entry of any order of the arbitrator as the order or judgment of the Court, without entry of findings of fact and conclusions of law.

## DISCUSSION

*Employer Access to Authorization Cards*

While the Union's request for orders lies at the heart of the present state of this dispute, I believe that the Employer's request to exam the authorization cards signed by the employees deserves to be discussed as a preliminary matter.  On this issue, the Employer has argued that that the validity and authenticity of some of the cards remains a question.  The Employer refers to my admission that I have no training in handwriting analysis and that there were differences as to what amounted to a signature.  The Employer also points out that there are situations in which the National Labor Relations Board will authorize a representative of the Employer to review authorization cards.  And, to give weight to the position of the Employer, I recognize that this is a situation in which authorization cards are being used to support an order to recognize the Union and to begin the negotiation process leading up to a collective bargaining agreement, and this situation is different from the use of authorization to justify an election.

Nevertheless, as the Arbitrator selected under Paragraph 11 of the Memorandum of Agreement, it is that Agreement which serves as the ultimate guide to my decisions.  Here, Paragraph 7 expressly states that the Arbitrator "identified in Paragraph 11, or another person mutually agreed to by parties, will conduct a review of Employees' authorization cards and membership information submitted by the Union."  The Agreement does not recognize anyone else to review the authorization cards, and there is certainly no authorization for the Employer to

review the cards.  And, I am unwilling to read that authorization into this agreement, especially in light of the sound public policy in protecting the employees from the possibility of retaliation based upon the exercise of their rights "to form, join, or assist labor organizations, to bargain collectively . . . ."[1]  I have seen no evidence of retaliation on the part of the Employer, and, indeed, in this case, the Employer has merely suggested Counsel for the Employer as the person who would inspect the authorization cards, someone that I would trust to isolate individuals from retaliation.  However, the problem here is more than just protection of employees from retaliation; rather the goal in this situation is to protect the employees from the fear or the perception, real or imagined, of possible retaliation.

    While the Employer does acknowledge that the National Labor Relations Board "has long recognized that employees may be discouraged from signing union authorization cards if they knew the employer could see who signed the cards," the Employer asserts that this protection is not absolute and in some circumstances a balancing test is appropriate based upon three criteria: "(1) the request must be relevant to the proceeding; (2) the request must not be made for an illegal objective; and (3) the discovering party's interest in obtaining protected information must outweigh the employee's confidentiality interest under Section 7 of the Act."[2] The case sighted for this position is not an authorization card case, and its application to the present case is dubious.  Moreover, the application of this three-prong test does nothing to help the Employer's case: the interest of the Employer here is the same as every employer has in an authorization case, to see if the count is accurate.   If that interest were sufficient to outweigh the

---

[1] National Labor Relations Act, 29 U.S.C. § 157.  Rights which appear to me to be embodied as well in the Memorandum of Agreement.
[2] Employer's Supplemental Post-Hearing Brief At. 4.

5

confidentiality interest of the employees, it would mean simply that the employees have no confidentially.  Clearly the interest of the employees outweighs that of the Employer.

In addition, in regard to this challenge to the authorization card count, it must be remembered that the Employer has agreed to the MOA, to a particular set of procedures for the authorization card count, to having a neutral Arbitrator count the authorization cards, to having this particular Arbitrator act as a neutral third party to review the cards; and, at no time prior to the result in this authorization card count, did the Employer suggest that the cards should be examined by a representative of the Employer. The result, in the end, is simply that the Employer's request to review the authorization cards is denied.

*Order to Recognize and Negotiate*

As mentioned above, the Union has requested that I "order the Tribe, and its Operator Boyd Gaming, to commence 'negotiations for a collective bargaining agreement . . . immediately and conducted diligently and in good faith to the end of reaching agreement expeditiously.'"  In my Award of April 28, 2025 regarding the "Authorization Card Review," I concluded that a majority of employees in the bargaining unit have "designated the Union as their exclusive collective bargaining representative" and that the Memorandum of Agreement requires the Employer to "recognize the Union as such representative of such Employees" and to engage in "collective bargaining."  In that award, I recognized that Paragraph 11 of the Memorandum of Agreement between the parties gave me the authority "to order compliance with the results of this process."  At that time, I did not issue any orders, partially because of my, perhaps naïve, hope that the parties would enter into negotiations without such an order and, more importantly, because neither party was at that point "noncompliant" as required by Paragraph 11.

6

The Union has presented documentary evidence that the Union requested recognition and the commencement of collective bargaining. On August 28, 2025, Aamir Deen, the president of Local 49 requested in an email that negotiation "commence immediately." In an email response on May 2, 2025, Christina Kazhe, the attorney general for the Employer, stated that the Employer believes the Union's requests was premature. At this time, it is clear that an order to recognize the Union and to begin the negotiations process is appropriate.

*Release from Paragraph 9*

The Union has also requested an order releasing the Union from "its obligation to comply with Paragraph 9 of the agreement until the Tribe and its Operator commence negotiations." Paragraph 9 of the Memorandum of Agreement prohibits the Union from engaging in strikes, picketing, or "other adverse economic or public relations' activity." The Union argues, not that there is any express provision of the Memorandum of Agreement which authorizes the arbitrator to negate the express language of Paragraph 9, but rather that the Arbitrator has the inherent power to formulate a remedy for a violation of the Memorandum of Agreement. Since the Employer has violated Paragraph 7, requiring recognition, and Paragraph 8, requiring negotiations begin "immediately," the Arbitrator has jurisdiction to formulate a remedy. The Union has cited heavyweight authority for this position:

> Just as courts defer to labor arbitrators' interpretation of the contract, courts also defer to arbitrators' judgment about how to remedy the violations they find: "[W]hen it comes to formulating remedies" labor arbitrators "need flexibility in meeting a wide variety of situations." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Courts "have no authority to disagree" with an arbitrator's honest judgment about the appropriate remedy. *Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987).

7

The Employer has argued that an arbitrator has no authority to ignore the plain language of the Memorandum of Agreement, and indeed is prohibited from dispensing his own brand of industrial justice:

> Thus, when issuing an award, "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (*quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). In reviewing an arbitration award, a court is similarly bound by the express limitation on the arbitrator's authority and will not enforce an award where, for instance, the award does not draw its essence from the underlying agreement.

According to the Employer, nothing in the Memorandum of Agreement authorizes the arbitrator to excise Paragraph 9 from the Memorandum of Agreement.

In regard to the cases cited by both parties, I am confused as to the metaphor which should be used to describe them: are these cases at the heart of labor law or are they foundational bedrock on which labor and arbitration law are built?  Either way, these cases are controlling here.  Personally, as an arbitrator, I am always mindful that my award should draw its essence from the Agreement between the parties and that I am not free to "dispense my own brand of industrial justice."  And, I should add, that these limitations are not restrictive, they are liberating.  As a labor arbitrator, I do not want to govern the affairs of the parties, I merely want to resolve the dispute that they put before me.  And, I believe that the same is true of my fellow arbitrators.  Nevertheless, I also recognize, the courts, including the United State Supreme Court, have granted arbitrators broad powers to resolve the dispute put before them, including the power to formulate an appropriate remedy.

As I have said, perhaps more than once in the course of my dealings with the parties herein, my allegiance is to the application of the provisions of the Memorandum of Agreement.

At this time, abrogation of Paragraph 9 and removal of the limitations it places on the Union's right to engage in the concerted activities of striking and picketing is not appropriate.

*Restoration of Access*

The Union has also requested that the Employer "restore the Union's access to the Casino in accordance with Paragraph 5 of the Agreement." Paragraph 5, reproduced in full above, states that the Employer Operator "shall provide access to its premises and to such Employees by the Union. The Union may engage in organizing efforts in nonpublic areas of the Casino during employees' non-working times (before work, after work, and during meals and breaks). . . ." In an email dated June 21, 2023, Chris Gibase the "President, Chief Operating Officer" of the Employer's Casino revoked the access to the Casino by Union representatives for the purpose of organizing the employees: "based upon your assertion, there is no need to continue the card collection process, so the approved access to the property is no longer needed. We will ask security to collect all visitor badges that have been assigned to your team." In his email, Gibase did not reference the Memorandum of Agreement or cite any authority for his denial of access.

In its brief prepared in response to the Union's requests, the Employer asserted that it is beyond my authority to order access to the non-public areas of the Employer's property because the Union must make a "request for access" to the Tribal Gaming Commission. According to the Employer, the Union made such a request in the past and was granted permission to enter the non-public areas, and the Union must follow these procedures again.

In response, the Union as asserted that the Employer has gotten its facts wrong. According to the Union, its organizers are still licensed by the Tribal Gaming Commission. The Union has presented three documents which, according to the Union, establish that the Union representatives are appropriately licensed. The first is a copy of a letter dated October 12, 2023,

9

signed by Kendall C. Dixon as Director of Licensing and Compliance for the Wilton Rancheria Gaming Commission.  This letter notifies the representatives of the Union that their Wilton Rancheria Gaming License has been "permanently approved," that the license will have to be renewed at some point, and mentions that a hard copy of the license certificate will be sent to the Union.  A copy of a second letter from Dixon with the same date, albeit unsigned, sets forth the details of the license, provides individual license numbers for the Union representatives, and states that the expiration date of the License is October 14, 2025.  And finally, the third document appears to be a copy of the license certificate which states that the License is "effective October 12, 2023 through October 14, 2025.  On the surface it appears to me that at least for the present time, there is no problem with the Gaming Commission regarding access. I realize, however, that the documents presented by the Union have not been subject to evidentiary scrutiny, but that fact does not influence my decision here.  It is not necessary for me to make any finding of fact in this situation because simply stated the argument presented by the Employer contains no evidence.

      As I have stated several times, my responsibility is to resolve issues that arise in the application of the parties' Agreement.  While I appreciate the information presented by the parties, my decision is based upon the language of Paragraph 5. While the reasons for the Employer's denial of access are not fully clear to me, the language of the Agreement is clear.  The Employer "shall provide access to its premises" and the "Union may engage in organizing efforts in nonpublic areas of the Casino during employees' non-working times."  More importantly, this provision expressly states that "'Organizing' includes communicating with Employees before and after recognition of the Union as provided in Paragraph 7."  It is significant that the parties did not place any time limit on the access granted in Paragraph 5.  Also, it is

reasonable to infer that this access played an important role in the Union's decision to agree to Paragraph 9 and to give up its legal rights to strike and to engage in picketing. Indeed, it is not too farfetched to believe that Section 5 was the quid pro quo for Section 9. The parties chose to put this language in this agreement, and this language controls. My decisions to enforce both Paragraphs 5 and 9 go hand in hand. While I am not prepared to say how long this right to access will ultimately last, my conclusion is that it certainly covers the period following the Employer's refusal to recognize the Union and initiate negotiations.

*MOA and TLRO*

As to the application of the Tribal Labor Relation Ordinance and my reasons for applying the Memorandum of Understanding rather than the TLRO, I believe that I have discussed these issues sufficiently in previous documents and meetings with the parties. While I have not counted the number of times that I have discussed it, the Union has counted five times: in the Preliminary Decision dated December 18, 2024; in an email dated February 12, 2025; in the Interim Award dated February 20, 2025; in an email dated February 27, 2025; and in a bench decision on March 14, 2025.[3] Also, as the Union points out, Arbitrator Brand discussed Paragraph 2 "on pages 12, 14-15 and 18-19"[4] of his Award. I have adopted previously, and I do so again now, the Decision of Arbitrator Brand in this matter, his reasoning, and his conclusion that the Memorandum of Agreement applies to this dispute rather than the Tribal Labor Relation Ordinance.

### CONCLUSION AND ORDERS

Paragraph 11 of the Memorandum of Agreement signed by the parties authorizes the Arbitrator "to determine the arbitration procedures to be followed" and to "order the

---

[3] Union Letter Brief dated May 5, 2025.
[4] Union Letter Brief dated June 3, 2025.

noncompliant party to comply with this Agreement." After careful consideration of the positions of the parties and the materials presented by the parties, I have reached the following conclusions and orders:

- The request by the Employer to exam the authorization cards signed by the employees and to compare the signatures of the employees to the signatures on the authorization cards is denied.

- The request by Union to be released from its obligation to comply with Paragraph 9 of the agreement until the Tribe and its Operator commence negotiations is denied.

- The Employer is hereby ordered to recognize the Union immediately as the exclusive bargaining representative of the bargaining unit Employees and to commence good faith negotiations at once with the Union to the end of reaching a collective bargaining agreement.

- The Employer is hereby ordered to restore the Union's access to the Casino in accordance with Paragraph 5 of the Agreement.

Dated: June 17, 2025

_____
Anthony Miller
Arbitrator