Shaneeda Jaffer (CA 253449)
Ruby H. Kazi (CA 243872)
Carlo J. Lipson (CA 351153)
Benesch, Friedlander, Coplan & Aronoff LLP
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone: 628.600.2250
Facsimile:  628.221.5828
sjaffer@beneschlaw.com
rkazi@beneschlaw.com
clipson@beneschlaw.com

*Attorneys for Plaintiff*
*WILTON RANCHERIA, CALIFORNIA*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILTON RANCHERIA, CALIFORNIA,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITE HERE,<br><br>    Defendant. | Case No. 2:25-cv-02413-DJC-SCR<br><br>**DECLARATION OF SHANEEDA JAFFER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT UNITE HERE'S MOTION TO CONFIRM ARBITRATION AWARD AND COMPEL INTEREST ARBITRATION**<br><br>Date: January 8, 2026<br>Time: 1:30 p.m.<br>Judge: The Hon. Daniel J. Calabretta |

I, Shaneeda Jaffer, declare:

1.    I am a partner at the law firm of Benesch, Friedlander, Coplan & Arnoff LLP ("Benesch") and counsel of record for Plaintiff Wilton Rancheria, California in the above-captioned action. I am an active member in good standing of the State Bar of California. I declare that the following statements are true to the best of my knowledge, information, and belief, and formed after a reasonable inquiry under the circumstances. If I am called upon to testify, I could and would completely testify thereto.

2.    I submit this declaration in support of Plaintiff's Opposition to Defendant Unite Here's Motion to Confirm Arbitration Award and Compel Interest Arbitration.

3.    Attached hereto as **Exhibit A** is a true and correct copy of the Memorandum of Agreement, entered into in August 2017 (the "MOA").

4.    Attached hereto as **Exhibit B** is a true and correct copy of the Tribal Labor Relations Ordinance of 2019, enacted on April 18, 2019 (the "TLRO").

5.    Attached hereto as **Exhibit C** is a true and correct copy of Arbitrator Norman Brand's Arbitration Award and Opinion, dated March 17, 2024.

6.    Attached hereto as **Exhibit D** is a true and correct copy of Arbitrator Anthony Miller's April 28, 2025 Award: Authorization Card Review.

7.    Attached hereto as **Exhibit E** is a true and correct copy of Wilton Rancheria's April 4, 2025 Arbitration Post-Hearing Brief.

8.    Attached hereto as **Exhibit F** is a true and correct copy of Arbitrator Miller's June 17, 2025 Award.

9.    Attached hereto as **Exhibit G** is a true and correct copy of an email chain between Aamir Deen of UNITE HERE and Christina Kazhe of Wilton Rancheria, California, between April 28, 2025 and October 10, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 12, 2025

SHANEEDA JAFFER

1

# **Exhibit A**

MEMORANDUM OF AGREEMENT

THIS AGREEMENT is made and entered into by and between Wilton Rancheria (the "Tribe"), Boyd Gaming Corp. (the "Operator") and UNITE HERE International Union (the "Union").

1.    This Agreement shall cover all employees defined as "Eligible Employees" by the Tribal Labor Relations Ordinance (referred to hereinafter as "Employees") at any casino and related facility (collectively the "Casino") which during the term of this Agreement is owned by, operated by or substantially under the control of the Tribe, except that the following classifications shall be excluded: sports book writer, slot machine mechanics, casino guest service representatives, bingo employees, keno runners, keno writers, and office clerical employees, and confidential employees as defined in Section 2(11) of the National Labor Relations Act (along with those classifications excluded from the definition of "Eligible Employee" in the Tribal Labor Relations Ordinance). The term "related facility" shall mean any facility the only significant purpose of which is to facilitate patronage of Class III gaming operations. The term "Tribe" shall be deemed to include any person, firm, partnership, corporation, joint venture or other legal entity substantially under the control of: (a) the Tribe covered by this Agreement; (b) one or more principal(s) of the Tribe covered by this Agreement; (c) a subsidiary of the Tribe covered by this Agreement; or (d) any person, firm, partnership, corporation, joint venture or other legal entity which substantially controls the Tribe covered by this Agreement. The term "Operator" shall be deemed to include any person, firm, partnership, corporation, joint venture or other legal entity substantially under the control of: (a) the Operator covered by this Agreement; (b) one or more principal(s) of the Operator covered by this Agreement; (c) a subsidiary of the Operator covered by this Agreement; or (d) any person, firm, partnership, corporation, joint venture or other legal entity which substantially controls the Operator covered by this Agreement.

2.    The parties agree that the Tribal Labor Relations Ordinance governs labor relations at the Casino, and to hereby establish the following procedure for the purpose of ensuring an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance to organize collectively, should employees choose to do so, and to avoid picketing and/or other economic action directed at the Tribe in the event the Union decides to conduct an organizing campaign among the Employees.

3.    The Tribe and the Operator will take a neutral approach to unionization of Employees. The Tribe and the Operator will not do any action nor make any statement that will directly or indirectly state or imply any opposition by the Tribe or the Operator to the selection by such Employees of a collective bargaining agent, or preference for or opposition to any particular union as a bargaining agent.

4.    The Union and its representatives will not coerce or threaten any Employee in an effort to obtain authorization cards.

5.    If the Union provides written notice to the Tribe or the Operator of its intent to organize Employees covered by this Agreement, the Tribe and the Operator shall provide access to its premises and to such Employees by the Union. The Union may engage in organizing efforts in non-public areas of the Casino during Employees' non-working times (before work, after work, and during meals and breaks) and/or during such other periods as the parties may mutually agree upon. "Organizing" includes communicating with Employees before and after recognition of the Union as provided in Paragraph 7.

6.    Within fifteen (15) days following receipt of written notice of intent to organize

1

Employees, the Tribe or the Operator will furnish the Union with a complete list of Employees, including both full and part-time Employees, showing their job classifications, departments, home and email addresses, and telephone numbers. Thereafter, the Tribe or the Operator will provide updated complete lists monthly.

7.    The Union is not presently recognized as the exclusive collective bargaining representative of the Employees.  The Union may request recognition as the exclusive collective bargaining agent for such Employees. The arbitrator identified in Paragraph 11, or another person mutually agreed to by parties, will conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees. If that review establishes that a majority of such Employees has designated the Union as their exclusive collective bargaining representative or joined the Union, the Tribe and the Operator will recognize the Union as such representative of such Employees. The Tribe and the Operator will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this agreement.  The parties agree that if any other person or entity petitions the National Labor Relations Board for any election as a result of or despite recognition of the Union pursuant to this Paragraph, (a) the parties will each request that the NLRB dismiss the petition on grounds of recognition bar or, if they have agreed to a collective bargaining agreement covering Employees at the time the petition is filed, on grounds of contract bar, (b) if the petition is not dismissed, the parties shall agree to a full consent election agreement under Section 102.62(c) of the NLRB's Rules and Regulations, and (c) the parties shall at all times abide by the provisions of this Agreement except that the Union may file unfair labor practice charges. Except as provided above, the parties will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration under Paragraph 11 shall be the exclusive remedy.

8.    If the Union is recognized as the exclusive collective bargaining representative as provided in paragraph 7, negotiations for a collective bargaining agreement shall be commenced immediately and conducted diligently and in good faith to the end of reaching agreement expeditiously. If the parties are unable to reach agreement on a collective bargaining agreement within 120 days after recognition pursuant to Paragraph 7, all unresolved issues shall be submitted for resolution to final and binding arbitration pursuant to Paragraph 11.  The arbitrator identified in paragraph 11 below shall be the arbitrator, unless another arbitrator is mutually agreed to by the parties. The arbitrator shall be guided by the following considerations: a) Tribe's financial ability; b) size and type of the Tribe's operations; c) cost of living as it affects the Employees; d) ability of the Employees, through the combination of wages, hours and benefits, to earn a living wage to sustain themselves and their families; and e) Employees' productivity.

9.    During the term of this Agreement, the Union will not engage in any strike, picketing or other adverse economic or public relations' activity at, or in connection with, the Casino, and the Tribe and the Operator will not engage in a lockout of the Employees. Notwithstanding the termination provision above, if the Tribe or the Operator recognizes any union besides Union as the exclusive collective bargaining representative of Employees, or any of them, this paragraph shall terminate immediately and without notice.

10.    The Tribe and the Operator shall incorporate the entirety of paragraphs 3, 5, 6, 7 and 8 of this of Agreement in any contract, subcontract, lease, sublease, operating agreement, franchise agreement or any other agreement or instrument giving a right to any person to operate any enterprise

in the Casino employing employees in classifications covered by the Tribal Labor Relations Ordinance, and shall obligate any person taking such interest, and any and all successors and assigns of such person, to in turn incorporate said paragraphs in any further agreement or instrument giving a right as described above. The Tribe or the Operator shall enforce such provisions, or at its option, assign its rights to do so to the Union. The Tribe or the Operator shall give the Union written notice of the execution of such agreement or instrument and identify the other party(ies) to the transaction within 15 days after the agreement or instrument is signed. The terms "Tribe", "Operator" and "Casino" shall be modified in such agreement or instrument to conform to the terminology in such agreement or instrument but retain the same meaning as in this Agreement, and the terms "Tribe" and "Operator" as used herein shall be modified to refer to the person or persons receiving a right to operate an enterprise in the Casino, and the term "Employees" shall be modified to refer to the employees of such person or persons.

11.    The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration.    The Tribe's and the Union's representatives shall meet within fourteen (14) calendar days after the receipt of a panel of arbitrators from the Federal Mediation and Conciliation Service ("FMCS"). Selection of a sole and impartial arbitrator shall be made by the Tribe and the Union representatives each alternately striking, with Union making the first strike, one (1) name from a seven (7) member panel of arbitrators, received from the ("FMCS"), who are members of the National Academy of Arbitrators and who reside in California, Arizona, New Mexico or Nevada. The person whose name remains will be requested to serve as the impartial arbitrator. By mutual agreement, the parties may waive the use of the panel named above and refer the matter in dispute to an arbitrator selected from any other source.    The arbitrator shall have the authority to determine the arbitration procedures to be followed. The arbitrator shall also have the authority to order the non-compliant party to comply with this Agreement. The parties hereto agree to comply with any order of the arbitrator, which shall be final and binding. The United States District Court for the Eastern District of California shall have exclusive jurisdiction in any action concerning arbitration under this Agreement. The parties consent to the entry of any order of the arbitrator as the order or judgment of the Court, without entry of findings of fact and conclusions of law.

12.    For the sole purpose of enabling a suit to compel arbitration or to confirm an arbitration award under this Agreement, the Tribe agrees to a limited waiver of sovereign immunity and consents to be sued in federal court without exhausting tribal remedies, or in the event that the federal court declines jurisdiction, in the appropriate state superior court.

13.    This Agreement shall be in full force and effect from the date it is fully executed on behalf of the Tribe, the Operator and the Union until three (3) years from the full public opening of the Casino, or if sooner upon execution of a collective bargaining agreement or issuance of an interest arbitration award which concludes the collective bargaining agreement negotiations, either of which explicitly supersedes this document.

14.    The Union hereby agrees to actively support before the appropriate federal, state, and local administrative, bureaucratic, regulatory and legislative bodies, the Tribe's efforts to obtain ratification of the Compact by the California legislation, and to take all reasonable and necessary steps to assist the Tribe in connection therewith. For purposes of this Agreement, "active support" includes letter writing, consultation with and lobbying of elected and appointed officials, availability of members for events in furtherance of the Tribe's goals, opposition to competitor's efforts to prohibit the Tribe's entry into tribal government gaming on its lands in Elk Grove, California, and assistance with local government relations.

Ex. A-3

15.    The Tribal Chairperson has been authorized by an action appropriate under tribal law to enter into this Agreement, including the limited waiver of the Tribe's sovereign immunity as set forth in paragraph 12.

16.    In the event that any provision of this Agreement should be rendered invalid by applicable legislation or be declared invalid by any court or regulatory agency of competent jurisdiction, such action shall not invalidate the entire Agreement, it being the express intention of the parties hereto that all other provisions not rendered invalid shall remain in full force and effect. Both parties agree that the subject matter of any provision found to be invalid shall be renegotiated for the purpose of replacing the invalidated provision with a valid substitute which most nearly achieves the same objective. In the even the parties are unable to agree on a substitute, the matter shall be submitted to arbitration as provided in Paragraph 11; the arbitrator shall choose or formulate a substitute provision which accomplishes the purposes of the preceding sentence.

IN WITNESS WHEREOF, the parties hereto by their duly designated representatives have hereunto set their hands.

FOR THE TRIBE:

Wilton Rancheria

By: _Raymond C Hitchcock_

Its: _Chairman_

Date: _8/7/17_

FOR THE OPERATOR:

Boyd Gaming Corporation

By: _Brian A. Larson_

Its: _EVP, Sec. + General Counsel_

Date: _8/3/17_

FOR THE UNION:

UNITE HERE International Union

By: _Kim K___

Its: _INTERNATIONAL Vice Pres._

Date: _8/3/17_

4

# **Exhibit B**

**WILTON RANCHERIA CODE**
**TITLE 7 – LABOR CODE**
**CHAPTER 3 – TRIBAL LABOR RELATIONS ORDINANCE OF 2019**

**CITE AS: 7 WRC § 3-101, et seq.**

**ENACTED: APRIL 18, 2019**

**ARTICLE I**
**GENERAL**

**SECTION 3-101       TITLE**

This Ordinance shall be titled the Tribal Labor Relations Ordinance of 2019 and shall be codified as Chapter 3 of the Tribe's Labor Code.

**SECTION 3-102       AUTHORITY**

A.       Article VI, Section 2 of the Constitution of Wilton Rancheria ("Constitution") authorizes the Tribal Council to make the Tribe's laws.

B.       Article VI, Section 2(a) of the Constitution grants the Tribal Council the power to make all laws, including resolutions, codes, and statutes.

C.       Article VI, Section 2(c) of the Constitution grants the Tribal Council the power to pass laws regulating the Tribe's elections, enrollment, employment, and all other matters so long as those laws are consistent with the Constitution.

**SECTION 3-103       BACKGROUND**

This Ordinance governs the rights, responsibilities and limitations of any labor union or organization that desires to organize employees of the Tribe's class III casino or related facilities that facilitate patronage of the Tribe's class III gaming operations.  It is enacted in accordance with Section 12.10 of the Tribal-State Gaming Compact between the State of California and Wilton Rancheria, effective January 22, 2018, which provides that the gaming activities authorized by the compact may only commence after the Tribe has adopted an ordinance identical to the Tribal Labor Relations Ordinance attached to the compact, and the gaming activities may only continue as long as the Tribe maintains the ordinance.  Article II of this Ordinance is identical to the ordinance attached to the Tribe's January 22, 2018 compact.

**SECTION 3-104       SCOPE**

This Ordinance shall be narrowly construed to apply to Eligible Employees to the extent the Ordinance provisions are lawfully required by an effective tribal-state gaming compact between the Tribe and the State of California.

**SECTION 3-105**      **DEFINITIONS**

A.      "Eligible Employee" has the meaning given to it in Section 3-202 of this Ordinance.

B.      "Ordinance" means this Tribal Labor Relations Ordinance of 2019.

C.      "Tribe" means the Wilton Rancheria, a federally recognized Indian tribe.

**ARTICLE II**
**APPLICABILITY, RIGHTS, DUTIES, DISPUTE RESOLUTION**

**SECTION 3-201**      **THRESHOLD OF APPLICABILITY**

A.      This Ordinance shall apply only if the Tribe employs 250 or more persons in a tribal casino and related facility.  For purposes of this Ordinance, a "tribal casino" is one in which class III gaming is conducted pursuant to the tribal-state compact.  A "related facility" is one for which the only significant purpose is to facilitate patronage of the class III gaming operations.

B.      Upon the request of a labor union or organization which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, the Tribal Gaming Commission shall certify the number of employees in a tribal casino or other related facility as defined in subsection (A) of this Section 3-201.  Either party may dispute the certification of the Tribal Gaming Commission to the Tribal Labor Panel, which is defined in Section 3-213 herein.

**SECTION 3-202**      **DEFINITION OF ELIGIBLE EMPLOYEES**

A.      The provisions of this Ordinance shall apply to any person (hereinafter "Eligible Employee") who is employed within a tribal casino in which class III gaming is conducted pursuant to a tribal-state compact or other related facility, the only significant purpose of which is to facilitate patronage of the class III gaming operations, except for any of the following:

1.      any employee who is a supervisor, defined as any individual having authority, in the interest of the Tribe and/or employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment;

2.      any employee of the Tribal Gaming Commission;

3.      any employee of the security or surveillance department, other than those who are responsible for the technical repair and maintenance of equipment;

4.      any cash operations employee who is a "cage" employee or money counter; or

5.      any dealer.

2

B.      On July 1 of each year, the Tribal Gaming Commission shall certify the number of Eligible Employees employed by the Tribe to the administrator of the Tribal Labor Panel.

### SECTION 3-203      NON-INTERFERENCE WITH REGULATORY OR SECURITY ACTIVITIES

Operation of this Ordinance shall not interfere in any way with the duty of the Tribal Gaming Commission to regulate the gaming operation in accordance with the Tribe's National Indian Gaming Commission-approved gaming ordinance. Furthermore, the exercise of rights hereunder shall in no way interfere with the tribal casino's surveillance/security systems, or any other internal controls system designed to protect the integrity of the Tribe's gaming operations. The Tribal Gaming Commission is specifically excluded from the definition of Eligible Employees.

### SECTION 3-204      ELIGIBLE EMPLOYEES FREE TO ENGAGE IN OR REFRAIN FROM CONCERTED ACTIVITY

Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

### SECTION 3-205      UNFAIR LABOR PRACTICES FOR THE TRIBE

It shall be an unfair labor practice for the Tribe and/or employer or their agents:

A.      To interfere with, restrain or coerce Eligible Employees in the exercise of the rights guaranteed herein;

B.      To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it, but this does not restrict the Tribe and/or employer and a certified union from agreeing to union security or dues check off;

C.      To discharge or otherwise discriminate against an Eligible Employee because s/he has filed charges or given testimony under this Ordinance; or

D.      After certification of the labor organization pursuant to Section 3-210, to refuse to bargain collectively with the representatives of Eligible Employees.

### SECTION 3-206      UNFAIR LABOR PRACTICES FOR THE UNION

It shall be an unfair labor practice for a labor organization or its agents:

A.      To interfere, restrain or coerce Eligible Employees in the exercise of the rights guaranteed herein;

B.      To engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a primary or secondary boycott or a refusal in the course of his employment to use, manufacture, process,

transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce or other terms and conditions of employment.  This section does not apply to Section 3-211;

C.      To force or require the Tribe and/or employer to recognize or bargain with a particular labor organization as the representative of Eligible Employees if another labor organization has been certified as the representative of such Eligible Employees under the provisions of this Ordinance;

D.      To refuse to bargain collectively with the Tribe and/or employer, provided it is the representative of Eligible Employees subject to the provisions herein; or

E.      To attempt to influence the outcome of a tribal governmental election, provided, however, that this section does not apply to tribal members.

## SECTION 3-207        TRIBE AND UNION RIGHT TO FREE SPEECH

A.      The Tribe's and union's expression of any view, argument or opinion or the dissemination thereof, whether in written, printed, graphic or visual form, shall not constitute or be evidence of interference with, restraint, or coercion if such expression contains no threat of reprisal or force or promise of benefit.

B.      The Tribe agrees that if a union first offers in writing that it and its local affiliates will comply with (B)(1) and (B)(2), the Tribe shall comply with the provisions of (C) and (D).

        1.      For a period of three hundred sixty-five (365) days following delivery of a Notice of Intent to Organize (NOIO) to the Tribe:

                a.      Not engage in strikes, picketing, boycotts, attack websites, or other economic activity at or in relation to the tribal casino or related facility; and refrain from engaging in strike-related picketing on Indian lands as defined in 25 U.S.C. § 2703(4);

                b.      Not disparage the Tribe for purposes of organizing Eligible Employees;

                c.      Not attempt to influence the outcome of a tribal government election; and

                d.      During the three hundred sixty-five (365) days after the Tribe received the NOIO, the Union must collect dated and signed authorization cards pursuant to Section 3-210 herein and complete the secret ballot election also in Section 3-210 herein.  Failure to complete the secret ballot election within the three hundred sixty five (365) days after the Tribe received the NOIO shall mean that the union shall not be permitted to deliver another NOIO for a period of two years (730 days).

        2.      Resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 3-213 herein.

4

C.      Upon receipt of a NOIO, the Tribe shall:

     1.      Within two (2) days provide to the union an election eligibility list containing the full first and last names of the Eligible Employees within the sought-after bargaining unit and the Eligible Employees' last known addresses and telephone numbers and email addresses;

     2.      For period of three hundred sixty-five (365) days thereafter, Tribe will not do any action nor make any statement that directly or indirectly states or implies any opposition by the Tribe to the selection by such employees of a collective bargaining agent, or preference for or opposition to any particular union as a bargaining agent.  This includes refraining from making derisive comments about unions; publishing or posting pamphlets, fliers, letters, posters or any other communication which could reasonably be interpreted as criticizing the union or advising Eligible Employees to vote "no" against the union.  However, the Tribe shall be free at all times to fully inform Eligible Employees about the terms and conditions of employment it provides to employees and the advantages of working for the Tribe; and

     3.      Resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 3-213 herein.

D.      The union's offer in subsection (B) of this Section 3-207 shall be deemed an offer to accept the entirety of this Ordinance as a bilateral contract between the Tribe and the union, and the Tribe agrees to accept such offer.  By entering into such bilateral contract, the union and Tribe mutually waive any right to file any form of action or proceeding with the National Labor Relations Board for the three hundred sixty-five (365)-day period following the NOIO.

E.      The Tribe shall mandate that any entity responsible for all or part of the operation of the casino and related facility shall assume the obligations of the Tribe under this Ordinance.  If at the time of the management contract, the Tribe recognizes a labor organization as the representative of its employees, certified pursuant to this Ordinance, the labor organization will provide the contractor, upon request, the election officer's certification which constitutes evidence that the labor organization has been determined to be the majority representative of the Tribe's Eligible Employees.

## SECTION 3-208      ACCESS TO ELIGIBLE EMPLOYEES

A.      Access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity shall not interfere with patronage of the casino or related facility or with the normal work routine of the Eligible Employees and shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public.  The Tribe may require the union and or union organizers to be subject to the same licensing rules applied to individuals or entities with similar levels of access to the casino or related facility, provided that such licensing shall not be unreasonable, discriminatory, or designed to impede access.

B.      The Tribe, in its discretion, may also designate additional voluntary access to the Union in such areas as employee parking lots and non-casino facilities located on tribal lands.

C.    In determining whether organizing activities potentially interfere with normal tribal work routines, the union's activities shall not be permitted if the Tribal Labor Panel determines that they compromise the operation of the casino:

      1.    Security and surveillance systems throughout the casino, and reservation;

      2.    Access limitations designed to ensure security;

      3.    Internal controls designed to ensure security; or

      4.    Other systems designed to protect the integrity of the Tribe's gaming operations, tribal property and/or safety of casino personnel, patrons, employees or tribal members, residents, guests or invitees.

D.    The Tribe agrees to facilitate the dissemination of information from the union to Eligible Employees at the tribal casino by allowing posters, leaflets and other written materials to be posted in non-public employee break areas where the Tribe already posts announcements pertaining to Eligible Employees.  Actual posting of such posters, notices, and other materials shall be by employees desiring to post such materials.

## SECTION 3-209    INDIAN PREFERENCE EXPLICITLY PERMITTED

Nothing herein shall preclude the Tribe from giving Indian preference in employment, promotion, seniority, lay-offs or retention to members of any federally recognized Indian tribe or shall in any way affect the Tribe's right to follow tribal law, ordinances, personnel policies or the Tribe's customs or traditions regarding Indian preference in employment, promotion, seniority, lay-offs or retention.  Moreover, in the event of a conflict between tribal law, tribal ordinance or the Tribe's customs and traditions regarding Indian preference and this Ordinance, the tribal law, tribal ordinance, or the Tribe's customs and traditions shall govern.

## SECTION 3-210    SECRET BALLOT ELECTIONS

A.    The election officer shall be chosen within three (3) business days of notification by the labor organization to the Tribe of its intention to present authorization cards, and the same election officer shall preside thereafter for all proceedings under the request for recognition; provided, however, that if the election officer resigns, dies, or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.  Dated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer will result in a secret ballot election.  The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards.  If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election.  The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

B.    Upon the showing of interest to the election officer pursuant to subsection (A), within two (2) working days the Tribe shall provide to the union an election eligibility list containing

the full first and last names of the Eligible Employees within the sought after bargaining unit and the Eligible Employees' last known addresses and telephone numbers and email addresses. Nothing herein shall preclude a Tribe from voluntarily providing an election eligibility list at an earlier point of a union organizing campaign with or without an election. The election shall be conducted by the election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1. In the event either that a party refuses to enter into the consent election agreement or that the parties do not agree on the terms, the election officer shall issue an order that conforms to the terms of the form consent election agreement and shall have authority to decide any terms upon which the parties have not agreed, after giving the parties the opportunity to present their views in writing or in a telephonic conference call. The election officer shall be a member of the Tribal Labor Panel chosen in the same manner as a single arbitrator pursuant to the dispute resolution provisions herein at Section 3-213(B)(2). All questions concerning representation of the Tribe and/or Eligible Employees by a labor organization shall be resolved by the election officer.

C.      The election officer shall certify the labor organization as the exclusive collective bargaining representative of a unit of employees if the labor organization has received the support of a majority of the Eligible Employees in a secret ballot election that the election officer determines to have been conducted fairly. The numerical threshold for certification is fifty percent (50%) of the Eligible Employees plus one. If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or union, the election officer may order a re-run election. If the election officer determines that there was the commission of serious Unfair Labor Practices by the Tribe, or in the event the union made the offer provided for in Section 3-207(B) that the Tribe violated its obligations under Section 3-207(C), that interferes with the election process and precludes the holding of a fair election, and the labor organization is able to demonstrate that it had the support of a majority of the employees in the unit at any time before or during the course of the Tribe's misconduct, the election officer shall certify the labor organization as the exclusive bargaining representative.

D.      The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel mutually chosen by both parties, provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

E.      A union which loses an election and has exhausted all dispute remedies related to the election may not invoke any provisions of this Ordinance at that particular casino or related facility until one (1) year after the election was lost.

## SECTION 3-211       COLLECTIVE BARGAINING IMPASSE

A.      Upon recognition, the Tribe and the union will negotiate in good faith for a collective bargaining agreement covering bargaining unit employees represented by the union.

B.      Except where the union has made the written offer set forth in Section 3-207(B), if collective bargaining negotiations result in impasse, the union shall have the right to strike. Strike-related picketing shall not be conducted on Indian lands as defined in 25 U.S.C. § 2703(4).

C.      Where the union makes the offer set forth in Section 3-207(B), if collective bargaining negotiations result in impasse, the matter shall be resolved as set forth in Section 3-213(C).

## <u>SECTION 3-212</u>      <u>DECERTIFICATION OF BARGAINING AGENT</u>

A.      The filing of a petition signed by thirty percent (30%) or more of the Eligible Employees in a bargaining unit seeking the decertification of a certified union, will result in a secret ballot election.  The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards.  If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election.  The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

B.      The election shall be conducted by an election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1.  The election officer shall be a member of the Tribal Labor Panel chosen in the same manner as a single arbitrator pursuant to the dispute resolution provisions herein at Section 3-213(B)(2).  All questions concerning the decertification of the union shall be resolved by an election officer.  The election officer shall be chosen upon notification to the Tribe and the union of the intent of the Eligible Employees to present a decertification petition, and the same election officer shall preside thereafter for all proceedings under the request for decertification; provided however that if the election officer resigns, dies or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.

C.      The election officer shall order the labor organization decertified as the exclusive collective bargaining representative if a majority of the Eligible Employees support decertification of the labor organization in a secret ballot election that the election officer determines to have been conducted fairly.  The numerical threshold for decertification is fifty percent (50%) of the Eligible Employees plus one (1).  If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or the union the election officer may order a re-run election or dismiss the decertification petition.

D.      A decertification proceeding may not begin until one (1) year after the certification of a labor union if there is no collective bargaining agreement.  Where there is a collective bargaining agreement, a decertification petition may only be filed no more than ninety (90) days and no less than sixty (60) days prior to the expiration of a collective bargaining agreement.  A decertification petition may be filed any time after the expiration of a collective bargaining agreement.

E.      The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel chosen in accordance with Section 3-213(C), provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

**SECTION 3-213        BINDING DISPUTE RESOLUTION MECHANISM**

A.    All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein.

B.    The method of binding dispute resolution shall be a resolution by the Tribal Labor Panel, consisting of ten (10) arbitrators appointed by mutual selection of the parties which panel shall serve all tribes that have adopted this Ordinance.  The Tribal Labor Panel shall have authority to hire staff and take other actions necessary to conduct elections, determine units, determine scope of negotiations, hold hearings, subpoena witnesses, take testimony, and conduct all other activities needed to fulfill its obligations under this Ordinance.

     1.    Each member of the Tribal Labor Panel shall have relevant experience in federal labor law and/or federal Indian law with preference given to those with experience in both.  Names of individuals may be provided by such sources as, but not limited to, Indian Dispute Services, Federal Mediation and Conciliation Service, and the American Academy of Arbitrators.

     2.    Unless either party objects, one (1) arbitrator from the Tribal Labor Panel will render a binding decision on the dispute under the Ordinance.  If either party objects, the dispute will be decided by a three (3)-member panel, unless arbitrator scheduling conflicts prevent the arbitration from occurring within thirty (30) days of selection of the arbitrators, in which case a single arbitrator shall render a decision.  If one (1) arbitrator will be rendering a decision, five (5) Tribal Labor Panel names shall be submitted to the parties and each party may strike no more than two (2) names.  If the dispute will be decided by a three (3)-member panel, seven (7) Tribal Labor Panel names will be submitted and each party can strike no more than two (2) names.  A coin toss shall determine which party may strike the first name.  The arbitrator will generally follow the American Arbitration Association's procedural rules relating to labor dispute resolution.  The arbitrator must render a written, binding decision that complies in all respects with the provisions of this Ordinance within thirty (30) days after a hearing.

C.    1.    Upon certification of a union in accordance with Section 3-210 of this Ordinance, the Tribe and union shall negotiate for a period of ninety (90) days after certification.  If, at the conclusion of the ninety (90)-day period, no collective bargaining agreement is reached and either the union and/or the Tribe believes negotiations are at an impasse, at the request of either party, the matter shall be submitted to mediation with the Federal Mediation and Conciliation Service.  The costs of mediation and conciliation shall be borne equally by the parties.

     2.    Upon appointment, the mediator shall immediately schedule meetings at a time and location reasonably accessible to the parties.  Mediation shall proceed for a period of thirty (30) days.  Upon expiration of the thirty (30)-day period, if the parties do not resolve the issues to their mutual satisfaction, the mediator shall certify that the mediation process has been exhausted.  Upon mutual agreement of the parties, the mediator may extend the mediation period.

3.      Within twenty-one (21) days after the conclusion of mediation, the mediator shall file a report that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process.  With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination.  The mediator's determination shall be supported by the record.

D.      In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings.

E.      Either party may seek a motion to compel arbitration or a motion to confirm or vacate an arbitration award, under this Section 3-213, in the appropriate state superior court, unless a bilateral contract has been created in accordance with Section 3-207, in which case either party may proceed in federal court.  The Tribe agrees to a limited waiver of its sovereign immunity for the sole purpose of compelling arbitration or confirming or vacating an arbitration award issued pursuant to the Ordinance in the appropriate state superior court or in federal court.  The parties are free to put at issue whether or not the arbitration award exceeds the authority of the Tribal Labor Panel.

---

Legislative History:

| | |
|---|---|
| 2/14/2019 | Submitted for public review by Tribal Council Resolution No. 2019-11 by vote of 7 for, 0 against, 0 abstaining. |
| 2/20/2019 | Thirty (30) day public review phase began. |
| 3/7/2019 | Public hearing held at Tribal Office. |
| 3/21/2019 | Thirty (30) day public review phase ended. |
| 3/28/2019 | Seven (7) day final review phase began. |
| 4/18/2019 | Tribal Council passed the Ordinance by Resolution No. 2019-23 by vote of 5 for, 0 against, 0 abstaining. |
| 4/18/2019 | Chairperson concurrence; the Ordinance is codified as Chapter 3 of the Labor Code. |

Ex. B-10

**Attachment 1**

CONSENT ELECTION AGREEMENT PROCEDURES

      Pursuant to the Tribal Labor Relations Ordinance adopted pursuant to section 12.10 of the compact, the undersigned parties hereby agree as follows:

      1.     Jurisdiction.  Tribe is a federally recognized Indian tribal government subject to the Ordinance; and each employee organization named on the ballot is an employee organization within the meaning of the Ordinance; and the employees described in the voting unit are Eligible Employees within the meaning of the Ordinance.

      2.     Election.  An election by secret ballot shall be held under the supervision of the elections officer among the Eligible Employees as defined in Section 3-202 of the Ordinance of the Tribe named above, and in the manner described below, to determine which employee organization, if any, shall be certified to represent such employees pursuant to the Ordinance.

      3.     Voter Eligibility.  Unless otherwise indicated below, the eligible voters shall be all Eligible Employees who were employed on the eligibility cutoff date indicated below, and who are still employed on the date they cast their ballots in the election, i.e., the date the voted ballot is received by the elections officer. Eligible Employees who are ill, on vacation, on leave of absence or sabbatical, temporarily laid off, and employees who are in the military service of the United States shall be eligible to vote.

      4.     Voter Lists.  The Tribe shall electronically file with the elections officer a list of eligible voters within two (2) business days after receipt of a Notice of Election.

      5.     Notice of Election.  The elections officer shall serve Notices of Election on the Tribe and on each party to the election.  The Notice shall contain a sample ballot, a description of the voting unit and information regarding the balloting process.  Upon receipt, the Tribe shall post such Notice of Election conspicuously on all employee bulletin boards in each facility of the employer in which members of the voting unit are employed.  Once a Notice of Election is posted, where the union has made the written offer set forth in Section 3-207(B) of the Tribal Labor Relations Ordinance of 2019, the Tribe shall continue to refrain from publishing or posting pamphlets, fliers, letters, posters or any other communication which should be interpreted as criticism of the union or advises employees to vote "no" against the union.  The Tribe shall be free at all times to fully inform employees about the terms and conditions of employment it provides to employees and the advantages of working for the Tribe.

      6.     Challenges.  The elections officer or an authorized agent of any party to the election may challenge, for good cause, the eligibility of a voter.  Any challenges shall be made prior to the tally of the ballots.

      7.     Tally of Ballots.  At the time and place indicated below, ballots shall be co-mingled and tabulated by the elections officer.  Each party shall be allowed to station an authorized agent at the ballot count to verify the tally of ballots.  At the conclusion of the counting, the elections officer shall serve a Tally of Ballots on each party.

8.      Objections and Post-election Procedures.  Objections to the conduct of the election may be filed with the elections officer within five (5) calendar days following the service of the Tally of Ballots.  Service and proof of service is required.

9.      Runoff Election.  In the event a runoff election is necessary, it shall be conducted at the direction of the elections officer.

10.     Wording on Ballot.  The choices on the ballot shall appear in the wording and order enumerated below.

        FIRST:      [***]
        SECOND:     [***]
        THIRD:      [***]

11.     Cutoff Date for Voter Eligibility:  [***]

12.     Description of the Balloting Process.  A secret ballot election will take place within thirty (30) days after delivery of the voter list referenced in paragraph 4.  The employer will determine the location or locations of the polling places for the election.  There must be at least one (1) neutral location (such as a high school, senior center, or similar facility) which is not within the gaming facility and employees must also be afforded the option of voting by mail through procedures established by the elections officer.  Such procedures must include provisions that provide meaningful protection for each employee's ability to make an informed and voluntary individual choice on the issue of whether to accept or reject a union.  Such procedures must also ensure that neither employer nor union representatives shall observe employees personally marking, signing, and placing their ballot in the envelope.  Only voters, designated observers and the election officer or supporting staff can be present in the polling area.  Neither employer nor union representatives may campaign in or near the polling area.  If the election officer or supporting staff questions an employee's eligibility to vote in the election, the ballot will be placed in a sealed envelope until eligibility is determined.  The box will be opened under the supervision of the election officer when voting is finished.  Ballots submitted by mail must be received by the elections officer no later than the day of the election in order to be counted in the official tally of ballots.

13.     Voter List Format and Filing Deadline:  Not later than two (2) business days after receipt of the Notice of Election, the Tribe shall file with the elections officer, at [**address**], an alphabetical list of all eligible voters including their job titles, work locations and home addresses.

Copies of the list shall be served concurrently on the designated representative for the [***]; proof of service must be concurrently filed with elections officer.

In addition, the Tribe shall submit to the elections officer on or before [***], by electronic mail, a copy of the voter list in an Excel spreadsheet format, with columns labeled as follows:  First Name, Last Name, Street Address, City, State, and Zip Code.  Work locations and job titles need not be included in the electronic file.  The file shall be sent to [***].

14.     Notices of Election:  Shall be posted by the Tribe no later than [***].

A-2

15.    Date, Time and Location of Counting of Ballots:  Beginning at [**time**] on [**date**], at the [**address**].

16.    Each signatory to this Agreement hereby declares under penalty of perjury that s/he is a duly authorized agent empowered to enter into this Consent Election Agreement.

| (Name of Party) | (Name of Party) |
|---|---|
| By | By |
| (Title)          (Date) | (Title)          (Date) |

| (Name of Party) | (Name of Party) |
|---|---|
| By | By |
| (Title)          (Date) | (Title)          (Date) |

Date approved: _____

[**Author**]
Elections Officer

Ex. B-13

 **Wilton Rancheria** 

9728 Kent Street, Elk Grove, CA 95624

### Tribal Council Resolution No. 2019-23
### RESOLUTION TO ENACT THE TRIBAL LABOR RELATIONS ORDINANCE OF 2019

**WHEREAS,** Wilton Rancheria ("Tribe") is a federally-recognized Indian tribe eligible for all rights and privileges afforded to recognized Native American tribes; and

**WHEREAS,** Wilton Rancheria adopted the Constitution of Wilton Rancheria ("Constitution") on November 12, 2011; and

**WHEREAS,** Article VI, Section 2 of the Constitution authorizes the Tribal Council to make the Tribe's laws; and

**WHEREAS,** Article VI, Section 2(a) of the Constitution grants the Tribal Council the power to make all laws, including resolutions, codes and statutes; and

**WHEREAS,** Article VI, Section 2(c) of the Constitution grants the Tribal Council the power to pass laws regulating the Tribe's elections, enrollment, and employment, and all other matters so long as those laws are consistent with the Constitution; and

**WHEREAS,** the Tribal Council Organization Act of 2012 provides that acts shall be the formal laws passed by the Tribal Council in development of the Tribe's permanent body of law, 4 WRC § 1-303(A); and

**WHEREAS,** the Tribal Council Organization Act of 2012 provides that all acts and amendments shall go through a legislation process consisting of an internal review phase, a public review phase, and a final review phase, 4 WRC § 1-305; and

**WHEREAS,** the Tribal Council Organization Act of 2012 provides that during a thirty (30) day public review phase, the Tribal Council shall solicit comments from members of the public regarding a proposed act and shall hold at least one (1) public hearing, 4 WRC § 1-307; and

**WHEREAS,** the Tribal Council Organization Act of 2012 provides that the final version of a proposed act shall be submitted to each member of the Tribal Council for a final review period of no less than seven (7) days, 4 WRC § 1-308(B); and

**WHEREAS,** pursuant to Resolution No. 2019-11, the Tribal Council submitted the proposed Tribal Labor Relations Ordinance of 2019 for public review from February 20, 2019 to March 21, 2019; and

Resolution 2019-23
April 18, 2019
Page 2

**WHEREAS,** the Tribal Council conducted a public hearing regarding the proposed Tribal Labor Relations Ordinance of 2019 on March 7, 2019 at the Tribe's office; and

**WHEREAS,** the proposed Tribal Labor Relations Ordinance of 2019 was submitted to each member of the Tribal Council for final review on March 28, 2019.

**NOW BE IT THEREFORE RESOLVED,** the Tribal Council does hereby enact the Tribal Labor Relations Ordinance of 2019; and

**BE IT FINALLY RESOLVED,** the Tribal Chairperson shall fully and faithfully execute, and take any and all action necessary to implement, the Tribal Labor Relations Ordinance of 2019.

<strong>CERTIFICATION</strong>

It is hereby certified that the foregoing Resolution was adopted by an affirmative vote of 5 for, 0 against, and 0 abstaining, presented for approval on April 18th, 2019, pursuant to the authority contained within the Constitution of Wilton Rancheria.

Dated this 18th day of April 2019.

Tonya Caldwell
Tribal Council Spokesperson

Attest:

Jesus Tarango
Vice-Chairperson

107819464.1

Ex. B-15

# **<u>Exhibit C</u>**

In the Matter of an Arbitration Between

**WILTON RANCHERIA**
                                    Tribe

    - and -

**UNITE HERE International**
                                    Union

---

**AWARD & OPINION**

---

NB 4229
AAA-01-23-00003-6907
Sky River Casino

---

**Arbitrator:**          **Norman Brand, Esq.**

**Appearances:**

       **For** Wilton Rancheria
       Carroll & Associates, PC
       **By Sheila Lamb Carroll, Esq.**
          **Dacia J. Senat, Esq.**

       **For** UNITE HERE International
       McCracken, Stemerman, Holsberry, LLP
       **By Kristin L. Martin, Esq.**

**Date:  March 17, 2024**

1

## Background

By letter dated November 8, 2023, the American Arbitration Association ("AAA") informed the Arbitrator he had been chosen from the Tribal Labor Panel to serve in this dispute between the Wilton Rancheria d/b/a Sky River Casino ("Tribe") and UNITE HERE International Union ("Union").[1] After making disclosures, on December 15, 2023, the Arbitrator held a case management call to resolve a dispute over the issue. Based on the Tribe's description of the issue in the demand it filed with AAA[2], the Arbitrator deemed the dispute was whether the election/certification procedure in the Tribal Labor Relations Ordinance ("TLRO") enacted April 18, 2019, or the card check/recognition procedure in the Memorandum of Agreement ("MOA") signed August 7, 2017, must be followed. The Union proposed that if the Arbitrator determines the MOA applies, he should conduct the review of authorization cards required by the MOA, as well as decide another pending issue under the MOA. The Tribe asserted no issue could be added to its demand for arbitration without its approval and refused to approve. The

---

[1] On November 18, the Union notified the Arbitrator, through his website calendar, that he had been chosen by the parties to arbitrate this dispute. Both the TLRO and the MOA contain arbitration clauses. While the TLRO requires a member of the Tribal Labor Panel, the MOA permits any agreed upon arbitrator. Both documents contain limited waivers of sovereign immunity, for compelling or confirming an arbitration award. Thus, regardless of which document, the Arbitrator has authority to hear and decide this dispute.

[2] Grievance: Pursuant to the Tribal-State Gaming Compact between the State of California and Wilton Rancheria, Wilton Rancheria was required to adopt and maintain Tribal Law identical to the Tribal Labor Relations Ordinance attached to the Compact. To comply with this requirement, Wilton Rancheria enacted the Tribal Labor Relations Ordinance of 2019 ("TLRO"), codified as Chapter 3 of the Wilton Rancheria Labor Code, on April 18, 2019. The TLRO provides for a two-step certification process before an arbitrator from the Tribal Labor Panel: (1) dated and signed authorization cards from thirty percent (30%) or more of the Eligible Employees; and (2) a secret ballot election requiring more than fifty percent (50%) of Eligible Employees. The TLRO requires all issues to be resolved by a resolution by the Tribal Labor Panel. Respondent refuses to comply with the two-step certification process and the dispute resolution mechanism identified in the TLRO, relying on a Memorandum of Agreement (MOA) signed by the parties on August 7, 2017, prior to the enactment of the Tribe's TLRO.

Arbitrator declined to decide any additional issues under the MOA, if it applies, or to review the authorization cards.

The parties agreed to pre-hearing briefs and reply briefs, all of which were timely filed in accordance with their agreed upon timetable. The Arbitrator held a hearing on February 8, 2024, in Sacramento, CA. Both parties were present and represented by counsel.  Each had a full opportunity to examine and cross-examine witnesses, present evidence, and argue its position.  Neither party objected to the conduct of the hearing. A court reporter recorded the proceedings.  At the close of the evidentiary hearing the parties asked to schedule a further date to make oral closing arguments. The Arbitrator heard oral arguments on February 15, 2024, and declared the hearing closed when he received the transcript of the closing oral arguments on February 28, 2024.

## Issue

The parties agreed the issue is:

Whether the Union must comply with the TLRO promulgated April 18, 2019, or the Tribe must comply with the MOA signed by the parties on August 7, 2017.[3]

---

[3] The issue was stated broadly to allow agreement, but the essential dispute is narrower. The TLRO contains provisions for an organizing campaign leading to an election and potential certification of the Union and negotiation/mediation of a first agreement. The MOA contains provisions for an organizing campaign leading to a neutral review of authorization cards and potential recognition of the Union and negotiation/mediation of a first agreement. Both contain essentially similar dispute resolution provisions. Each provides a complete process from organizing through establishment of a first collective bargaining agreement. Those competing processes are at issue. The TLRO, however, has additional provisions that – as became clear at the hearing – are not at issue (e.g. §3-203 "Non-Interference with Regulatory or Security Activities;" §3-209 "Indian Preference Explicitly Permitted;" and, §3-212 Decertification of a Bargaining Agent.") Thus, compliance with the MOA does not affect compliance with those provisions.

**History**

Two histories are relevant to this dispute: 1) the history of the creation of the mandatory model TLRO in State of California/Tribal Compacts; and 2) the negotiating history of the MOA between the Tribe and Union. There was testimony about both.

Mandatory Model TLRO

Howard Dickstein, who has been practicing Indian law for over 40 years, represented the United Auburn Indian Community, Yocha Dehe Wintun Nation (then called Rumsey Rancheria), Pala Band of Mission Indians, and Jackson Rancheria in the 1999 Compact negotiations with the State of California. (Tr. 95:3-5; 97:15-25)[4] He was the only lawyer on the tribal side, and he negotiated what became the model Compact that approximately 60 tribes entered into. (Tr. 104:10-11; 98:7-10) The negotiations had to be completed and the Compacts signed in time for the legislature to approve them. This was particularly important because US Attorneys were "breathing down the necks" of tribes conducting Class 2 gaming without a Compact, threatening to shut them down unless they had Compacts. Negotiations concluded just an hour or two before the legislature adjourned. (Tr. 99:10-25)

According to Dickstein, the legislature had taken the position that it would not ratify Compacts that failed to give unions organizational and representational rights at the casinos established under those Compacts. Negotiations on union organizational

---

[4] There are two transcripts with non-sequential page numbering. The citation "Tr." refers to the transcript of the hearing on February 8, 2024. The citation "Tr.II" refers to the transcript of closing arguments on February 15, 2024.

and representational rights were not completed before the legislature adjourned.

Consequently, the legislature approved Compacts that contained language nullifying

them unless such rights were subsequently made part of the Compact.[5] (Tr. 101:19-

102:5) The negotiations over union organizational rights continued after the legislature

adjourned. The parties agreed on a "Model Tribal Labor Relations Ordinance," providing

union organizational and representational rights, later in September.[6] There was no

bilateral mechanism to put these rights into effect after the Compacts had been

approved by the legislature. Therefore, there had to be unilateral action by the Tribes to

effectuate the rights contained in the Model TLRO that was part of each compact.

Dickstein explained:

> it would be unilateral at that point, so it was called an ordinance really for
> that reason, so the tribe could implement it, but the tribe was implementing
> it as really a part of the compact and the negotiation of the compact .... It
> was unlike any ordinance that you would otherwise see because it was an
> ordinance in form, in name, but it was actually negotiated pursuant to the
> compact, and then made a part of the compact with its own dispute
> resolution mechanisms… So it was not an ordinance like any other I'd
> ever seen. (Tr. 102:16-103:2)

Once it had been negotiated, the State required all Tribes to adopt the TLRO

and maintain it in effect to avoid termination of its Compact.[7] Dickstein was "the only

---

[5] *See,* e.g. Pala/State Compact Sec. 10.7. Labor Relations.
Notwithstanding any other provision of this Compact, this Compact shall be null and void if, on or before
October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State
for addressing organizational and representational rights of Class III Gaming Employees and other
employees associated with the Tribe's Class III gaming enterprise, such as food and beverage,
housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any
related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.
*State/Pala Compact,* September 10, 1999.
[6] The negotiating parties apparently reached agreement on September 14, 2099, since that is the date on
the first Model TLRO. *See,* e.g. "Tribal-State Compact between the State of California and the Agua
Caliente Band of Cahuilla Indians" http://www.cgcc.ca.gov/?pageID=compacts accessed March 17, 2024.
[7] In compliance with Section 10.7 of the Compact, the Tribe agrees to adopt an ordinance identical to the
Model Tribal Labor Relations Ordinance attached hereto, and to notify the State of that adoption no later
than October 12,1999. If such notice has not been received by the State by October 13, 1999, this
Compact shall be null and void Failure of the Tribe to maintain the Ordinance in effect during the term of

attorney [on the tribal side] who negotiated that TLRO…" (Tr. 104:10-11) At the time it

was assumed the National Labor Relations Act ("NLRA") did not apply to tribal casinos.

(Tr. 103:6-10)[8] Dickstein, who had experience with the NLRA, knew the State

administration and unions wanted to replicate the NLRA and the TLRO was "modeled

on it." (Tr. 103:14-20) Dickstein was aware of what the NLRA "said about elections and

card check agreements" and he and his tribal clients understood it. In response to a

question about whether the TLRO language meant card check would not be allowed, he

said the TLRO "was a floor from which tribes could take off … because that was the

way the NLRA had interpreted it …" (Tr. 104:13-25)[9],[10]

Raymond C. Hitchcock, as Chairperson of Wilton Rancheria, signed the Compact

between the State of California and Wilton Rancheria on June 29, 2017. The Compact

provides, at Section 12.10 Labor Relations:

> The Gaming Activities authorized by this Compact may only commence
> after the Tribe has adopted an ordinance identical to the Tribal Labor
> Relations Ordinance attached hereto as Appendix C, and the Gaming
> Activities may only continue as long as the Tribe maintains the ordinance.
> The Tribe shall provide written notice to the State that it has adopted the
> ordinance, along with a copy of the ordinance, before commencing the
> Gaming Activities authorized by this Compact.

On April 18, 2019, the Tribe adopted the required TLRO. While it is identical to the

ordinance required by the Compact, the Tribe added four prefatory sections,

denominated "Article 1". (Exhibit 4 to Tribe's Opening Brief) What is denominated

---

this Compact shall constitute a material breach entitling the State to terminate this Compact No
amendment of the Ordinance shall be effective unless approved by the State. *State/Pala Compact,*
September 28, 1999. The Tribe notified the State it had adopted the TLRO that same day.
[8] *See,* Fort Apache Timber Co., 226 N.L.R.B. 503 (N.L.R.B-BD 1976)
[9] "It is a long established Board policy to promote voluntary recognition and bargaining between
employers and labor organizations…" *MGM Grand Hoel, Inc. 329 NLRB 464, 466 (1999)*
[10] Dickstein's description of negotiations is consistent with the more contemporary description in *Coyote
Valley Band of Pomo Indians v. Cal. (In re Indian Gaming Related Cases Chemehuevi Indian Tribe),* 331
F.3d 1094 (9th Cir. 2003)

"Article II" of the TLRO is explained in the third prefatory section, 3-103 Background, which recites:

> Article II of this Ordinance is identical to the ordinance attached to the Tribe's January 22, 2018, compact. [11]

The fourth prefatory section in Article I, Section 3-104 Scope reads:

> This Ordinance shall be narrowly construed to apply to Eligible Employees to the extent the Ordinance provisions are lawfully required by an effective tribal-state gaming compact between the Tribe and the State of California.

By limiting the TLRO to what can be "lawfully required by an effective tribal-state gaming compact," the Tribe recognized it had ceded its sovereign power to legislate labor relations in its Compact with the State. Nevertheless, it attempts to limit that grant of sovereign power by making it contingent on what the State can lawfully require it to do in a Compact. This appears to be an attempt to provide an avenue to change terms of the TLRO if the State's power to negotiate labor relations provisions is limited in the future.[12]

## MOA between the Tribe and Union

Mr. Kevin Kline, a vice president of UNITE HERE International Union, and Mr. Brian Larson, a vice president of Boyd Gaming, negotiated the MOA between the Tribe

---

[11] The ordinance recites the effective date of the Compact, January 22, 2018, when it was published in the Federal Register, rather than the date it was signed.

[12] While the validity of negotiating any labor relations provision in a compact was decided in *Coyote Valley Band of Pomo Indians v. Cal. (In re Indian Gaming Related Cases Chemehuevi Indian Tribe)*, 331 F.3d 1094 (9th Cir. 2003), it does not appear that the specifics of such provisions have been challenged. The question of NLRA preemption of TLROs continues to be litigated. *See, Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695 (9th Cir. 2022). Additionally, regular attempts have been made to legislate a change to the NLRA to exclude tribes from its coverage. *See,* e.g. Tribal Labor Sovereignty Act of 2015, S.248 https://www.congress.gov/bill/114th-congress/senate-bill/248 last visited March 17, 2024 and Tribal Labor Sovereignty Act of 2023, S. 1328 https://www.govtrack.us/congress/bills/118/s1328/ summary  last visited March 17, 2024.

and the Union.[13] They had previously negotiated card check agreements for commercial casinos managed by Boyd in Tunica and Biloxi Mississippi. (Tr. 75:8-23)[14] Kline had also negotiated a card check agreement in June 2016 with Penn National, another national gaming company in Las Vegas, which managed the casino for the Jamal Indian Village of California. (Union Ex E)[15]  Because both Kline and Larson are in Las Vegas, they conducted the negotiations at Boyd's offices in Las Vegas. Kline never met or communicated with any other representative of the Tribe. (Tr. 77:18-78:5)

Kline did not have copies of the versions of the MOA that were exchanged prior to agreeing on the final version of the MOA. (Tribe Ex. 2) Larson did not testify. The Tribe's General Counsel at the time, Ms. Rose Weckenmann, participated in the negotiations on behalf of the Tribe by redlining a copy of the Union's initial MOA proposal with Larson. (Tr. 25:15-26:16) She did not testify. Mr. Raymond Hitchcock, Chairperson of the Tribe from 2014 to 2020, was the only witness for the Tribe. He was not present at any negotiations. Hitchcock testified that when he was no longer Chairperson, he "lost access" to emails and that he "gained some access to emails" when he became the "Wilton Rancheria gaming authority … but there's a lot of missing stuff there." (Tr. 25:15-28:12) The Tribe provided no emails or earlier drafts of the MOA, either from its own, or Boyd's, records. It relied solely on Hitchcock's testimony.

---

[13] Boyd Gaming became the "development partner" and manager of the Sky River casino for the first seven years of its operation as the result of providing "a lot of money to help the tribe get recognized." (Tr. 17:14-23; 26:9-16) Neither Mr. Larson, nor anyone else from Boyd Gaming testified.

[14] The term "card check agreement" denominates an arrangement in which an employer agrees that it will recognize a union if the union presents union authorization cards from a majority of all Eligible Employees. This contrasts with a secret ballot election, where only a majority of those voting is required. (Tr. 76:8-19) The agreement itself generally contains many other terms, but the essence is substituting the card check process for an election.

[15] Between 2001 and 20012, Mr. Jack Gibbons, the Union's California Political Director, negotiated five card check MOAs with California tribes. (Union Exs. F, G, H, I, K) In 2019 Mr. David Gleason, the Union's Organizing Director, negotiated a card check MOA with the Buena Vista Rancheria. (Union Ex. J)

Kline presented the first proposal for an MOA to Larson in July 2017. Paragraph 1, which recites that the MOA "covers all employees defined as Eligible Employees by the Tribal Labor Relations Ordinance..." was "originally very general" but was negotiated to the MOA language. (Tr. 78:25-79:12) The final language defines specific excluded classifications and "confidential employees as defined in Section 2(11)" of the NLRA to exclude others. [16] Kline testified that paragraph 7 ("¶7"), which requires the Tribe to recognize the Union as the Eligible Employees' collective bargaining representative if a majority have chosen the Union through authorization cards or membership, is unchanged from the Union's original proposal.

Hitchcock contradicted Kline, testifying that the Union wanted to be recognized if 30% of the employees chose it, but the Tribe insisted on 50%. (Tr. 31:1-12) It is not believable that a sophisticated Union negotiator would propose this to an experienced management lawyer, both of whom would know NLRA requirements. As Kline testified, that testimony makes "zero sense because we have to have a majority status to be recognized. (Tr. 80:25-81:10) In his Declaration, Hitchcock claimed to have heard "cautionary stories" of union representatives aggressively soliciting employees from "officials and leaders of other tribes." Because of these stories, he claimed, he would not have signed the MOA if he did not believe it provided for secret ballot elections. When asked who he claimed to have spoken with, he first evaded the question, then refused to answer, insisting "you'll have to subpoena."[17] (Tr. 36:4-38:1)

---

[16] The parties stipulated that the initial draft of what became the MOA did not contain a reference to the TLRO in paragraph 2 ("¶2"). (Tr. 48:1-6)
[17] Declaration, Paragraph 10.

Kline testified that toward the end of their bargaining Larson requested examples of other card check agreements the Union had negotiated. Kline provided the MOA between the Union and the Federated Tribes of Graton Rancheria, under which the Union had gained recognition through a card check procedure. (Tr. 81:20-82:15; 74:2-18) That MOA differs in at least two ways from what the parties had negotiated up to that point. First, there is an explicit promise to politically support the Tribe's effort to enter the gaming market and to oppose its competitors. It reads:

> The Union hereby agrees to actively support before the appropriate federal, state, and local administrative, bureaucratic, regulatory, and legislative bodies for the Tribe's efforts to remain competitive in, and gain entry to, casino and related markets in which the Tribe chooses to participate pursuant to the IGRA. For purposes of this Agreement "active support" includes letter writing, consultation with and lobbying of elected and appointed officials, availability of members for events in furtherance of the Tribe's goals, opposition to competitor's efforts to prohibit the Tribe's entry into tribal government gaming on its lands in Sonoma or Marin Counties, California, and assistance with local government relations. (Union F, paragraph 9)

Second, the Graton MOA explicitly refers to the TLRO in multiple sections and incorporates it into the MOA:

> 1. Purpose
> The purpose of the Agreement is <u>to ensure an orderly environment for the exercise by Eligible Employees of their rights under the Tribal Labor Relations Ordinance</u>…

> 4. Applicability
> All card check procedures and any recognition of the Union provided for by this Agreement shall be in accordance with and applicable only to "Eligible Employees" of the Casino as defined in the TLRO, <u>which will be attached hereto as Attachment 1, and made part of this Agreement.</u>

> 13. Compliance with TLRO
> Nothing herein shall be construed to be inconsistent with or derogate from the obligation of the Union and the Tribe to conform to the TLRO.

After reviewing the Graton MOA, the Tribe proposed and the Union agreed to paragraph

14 (Tr. 83:5-16), which contains substantially similar language to the Graton MOA:

> 14. The Union hereby agrees to actively support before the appropriate
> federal, state, and local administrative, bureaucratic, regulatory, and
> legislative bodies, the Tribe's efforts to obtain ratification of the Compact
> by the California legislation, and to take all reasonable and necessary
> steps to assist the Tribe in connection therewith. For purposes of this
> Agreement, "active support" includes letter writing, consultation with and
> lobbying of elected and appointed officials, availability of members for
> events in furtherance of the Tribe's goals, opposition to competitor's efforts
> to prohibit the Tribe's entry into tribal government gaming on its lands in
> Elk Grove, California, and assistance with local government relations.

Hitchcock asserted that neither the Tribe nor its attorney reviewed the Graton

MOA. Instead, he insisted that the Tribe looked only at TLROs from other tribes. (Tr.

32:21-33:19) Given the uniformity of State required TLROs, and their irrelevance to

negotiating the MOA, that testimony is implausible. The Arbitrator accepted Hitchcock's

Declaration (Tribe 10), only after striking paragraph 10 (42:21) and paragraph 6. (Tr.

46:13-14) The Arbitrator noted further:

> …the declaration is a piece of paper. There is a person here who is live
> and under oath and I will regard what he says here today and is able to be
> cross-examined on as the evidence before me. (Tr. 15:10-13)

After considering his declaration and testimony the Arbitrator finds that Hitchcock was

an unreliable witness whose testimony was not credible. Kline's testimony is the only

credible evidence concerning the negotiation of the MOA.

Kline testified that when the Tribe proposed the political support language, it also

proposed:

> …something about tribal authority … we didn't want in … this was our
> counter to that … traditional language we have in a lot of our card check
> agreements in tribal country referring to the TLRO because that's … part
> of the compact … they have to have that.  (Tr. 84:13-85:2)

The parties agreed to the Union's counter on paragraph 2:

> The parties agree that the Tribal Labor Relations Ordinance governs labor relations at the Casino, and <u>to hereby establish the following procedure for the purpose of ensuring an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance</u> to organize collectively, should employees choose to do so, and to avoid picketing and/or other economic action directed at the Tribe in the event the Union decides to conduct an organizing campaign among the Employees.

Neither Larson nor anyone else from Boyd suggested this language invalidated the card check provision. Kline testified that he would not have signed the MOA if they had because the "whole goal was to get a card check neutrality agreement. That's the purpose of our bargaining and our negotiations." (Tr. 85:12-25) The parties signed the MOA in August 2017.


**<u>Additional Facts</u>**

In the 2017 MOA the Union agreed to support the Tribe in its effort to get legislative approval for its Compact with the State, which would allow it to build and run a casino with Class III gaming. (¶14) The evidence shows the Union fulfilled its agreement to provide legislative support by appearing at committee hearings and arguing for approval of the Compact. In the MOA the Tribe agreed the Union could seek recognition as the collective bargaining representative through a card check procedure, with the Tribe "taking a neutral approach to unionization of Employees." (¶7)

What has occurred was described in the uncontradicted testimony of Mr. Aamir Deen, president of UNITE HERE Local 49. He met with Mr. Gibase, the general manager of the Sky Casino, shortly after the casino opened in August 2022. Gibase agreed to provide a list of employees and investigate access to employee for the Union.

The Union received the list and access in April 2023 and began collecting cards in June 2023.[18] On June 20, 2023, Deen wrote Gibase and the Casino's VP Human resources. Deen asserted the Union had collected authorization cards from a majority of employees in the bargaining unit and requested recognition in accordance with ¶7 of the MOA. The Tribe has taken no steps toward recognizing the Union under ¶7.  (Tr. 133:23-143:3) Thus, the evidence shows the Tribe has not followed the MOA.


## Discussion

The Tribe makes four arguments to support its position that it did not agree the Union could organize employees and potentially obtain recognition through a card check.[19] First, the Tribe asserts as a general matter that:

> The purpose of the MOA, as stated by the MOA, is to memorialize the tribe's promise to maintain neutrality while allowing the union to organize in exchange for the union's support of ratification of the compact. (Tr.II 8:5-8)

While the TLRO makes it an unfair labor practice to "to interfere  with, restrain, coerce eligible employees in the exercise of their rights …Paragraph 3 of the MOA goes farther and that's where the consideration comes in." (Tr. II 10:4-8) That is, the Union got a neutrality provision in return for supporting the Tribe politically. The Tribe agreed to the MOA because it understood ¶2 negated ¶7. Hitchcock signed the MOA because he

---

[18] In November 2022, Gibase wrote Deen saying there appeared to be conflicts between the MOA and the compact. (Union Ex. M)

[19] The Arbitrator has not considered the Tribe's argument that it did not know what a card check agreement was, or that because the MOA is not titled "card check agreement" it was misled. The negotiations were conducted by the Tribe's partner, an attorney at Boyd who had negotiated other card check agreements with Kline. The Tribe's own Counsel redlined the proposed agreement with Larson. It is not plausible that the actual negotiators were misled because of their naivete.

reasonably believed that it meant the election procedures in the TLRO would be followed. (Tr.II 12:17-13:4)

Second, the Tribe asserts that the word "governs," in the phrase "The parties agree that the Tribal Labor Relations Ordinance governs labor relations at the Casino," is dispositive. Taken together with the statement that the "purpose" of the MOA is to ensure "an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance," ¶2 means that the entire MOA is subordinate to the "mandatory and all-inclusive" TLRO. Because the TLRO governs and it does not specifically provide for a card check, the Union cannot use the card check procedure negotiated in ¶7. The Union can only use the election procedure in §3-210 of the TLRO.

Third, in its opening brief the Tribe asserts the TLRO provides for a mandatory two-step certification process which, if not followed, "could subject the Tribe to a claim for breaching its Compact with the State of California." (Brief, 15:23-24) In closing argument, the Tribe said:

> We are not saying that the State of California does not allow a card check process. It does. We are saying that Wilton Rancheria is not allowing a card check process without a secret ballot because that is in the TLRO and that is a right it didn't give up. (TrII. 60:8-12)

Consequently, the Arbitrator does not address the argument about potentially breaching the Compact.

Fourth, the Tribe asserts that the TLRO it enacted in 2019 is the act of a sovereign. Because the MOA does not limit the Tribe's authority to regulate union activities in "unmistakable terms," as a sovereign the Tribe was free to enact a law that is inconsistent with the MOA and which takes precedence over it. *United States v. Winstar Corp.*, 518 U.S. 839, 868 (1996) Thus, regardless of what it might have agreed

to in the MOA, the Union must follow the election process in the TLRO because that is enacted Tribal law.

The Union makes five arguments. First, it asserts the Tribe's reading of the MOA disregards its core promise. In ¶2 the parties agreed that the purpose of the MOA is to ensure "an orderly environment for Employees to exercise their rights" under the TLRO to "organize collectively." In ¶7 the parties agreed on the method by which employees would exercise their TLRO right to organize collectively. Having agreed to card check recognition as a method for employees to exercise their rights under the TLRO in 2017, the Tribe cannot claim in 2023 that its unexpressed intent in 2017 was to require a secret ballot election.

Second, there is no conflict between the TLRO's election procedure and the MOA's card check procedure. They are simply alternative means for the Union to achieve recognition. Section 10 of the TLRO, which was negotiated as part of the Compacts in 1999, contains the same four step procedure for an election as the NLRA: notification of interest by the Union, a 30% showing of interest, a secret ballot election conducted by a neutral party ("election officer" or NLRB), and certification of the Union as the exclusive representative if it has majority support. Both the NLRA and TLRO are silent about card check recognition.

Although the NLRA both contains an election procedure and is silent about voluntary recognition through a card check procedure, that silence is not evidence that voluntary recognition is forbidden. To the contrary. As one court said:

> Voluntary recognition by employers of bargaining units would be discouraged, and the objectives of our national labor policy thwarted if recognition were to be limited to Board-certified elections *NLRB v. Broad St. Hosp. & Med. Ctr.*, 452 F.2d 302, 305 (3d Cir. 1971)

Similarly, the TLRO's silence about a voluntary card check procedure is not evidence that it is forbidden. Assuming arguendo the TLRO governs, there is no conflict between it and the MOA. They are simply alternatives. Viewing them as alternate paths to recognition avoids making ¶7 surplusage and is consistent with contract construction principals: "a document should be read to give effect to all its provisions and to render them consistent with each other. *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63, (1995) The Tribe's interpretation of the MOA gives no effect to ¶7.

Third, the Tribe must comply with the MOA even if the TLRO precludes card check recognition because: a) the Tribe surrendered any right it had to regulate union organizing at its casino when it entered the Compact; b) federal law would preempt the TLRO if it were Tribal law and not an agreement between the State and Tribe; and, c) the TLRO is not a law at all, but an agreement with the State. The Tribe is not excused from complying with the MOA because it entered into another inconsistent agreement. *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 767 (1983)

The Arbitrator finds the Tribe must comply with the MOA signed by the parties on August 7, 2017. There are three reasons for this finding.

First, the Tribe agreed to the MOA, whose essential promises are Tribal neutrality in an organizing campaign and card check recognition, in return for the Union's support in the Tribe's efforts to have the legislature approve its compact with the State. The credible bargaining history is unequivocal. The testimony of Hitchcock, who was not at the negotiations, about what he "believed" was neither competent, nor credible. The Tribe's assertion that it was misled on labor relations matters through

naivete, ignores the experience of its negotiator – a lawyer who had previously

negotiated card check agreements with the Union. Nothing suggests the Tribe was

unaware that it was agreeing to permit the Union to organize its employees and gain

recognition through the card check process described in ¶7.

Second, the Tribe's contention that the purpose of the MOA is:

> …to memorialize the tribe's promise to maintain neutrality while allowing
> the union to organize in exchange for the union's support of ratification of
> the compact. (Tr.II 8:5-8)

finds no support in the evidence, logic, or the MOA. Kline credibly testified that the

whole purpose of the negotiation was to get a card check agreement. That position is

logical because the Union could have most of what it negotiated in the MOA – without

supporting ratification of the Compact – if it sought certification through an election

under the TLRO.  Section 3-207 provides an opportunity for union that seeks

recognition through an election to create a bilateral contract with the Tribe, by agreeing

to certain non-onerous condition.[20] That contract requires the Tribe to provide a list of

eligible employees, access, resolve all issues through arbitration, and provide limited

neutrality.[21] Thus, it would be illogical for a Union to spend months negotiating a

---

[20] Not engage in strikes, picketing, boycotts, attack websites, or other
economic activity at or in relation to the tribal casino or related facility; and
refrain from engaging in strike-related picketing on Indian lands as defined in 25
U.S.C. § 2703(4);
b.    Not disparage the Tribe for purposes of organizing Eligible Employees;
c.    Not attempt to influence the outcome of a tribal government election; and
2.    Resolve all issues, including collective bargaining impasses, through the binding
dispute resolution mechanisms set forth in Section 3-213 herein.
[21] Tribe will not do any action nor make any statement that directly or indirectly states or implies any
opposition by the Tribe to the selection by such employees of a collective bargaining agent, or preference
for or opposition to any particular union as a bargaining agent. This includes refraining from making
derisive comments about unions; publishing or posting pamphlets, fliers, letters, posters, or any other
communication which could reasonably be interpreted as criticizing the union or advising Eligible
Employees to vote "no" against the union.

comprehensive MOA providing political support for the Tribe in order to receive so little in return.

Moreover, the Tribe's argument about the meaning of ¶2 is unconvincing for at least two reasons. First, the Tribe relies on an improbable analysis of the language of ¶2 of the MOA. The paragraph says the parties agree the TLRO "governs labor relations at the Casino" and they:

> establish the following procedure for the purpose of ensuring an orderly environment for Employees to exercise their rights under the Tribal Relations Ordinance to organize collectively …

Taken together, the Tribe says, the two phrases mean the Union agreed that it must follow the election procedure in the TLRO because that procedure is exclusive. That reading is implausible and inconsistent with the interpretation of other card check MOAs. All six card check MOAs in evidence assert their purpose is to ensure an orderly environment for employees to exercise their rights under the TLRO (or Ordinance). Graton goes further and makes the TLRO part of the MOA and says nothing will be done in derogation of it (Union Ex. F); Red Hawk says the TLRO is part of the MOA (Union Ex. I); Enterprise attaches the TLRO, saying it will be adopted. (Union Ex. K) None of these other tribes claimed incorporating or acknowledging the TLRO vitiates the card check process that is part of their MOA.

Additionally, the Tribe's interpretation of ¶2 makes the entirety of ¶7 surplusage. Canons of construction counsel avoiding an interpretation of one part of a contract that makes another part surplusage.

> " '[i]f possible, significance should be given to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose' " and " 'a construction making some words surplusage is to be avoided.' " [citation omitted] see Code Civ. Proc., § 1858 ["In the construction of a statute … where there are several provisions or particulars, such a

construction is, if possible, to be adopted as will give effect to all."].*Picayune Rancheria of Chukchansi Indians v. Brown*, 229 Cal. App. 4th 1416, 1428, (2014)

The Tribe's interpretation of ¶2 is implausible and unconvincing.

Third, the Tribe fails to show that the TLRO is a law it made as a sovereign that takes precedence over the MOA. The TLRO is in the Tribe's compact with the State that allows it to operate a casino with Class III gaming. In agreeing to that compact, the Tribe voluntarily gave up its right to legislate about labor relations. It explicitly agreed:

> The Gaming Activities authorized by this Compact may only commence after the Tribe has adopted an ordinance identical to the Tribal Labor Relations Ordinance attached hereto as Appendix C, and the Gaming Activities may only continue as long as the Tribe maintains the ordinance. The Tribe shall provide written notice to the State that it has adopted the ordinance, along with a copy of the ordinance, before commencing the Gaming Activities authorized by this Compact. (Compact, Section 12.10)

In passing the TLRO as an Ordinance, the Tribe created a framework in "Article 1" that explicitly recognizes the TLRO exists only because the Tribe ceded its power to regulate labor relations to the State:

> This Ordinance shall be narrowly construed to apply to Eligible Employees to the extent the Ordinance provisions are lawfully required by an effective tribal-state gaming compact between the Tribe and the State of California.

This framework allows the Tribe to attempt to repudiate any portion of the TLRO that is found to be beyond the State's power to require. It further demonstrates that passing the TLRO was not a sovereign act. As Dickstein, who negotiated the TLRO on behalf of the tribes, observed:

> it was called an  ordinance …so the tribe could  implement it, but the tribe was implementing it as really a part of the compact and the negotiation of the compact, … because it was an ordinance in form, in name, but it was actually negotiated pursuant to the compact… So it was not an ordinance like any other I'd  ever seen. (Tr. 102:16-103:2)

The evidence shows that by passing the TLRO the Tribe was not engaging in a sovereign act but acting on a requirement of its compact with the State in which it had

agreed to give up its sovereign power legislate labor relations in return for a compact that permitted it to engage in Class III gaming in its casino.

The credible evidence shows that the Tribe agreed to the 2017 MOA with the Union. The MOA provide for, among other things, card check recognition of the Union as the exclusive collective bargaining representative the employees. In its compact with the State, the Tribe agreed to enact a specific TLRO as a condition of opening a casino with Class III gaming. In making that agreement, the Tribe ceded its sovereign right to control labor relations in the casino. Consequently, enacting the TLRO in 2019 was not a sovereign act but a compact obligation to the State. Therefore, enacting the TLRO did not affect the Tribe's obligations under the MOA it negotiated with the Union. The evidence shows the Union fulfilled its obligation to support legislative passage of the compact. It also shows the Tribe has not fulfilled its reciprocal obligation under ¶7 of the MOA. It has not appointed an arbitrator to review authorization cards and membership information, to decide the Union's claim to represent a majority of the employees. The Tribe is obliged to do so under the MOA.

**Award**

       **The Tribe must comply with the MOA signed by the parties on August 7, 2017.**

**San Francisco, California**
**March 17, 2024**

                          **Norman Brand**

# **Exhibit D**

**ARBITRATION PROCEEDINGS**

| | | |
|---|---|---|
| In the Matter of the | ) | Anthony Miller |
|   Arbitration Between | ) | Arbitrator |
| | ) | 805/657-8794 |
| UNITE HERE | ) | |
| | ) | |
| Union, | ) | |
| | ) | |
| And | ) | Award: Authorization Card Review |
| | ) | |
| WILTON RANCHERIA | ) | |
| | ) | Date: April 28, 2025 |
| Employer, | ) | |
| | ) | |
| | ) | |

### COUNSEL FOR THE PARTIES

*For the Union*

Kristin L. Martin, Esq.
McCracken, Stemerman & Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612

*For the Employer*

Steven G. Biddle, Esq.
Melissa L. Shingles, Esq.
Littler Mendelson, P.C.
2425 E. Camelback Rd., Ste. 900
Phoenix, AZ 85016

## INTRODUCTION

The parties, UNITE HERE (Union) and Wilton Rancheria (Employer), have selected the Arbitrator, Anthony Miller, to hear disputes and review authorization cards collected during the Union's campaign to organize the employees of the Sky River Casino in Elk Grove, California, and to ultimately gain recognition as the exclusive representative of those employees in collective bargaining. The Memorandum of Agreement between the parties has authorized me, as the Arbitrator, to "conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees." The parties have also agreed that, "If that review establishes that a majority of such Employees has designated the Union as their exclusive collective bargaining representative or joined the Union, the Tribe and the Operator will recognize the Union as such representative of such Employees."[1] Additionally, the parties have also agreed that I have the "authority to determine the arbitration procedures to be followed" and "to order the noncompliant party to comply with this Agreement." And, finally, the parties agreed "to comply with any order of the arbitrator, which shall be final and binding.[2]

Up to this point the resolution of the issues presented in this matter have been handled somewhat informally. There have been several informal discussions, and the parties have filed several preliminary briefs which I have carefully considered. In response to these briefs, I have issued preliminary awards, all of which are hereby incorporated into the present opinion and award. Most importantly, a hearing was conducted with a Reporters Transcript on March 14, 2025. At that time, I established basic procedures and rules for the review of the authorization

---

[1] Memorandum of Agreement, Paragraph 7.
[2] Id., Paragraph 11.

cards presented by the Union.  In summary form, here are the provisions I established at that

time.  First, I stated that my primary allegiance was to the Memorandum of Agreement which

does not make any express provision for a signature check[3] of the authorization cards presented

by the Union.  Second, I believed that the Union had agreed to participate in the signature check.

Thirdly, the burden clearly falls on the Employer to provide signature templates that can be used

in the signature check.  Fourth, while time is of the essence in doing the review of the cards, the

Employer had four additional weeks to provide signature templates to be used in the signature

check.  Fifth, while waiting for the signature templates, I would proceed with the preliminary

counting of the authorization cards.  Sixth, I would count the authorization cards twice, first,

using only cards that had been dated withing the 12-month period ending with March 14, 2025

and, second, using all the cards that the Union presented to me.  Seventh, both parties were

allowed to file additional briefs.  And, finally, in determining if there was a majority in favor of

Union representation, I would use an employee list updated as of March 14, 2025

### RELEVANT PROVISION OF THE MEMORANDUM OF AGREEMENT

7. The Union is not presently recognized as the exclusive collective
bargaining representative of the Employees. The Union may request recognition
as the exclusive collective bargaining agent for such Employees. The arbitrator
identified in Paragraph 1 1, or another person mutually agreed to by parties, will
conduct a review of Employees' authorization cards and membership information
submitted by the Union in support of its claim to represent a majority of such
Employees. If that review establishes that a majority of such Employees has
designated the Union as their exclusive collective bargaining representative or
joined the Union, the Tribe and the Operator will recognize the Union as such
representative of such Employees. The Tribe and the Operator will not file a
petition with the National Labor Relations Board for any election in connection
with any demands for recognition provided for in this agreement. The parties
agree that if any other person or entity petitions the National Labor Relations
Board for any election as a result of or despite rec recognition of the Union

---

[3] In my original statement I used the term card check, but, as Ms. Martin helpfully pointed out, I
was actually referring to the signature check which Mr. Biddle had proposed in the course of the
hearing.

pursuant to this Paragraph, (a) the parties will each request that the NLRB dismiss the petition on grounds of recognition bar or, if they have agreed to a collective bargaining agreement covering Employees at the time the petition is filed, on grounds of contract bar, (b) if the petition is not dismissed, the parties shall agree to a full consent election agreement under Section 1 02.62(c) of the NLRB's Rules and Regulations, and (c) the parties shall at all times abide by the provisions of this Agreement except that the Union may file unfair labor practice charges. Except as provided above, the parties will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration under Paragraph 11 shall be the exclusive remedy.

11. The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration. The Tribe's and the Union's representatives shall meet within fourteen (14) calendar days after the receipt of a panel of arbitrators from the Federal Mediation and Conciliation Service ("FMCS"). Selection of a sole and impartial arbitrator shall be made by the Tribe and the Union representatives each alternately striking, with Union making the first strike, one (1) name from a seven (7) member panel of arbitrators, received from the ("FMCS"), who are members of the National Academy of Arbitrators and who reside in California, Arizona, New Mexico or Nevada. The person whose name remains will be requested to serve as the impartial arbitrator. By mutual agreement, the parties may waive the use of the panel named above and refer the matter in dispute to an arbitrator selected from any other source. The arbitrator shall have the authority to determine the arbitration procedures to be followed. The arbitrator shall also have the authority to order the noncompliant party to comply with this Agreement. The parties hereto agree to comply with any order of the arbitrator, which shall be final and binding. The United States District Court for the Eastern District of California shall have exclusive jurisdiction in any action concerning arbitration under this Agreement. The parties consent to the entry of any order of the arbitrator as the order or judgment of the Court, without entry of findings of fact and conclusions of law.

**DISCUSSION**

*Materials Used*

The parties supplied me with the basic material to review the authorization cards. From the Employer, I received an Excel spreadsheet listing all of the employees in the bargaining unit as of March 14, 2025 and a PDF file containing documents with employee signatures. The list contained <u>658</u> employees. As to the file, I did not count the number of employee signature templates, but I know that there was no signature template supplied for a number of employees.

4

The Union supplied me with a PDF file containing the signed and dated employee authorization cards. The authorization cards came in two forms. One card states, "I authorize UNITE HERE to be my representative, and I will proudly become a member of UNITE HERE Local 49" [4] and the other, "I hereby authorize UNITE HERE International Union to represent me for the purposes of collective bargaining." It is my conclusion that both of these statements are adequate to establish the signer's intent to have the Union represent them in collective bargaining. The total number of Authorization Cards presented was <u>457</u>.

*Non-Employees*

From the total number of cards, I excluded from the count <u>25</u> cards. Each of these cards was signed by an employee whose name did not appear on the March 14, 2025 list of employees provided by the Employer. Presumably, these cards were signed by former employees who left the company prior to March 14, 2025 and no longer worked for the Employer. I have accepted the Employer's implied representation that the March 14th list of employees was accurate, and, indeed, have no way to check its accuracy. At this time, I do not believe this issue is critical in light of the conclusions that I have reached in favor of the Union.

*Signature Check*

I have also excluded <u>12</u> cards because I could not verify the authenticity of them. Paragraph 7 of the Memorandum of Agreement clearly establishes that the Arbitrator selected under Paragraph 11 should review the authorization cards. The Employer has asserted that this review should include the process of matching the signature on the authorization cards to other examples of the employee's signature. At the March 14th hearing, I concluded that the Employer

---

[4] Some of these cards were printed in Chinese logographic script. The cards have not been translated, nor have they been challenged by the Employer. I have included those cards in my count.

5

had the burden of producing signature samples for purposes of comparison.  At this time, it is my conclusion that, absent additional evidence of fraud or forgery, the Employer has the burden of proving via the samples that an authorization card is invalid.

Although I have no training in handwriting analysis, I did my (very time-consuming) best to compare the authorization cards to the samples. The employees on both the authorization cards and on the signature samples had widely differing views of what constituted a signature.  There were signatures that were carefully written in cursive but others were printed. There were many signatures that appeared to be hastily written. There were "signatures" which amounted to just initials or what merely appeared to be symbolic or logographic.  Signatures appear in the "print name" fields and printed names in the "signature" fields." Despite, these different approaches, the vast majority of signatures cards neatly matched the samples, and the rest, except for the twelve I have excluded from the count, were sufficiently similar so I did not question their authenticity.

*The One Year Count*

The Union has provided 356 employee signed authorization cards that were signed within the year preceding March 14, 2025.  The Employer requested that the count be based upon this time frame. This number of cards constitutes 54.10% of the 658 employees on the March 14, 2025 list. This majority has designated the Union to represent them in collective bargaining, and the Memorandum of Agreement requires the Employer to recognize them as the exclusive representative of the employees.

*The Count of All Authorization Cards*

If all the authorization cards presented by the Union are counted, the total number of the employees authorizing the Union to represent them is 420 which constitutes 63.83% of the 658

Employees.  The number <u>420</u> includes the <u>356</u> employees mentioned in the paragraph above and <u>64</u> authorization cards that were signed prior to March 14, 2024.  I believe that none of these cards were signed before June of 2023.

The Employer has argued that this approach to counting runs counter to both the Tribal Labor Relations Ordinance (TLRO) and the practice of the National Labor Relations Board in dealing with card counts. I have already concluded that my jurisdiction is based upon the Memorandum of Agreement and my responsibility is to apply that agreement fairly.  As to the NLRB practice the Employer states, "cards signed more than a year prior to the union's demand for recognition may be considered 'stale' and thus not count toward the union's majority." After review of the authority provided by the Employer, I am convinced that the operative word in this statement is "may."  In the present case, where there has been protracted litigation of the issues presented, I have concluded that fairness to those employees who signed authorization cards early in the campaign demands that their authorization cards be considered.  The Employer has rightfully taken advantage of various legal procedures and challenges to the right of the Union to represent the employees in collective bargaining based upon authorization cards.  That is how it should be.  But the delays that these procedures and challenges have caused should not now be used as a basis to disenfranchise employees from having their preference for Union representation and collective bargaining counted. It is my conclusion that both the "one year" count and the "all cards" count establish that a majority of the Employees have authorized Union representation in the collective bargain process.

### FINDINGS AND CONCLUSIONS

After careful consideration of the information and materials that were supplied to me, I have made the following findings of fact:

7

1. As of March 14, 2025, there were <u>658</u> employees in the bargaining unit that the Union seeks to represent.

2. As of March 14, 2025, employees had signed <u>457</u> cards authorizing the Union to represent the bargaining unit employees in collective bargaining.

3. <u>25</u> of the authorization cards were excluded from the overall count because the names of the employees who signed the cards were not on the list of the employees as of March 14, 2025.

4. <u>12</u> of the authorization cards were excluded because they did not sufficiently match what I considered valid samples provided by the Employer.

5. There was a total of <u>356</u> employee authorization cards signed by employees in the year prior to March 14, 2025. This number of cards constitutes <u>54.10%</u> of the <u>658</u> employees on the March 14, 2025 list of employees.

6. There was a total of <u>420</u> employee authorization cards signed by the employees during the course of the entire period in which the Union conducted its organizational campaign. This number of cards constitutes <u>63.83%</u> of the <u>658</u> employees on the March 14, 2025 list of employees.

It is my conclusion, using either of the time frames discussed above, that a majority of employees in the bargaining unit have "designated the Union as their exclusive collective bargaining representative" and that the Memorandum of Agreement requires the Employer to "recognize the Union as such representative of such Employees" and to engage in collective bargaining. Additionally, I am convinced that the Memorandum of Agreement gives me the power to order compliance with the results of this process; Paragraph 11 clearly states that "the arbitrator shall also have the authority to order the noncompliant party to comply with this

Agreement." I have not chosen to do so simply because at this time no one is technically "noncompliant." And, it is my sincere hope based upon the conclusions I have reached, that the Employer will recognize the Union and the process of collective bargaining will begin. Nevertheless, I hereby retain jurisdiction to resolve any issues that arise as a result of the conclusions that I have reached and to issue appropriate orders if the need arises.

Dated: April 28, 2025    _____

Anthony Miller
Arbitrator

9

# **<u>Exhibit E</u>**

## IN ARBITRATION PROCEEDING BEFORE

## ANTHONY MILLER, ARBITRATOR

| | |
|---|---|
| **UNITE HERE**<br><br>   **and**<br><br>**WILTON RANCHERIA** | **WILTON RANCHERIA'S ARBITRATION POST-HEARING BRIEF** |

Wilton Rancheria ("Wilton" or the "Tribe") respectfully submits this Post-Hearing Brief regarding the arbitration hearing held on March 14, 2025.

## I.     <u>INTRODUCTION</u>

For multiple reasons, issuing a final award, or even an interim determination regarding the Union's status at Sky River Casino ("Sky River" or "Casino"), is premature. Most fundamentally, the position that the Union presses here—that the MOA takes precedence over an affirmatively ratified Tribal Law—would undermine the paramount principle of Tribal Sovereignty. Starting with first principles, Wilton Rancheria is a federally recognized, sovereign Indian Nation with its own Constitution and a Sovereign Tribal Government made up of executive, legislative, and judicial branches. The Tribe, just like all similarly-situated Tribal Nations, is a Sovereign Tribal Nation governed by its own laws recognized and protected by United States federal law and court decisions.

Congress recognized the core principle of Tribal Sovereignty when it passed the Indian Gaming Regulatory Act ("IGRA") in 1988, and federal courts have echoed that recognition consistently, both before and after IGRA. It is critical that this arbitration recognizes, respects, and preserves the sovereignty of the Tribe and ensures that the laws of this Tribal Sovereign Nation

are not made subordinate to a private Agreement between Tribal and non-tribal, non-governmental, or non-sovereign entities.

Beyond that fundamental principle, proceeding directly to determining the Union's status would frustrate the August 7, 2024, Order of the Federal Court that referred this matter to arbitration. That Order made clear that the Tribe remains empowered to challenge the legitimacy and enforceability of the underlying contract—the Memorandum of Agreement ("MOA"). But proceeding directly to determining the Union's status under the card check procedure ostensibly permitted under the MOA would extinguish the Tribe's challenge before the Tribe receives a fair chance to present it. That outcome comports with neither due process nor the Federal Court's August 7 Order.

For these reasons, fleshed out below, the Union's status under the MOA's card check procedure is not yet ripe for determination. Instead, the Arbitrator should order additional, preliminary proceedings to hear and determine the Tribe's challenge to the MOA—a challenge rooted in the fundamental principle of Tribal Sovereignty  and actions of a Tribal Sovereign Government.

If, instead, the Arbitrator opts to indulge the Union's plea to undercut the Tribe's sovereignty and disregard the Tribe's challenge to the MOA, the Arbitrator should limit his count. Specifically, he should exclude any cards signed more than a year before March 14, 2025, and all cards signed by individuals who were no longer employed by the Casino on that date.

## II.  RELEVANT BACKGROUND

### A.  IGRA Establishes a Comprehensive Framework for Regulating Tribal Nations' Casinos and that Framework is Rooted in Congress's Recognition of Tribes as Sovereign Entities.

Congress passed IGRA to regulate tribal casinos through a framework that recognizes the sovereignty of both Tribal Nations and the states that surround them. Congress required the Tribal

2

Nations and States to enter into compacts—effectively treaties—that the Secretary of the Interior ultimately reviews and approves. 25 U.S.C. § 2710(d)(8). These Tribal–State compacts may address subjects that are directly related to the operation of gaming activities, including labor relations. *See Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 699 (9th Cir. 2022). Through this system of cooperative federalism, three separate sovereigns (Tribal Nations, the federal government, and the states) each play a role in working together to establish the rules under which tribal casinos will operate.

Notably, the IGRA framework empowers only those sovereigns. It neither empowers nor authorizes private entities like corporations or unions to play any role in establishing the rules applicable to tribal casinos. And IGRA certainly does not empower those private actors to trench on tribal sovereignty by undermining the compacts negotiated by state and tribal sovereigns.

**B.    The Compact Between the Tribe and the State of California Requires the Tribe to Adopt a Tribal Labor Relations Ordinance and that Ordinance Provides for Secret Ballot Elections.**

As a result of IGRA, the State of California and dozens of Tribal Nations entered into Tribal–State Compacts to authorize regulated Tribal Gaming. Although not all of the California Compacts are the same, for any Tribal Nation with 250 or more persons employed in their gaming facility, the Compacts include a model Tribal Labor Relations Ordinance that the Tribal Nations are requested to adopt. . Again, although not identical, the model TLRO addresses organizational and representational rights of the employees and grants unions access to eligible employees to discuss organization.[1]

---

[1] Tribal Alliance of Sovereign Indian Nations, Labor Relations Policy Issues, accessible at (https://www.tasin.org/policy-issues/labor-relations#:~:text=The%20Compact%20required%20tribal%20governments,discuss%20organization%20and%20representation%20issues.)

Consistent with its government-to-government Tribal–State Compact, Wilton passed the Tribal Labor Relations Ordinance of 2019, 7 WRC § 3-101, et seq. (enacted April 18, 2019) ("TLRO"). In Section 2-310, the TLRO provides, in part, "[d]ated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer **will result** in a secret ballot election." (emphasis added). The TLRO, which is a Tribal statute, contains no exception for any previously signed MOA.

### C.    The Union Sought to Organize Employees Using a Card Check Procedure Under a MOA that Predates the TLRO.

Before the Tribe passed its statute governing labor relations at the Casino, it had negotiated and entered the MOA with the Union and the Casino operator, Boyd Gaming. In paragraph 2, the MOA expressly adopted the not-then-enacted TLRO into the MOA:

> The parties agree that the **Tribal Labor Relations Ordinance governs labor relations at the Casino**, and to hereby establish the following procedure for the purpose of ensuring an orderly environment **for Employees to exercise their rights under the Tribal Relations Ordinance to organize collectively**, should employees choose to do so, and to avoid picketing and/or other economic action directed at the Tribe in the event the Union decides to conduct an organizing campaign among the Employees.

(emphasis added) Yet, and contrary to the TLRO, the MOA also contemplates a card check procedure, whereby collecting authorization cards from more than 50% of eligible employees would lead to union recognition.

Even though the TLRO provided for recognition only after a secret ballot election, the Union demanded recognition under the card check procedure. Unsurprisingly, this tactic led to a dispute. Because the Union sought to end-run the Tribe's affirmatively ratified Tribal Law—and thus sought to undermine the Tribe's sovereignty—the Tribe objected to the Union's efforts. That objection yielded an arbitration and a federal lawsuit.

In late 2023 and early 2024, the Parties participated in an arbitration with Arbitrator Norman Brand. Arbitrator Brand determined the MOA had an enforceable arbitration provision and the Parties were required to arbitrate the card count and other outstanding issues. But before Arbitrator Brand reached that issue, the Union filed a lawsuit in Federal District Court seeking to compel the Tribe to arbitrate the dispute over the card check procedure. On August 7, 2024, the Federal Court ordered the Parties to arbitrate their disputes regarding the MOA, including the extent to which the MOA or TLRO controls the Union's organization process. The Court specifically held the Tribe could challenge "the agreement [MOA] as a whole" and assert the TLRO as "a defense to enforcement" of the MOA in the instant arbitration. Accordingly, the Parties are before this Arbitrator to have him resolve the remaining issues between them.

Wilton and the Union participated in an arbitration hearing before this Arbitrator on Friday, March 14, 2025. The narrow issue covered in the hearing related to the Arbitrator's decision to count the union authorization cards signed by Sky River employees.

## III.  <u>ARGUMENT</u>

### A.  **This Arbitration is Not Limited to the Narrow Issue Currently Under Consideration and the Tribe's Challenge to the MOA is an Issue that Logically Must be Resolved First.**

The District Court's August 7 Order directed the Arbitrator to rule on multiple issues. Although the issues for arbitration include reviewing and counting the cards collected by the Union, that is not the only issue for resolution in this proceeding.

From the outset, the Tribe has challenged the validity of the MOA. The Court recognized that challenge and concluded that it must be decided in this arbitration.

Determining the validity of the MOA and whether that MOA can supersede the TLRO, a Tribal Sovereign Law, is logically necessary prior to any counting of cards. After all, if the Tribe's challenge to the MOA succeeds, the card check process cannot apply and counting of cards will

5

be necessary only to determine whether the Union can surpass the 30% threshold necessary to trigger a secret ballot election under the TLRO. Accordingly, the Tribe's challenge to the MOA's validity must be resolved first.

Resolving that challenge will require the Arbitrator to address issues including, but not limited to: (1) whether this Arbitrator has the authority to conduct the card check process outlined in the MOA in disregard of the TLRO's requirement to have a secret ballot election; (2) the extent to which the TLRO or MOA govern, or the proper order in which the MOA and TLRO govern if both are appropriately considered; and (3) whether the authorization cards are still valid and, if they are only valid in part, what is the appropriate cutoff date. The Tribe maintains that it has not had a full and fair opportunity to present its case and the Arbitrator has not fully and fairly considered and decided these issues, including by inappropriately deciding that the card count provision in the MOA supersedes the mandated secret ballot election in the TLRO – that paragraph 2 of the MOA recognizes as controlling – and by not holding a comprehensive hearing.

## B.    The Arbitrator Must Follow Tribal Law (the TLRO) and Not a Private Contract (the MOA) and Refrain from Conducting a Card Count.

Again, Wilton Rancheria is a federally recognized, Sovereign Indian Nation. Its Constitution and associated Tribal Laws authorize its Legislative Branch, the seven-member Tribal Council, to propose and pass Tribal laws. Its Constitution and Laws further authorize the Tribe's Executive Branch—the Chairperson—to either affirm a Tribal Council's action, thereby ratifying it as Tribal Law, or veto a Tribal Council action, thus defeating it. Here, the Tribal Council passed the TLRO and the Chairperson signed that legislation into law. The TLRO is an exercise of the Tribe's Sovereign power.

Although the National Labor Relations Act ("NLRA") governs, and the National Labor Relations Board ("NLRB") has jurisdiction over labor issues on Tribal land, the Parties

nevertheless agreed to a third-party procedure to check the cards, but simply to confirm whether the 30% threshold to trigger a secret ballot election is met as outlined in the TLRO. That procedure can be accomplished by using the card check provision in the MOA to count the cards, which will then trigger the secret ballot election under the TLRO that the Parties explicitly referenced in the MOA and to which they plainly intended to provide some deference. Otherwise, there is no reason for its inclusion in the MOA. This procedure is also consistent with the secret ballot election procedure referred to in the NLRA. Therefore, the MOA provides the framework to complete the gateway issue of whether an election is necessary before the MOA defers to the TLRO's secret ballot procedures.

At its core, IGRA reflects a compromise solution to the difficult problem involving tribal gaming and came into existence to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." *Artichoke Joe's v. Norton,* 216 F.Supp.2d 1084, 1092 (E.D. Cal. 2002) (alteration in original). Thus, IGRA provides an example of "cooperative federalism that seeks to balance the competing sovereign interests of the federal government, state government and Indian tribes, by giving each a role of the regulatory scheme." *Id.*

When interpretating laws that implicate the balancing of these competing sovereign interests, courts have developed and relied on "well-established canons of statutory construction" in determining issues of Indian affairs. Courts have consistently applied the principle that statutes passed for the benefit of Indian tribes and communities are to be "liberally construed in favor of the Indians, and any doubt as to the statute's proper construction is to be resolved in their favor." *Coyote Valley Band of Pomo Indians v. United States,* 639 F. Supp. 165, 170 (E.D. Cal. 1986); *see also Bryan v. Itasca County,* 426 U.S. 373, 392 (1976). Moreover, courts have routinely been

guided by the principle that "treaties and agreements are to be construed as the Indians would have understood them, and tribal … sovereignty [is] preserved unless Congress's intent to the contrary is clear and unambiguous." *Crow Tribe of Indians v. Repsis*, No. 1:92-CV-01002-ABJ, 2024 WL 1478580, at *8 (D. Wyo. Mar. 28, 2024) (quoting Felix Cohen, *Cohen's Handbook of Federal Indian Law* § 2.02, at 113–14).

As mentioned, it is incumbent upon the Arbitrator to hear and resolve multiple issues related to the TLRO and MOA prior to a card count. These issues include: (1) if both the TLRO and MOA govern, to what extent does each apply; (2) if the TLRO at least partially applies, what is the basis for such application; (3) whether a private agreement (MOA) can take precedence over either Tribal Law (the TLRO) and the Compact between this Sovereign Tribe and the State of California; (4) the effect of paragraph 2 of the MOA that provides for the TLRO to govern labor relations at the Casino; and (5) the resulting remedy if the Arbitrator elects to utilize paragraph 16 of the MOA that gives the Arbitrator the ability to formulate a substitute provision for a provision invalidated by applicable legislation.

The District Court's August 7, 2024, Order authorized Wilton to present the TLRO to the Arbitrator as "challenge to the agreement as a whole" or as "a defense to enforcement" of the MOA. That authorization raises the question of whether the MOA controls certain aspects of the Union's organization efforts, but the TLRO nonetheless remains binding on other aspects. Answering that question demands a specific factual and legal analysis that Arbitrator Brand did not conduct and that Wilton believes has not been undertaken by the Arbitrator here. Wilton has thus far been denied in its request that this Arbitrator hold a hearing to allow the Tribe an opportunity to present its case that the TLRO's union-organizing procedures apply rather than those of the MOA, a decision the Court stated is for this Arbitrator to decide.

8

As further explained below, if anything, the Arbitration should resort to the MOA's card count language only to confirm that at least 30% of the employees of the Casino expressed interest in exploring unionization, which would serve as the gateway to authorizing a secret ballot election under the TLRO. Allowing the Union to represent the employees based only on a card count would give precedence to the MOA, a private contract between a non-sovereign entity and a Tribal Sovereign Government, over sovereign Tribal Law (the TLRO). That approach contradicts the foundational principles of Wilton's status as a Sovereign Government and is inconsistent with longstanding canons of statutory construction. Further, that approach would subvert Congressional intent and the superseding Tribal–State Compact between Wilton and the State of California—a Compact directed and approved by the federal government. Put differently, the TLRO itself derives from the Compact, which derives from IGRA, so the TLRO, rather than the MOA, must control. Further, the TLRO must be construed in favor of the Tribe to preserve Tribal Sovereignty, as directed by the Supreme Court, the Ninth Circuit, and federal district courts in California. In other words, the TLRO is the "law of the land" unless the sovereign says otherwise.

### C.    Secret Ballot Elections Are the Preferred Means for Determining Union Majority Status.

Beyond the plain fact that the TLRO mandates a secret ballot election, such an election—and not a card count—is the preferred means of gauging employee sentiment regarding union representation. Specifically, card counts lack the employee protections of a secret ballot election. An election helps insulate employees from coercion and threats. An election also allows employees to express a preliminary showing of interest and nonetheless privately exercise their free choice regarding representation. Here, fundamental fairness demands that the employees be given the right to have a secret ballot election to decide whether to be represented by the Union.

Indeed, for more than five decades, the Supreme Court has recognized that secret-ballot elections are preferred by federal labor law over card checks. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 602 (1969) ("secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has a majority support"); *see also Brooks v. NLRB*, 348 U.S. 96, 99 (1954) ("an election is a solemn and costly occasion, conducted under safeguards to voluntary choice"). The NLRB has more recently reiterated federal labor law's preference for secret ballot elections over card checks. *See Levitz Furniture Co.*, 333 NLRB 717 (2001) (an employer's unilateral determination as to employee support or opposition to union representation is disfavored); *Underground Serv. Alert*, 315 NLRB 958, 960–61 (1994) (same). Any decision to replace or preempt employee free choice should be reserved for extreme circumstances (if ever).

Here, Section 3-210(A) of the TLRO requiring secret ballot elections was central to the negotiations of the Tribal–State Compact. Indeed, the MOA explicitly references and recognizes that the TLRO governs labor relations, showing the Parties intended to incorporate and defer to the TLRO. Otherwise, there would not be any reference to the TLRO at all. Deferring entirely to a card count to determine certification of a union would render the reference to the TLRO entirely meaningless and ignore why it was included at all. As such, the TLRO, rather than the MOA, ultimately governs labor relations and the process for a secret ballot election for union organization and should be construed in accordance with longstanding canons of construction regarding Tribal affairs.

Proceeding with the card count to determine whether the Union should represent the employees also would contravene historical principles of Tribal Sovereignty, and thereby fail to credit the superseding TLRO and its provision for a secret ballot election. Accordingly, if the

10

Arbitrator chooses that path, the Tribe requests that the Arbitrator provide a reasoned, legally supported ruling explaining the bases for departing from these well-established legal principles and explaining why the TLRO does not apply and why the employees should be stripped of their fundamental right to a secret ballot election. Instead, a rational reading of the TLRO and MOA together provides a procedure under which arbitrator oversight is sought to complete a card count and establish or disprove the requisite 30% showing of interest needed to trigger a representation election, conducted under the TLRO's provisions for a secret ballot election. Given the inclusion of both in the MOA and the various procedures provided by the MOA and the TLRO, this solution gives appropriate weight to all language included in the MOA without entirely removing the references to the TLRO, while protecting Wilton's Tribal Sovereignty guaranteed by the federal government in IGRA. Moreover, it also protects the employees' free choice to select or decline union representation.

### D. If the Arbitrator Decides to Conduct the Card Count, He Should Consider Only Those Cards Signed Within the Past Year and Compare Employee Signatures.

If the Arbitrator decides to utilize a card count, either to justify an election under the TLRO or to replace an election (in contradiction with the TLRO and disregarding IGRA and Tribal Sovereignty), the issue of which cards are active remains. Pursuant to Section 3-210(A) of the 2019 TLRO, "[d]ated and signed authorization cards from thirty (30%) or more of the eligible employees within the bargaining unit verified by the elections officer will result in a secret ballot election." An "eligible employee" is defined as "any person who *is* employed within a tribal casino in which Class III gaming is conducted pursuant to a tribal-state compact or other related facility, the only significant purpose of which is to facilitate patronage of the Class III gaming operations." 7 WRC § 3-202(A) (emphasis added). The use of the present tense in the TLRO's definition of

11

"eligible employees" contemplates that only authorization cards of presently employed employees be verified to trigger a secret ballot election.

Moreover, even if the Arbitrator maintains his decision to go forward with the card count to replace an election, NLRB precedent requires that the cards counted be limited to those received within a reasonable time of their verification. By the Union's own admission, some of the cards presented by the Union are several months, and even more than a year, old and may not accurately reflect the current sentiments of the employees. Indeed, both the staleness of some cards and the high employee turnover rate raise doubt about whether cards signed in the past 12 months correctly indicate employees' current sentiment regarding union representation.

The Union sought to have the Arbitrator count cards signed by employees well beyond the previous one-year period. At the hearing, the Union explicitly requested that the Arbitrator:

> [L]ook at the cards that had those March dates on them or March for – March going forward, excuse me. And if the union has a majority among folks who signed cards in the past 12 months, that's one question. If the union doesn't have majority among folks who signed cards in the past 12 months, please look at the cards dated prior to March of 2024.

Arbitration Hearing Transcript ("Tr.") 32:20-33:2. The Arbitrator determined at the hearing that he would "do the card count twice. The first will be using the cards from the last 12 months. The second time will be using all the cards." Tr. 89:17-20. The Arbitrator further stated that, following the counts, he "will address the issue of which one of those is appropriate to use." Tr. 89:20-22.

The Tribe's position is that cards signed earlier than one year ago should not be counted or considered at all. This position is supported by NLRB precedent. In general, when considering a union's demand for recognition, the NLRB will only review cards signed by employees within a "reasonable time" prior to their submission, normally set at one year. *See, e.g., Sertafilm, Atlas Microfilming Div.*, 267 NLRB 682 (1983), *enforced*, 753 F.2d 313, 118 LRRM 2628 (3d Cir. 1985)

(cards signed more than a year prior to the union's demand for recognition may be considered "stale" and thus not count toward the union's majority); *Blade-Tribune Publ'g Co.*, 161 NLRB 1512 (1966). *See also Audubon Reg'l Med. Ctr.,* 331 NLRB 374 (2000) (one-year time period is considered a reasonable time to consider signed cards).

As Josh Yeltman, the Casino's Vice President of Human Resources, testified at the March 14 hearing, employee turnover since the opening of the Casino has been significant. The turnover rate is about 4% per month or 48% annually. (Tr. 40:23-40:25; 41:1-4) This, of course, also affects whether the signed cards accurately reflect Casino employees' current sentiments. Consequently, if the Arbitrator decides to count the cards presented by the Union, he should only rely on cards signed by *current* employees within the *one* year preceding March 14, 2025. Given this turnover and the overarching concerns regarding erosion of the Tribe's sovereignty by this tribunal, it would be more equitable and, indeed, consistent with the Tribe's laws, for the Arbitrator to use a card check to determine simply whether an election is warranted rather than to replace a secret ballot election outright.

   **E.    The Arbitrator Should Compare Card Signatures to Those on Signed Employee Documents.**

Leading up to the March 14 hearing, a final key concern held by the Tribe was the lack of an agreed-upon process for ensuring the cards' authenticity. Typically, the signatures on cards are compared to the employees' signatures on other documents. As Wilton has argued throughout this arbitration, and as Mr. Yeltman testified at the hearing, gathering signatures from all employees is a burdensome, time consuming, and labor-intensive task. (Tr. 51:19-51:25; 52:1-52:24) Based on the logistical challenges involved in collecting such documents, the Arbitrator rightly ruled during the hearing that the Tribe may provide employee signatures from other sources by April 11, 2025,

that he will then compare to the signatures on the relevant and valid cards to ensure their authenticity.

## III.     <u>CONCLUSION</u>

Wilton Rancheria requests that the Arbitrator consider this matter within the context of the long and complex history between the United States and Tribal Nations. Courts have recognized and respected this history through the development and refinement of longstanding legal principles necessary to ensure that the rights and sovereignty of both nations are recognized and maintained. The TLRO at issue in this matter is the result of one of the legal compromises reached between the State of California and Wilton, a Sovereign Tribal Nation, and must be construed in accordance with the principles of cooperative federalism. This history and established procedure for protecting Tribal Nations should not be cast aside in favor of a simple contract that includes two non-sovereign entities, especially where that contract explicitly references and defers to the TLRO to protect the Tribe's sovereignty. Consequently, and based on the foregoing arguments, the March 14 hearing, and the Tribe's prior submissions, the Tribe once again requests that the Arbitrator consider the direction given by the Federal Court in its August 7 Order that does not require that he count the cards produced by the Union to determine whether the employees will be represented by the Union and, instead, reconsider the Tribe's arguments on the issues outlined herein before making his final decision.

Respectfully submitted this 4th day of April 2025.

*/s/ Steven G. Biddle*
LITTLER MENDELSON, P.C.
Steven G. Biddle
2425 East Camelback Road, Suite 900
Phoenix, AZ 85016
Sbiddle@littler.com
*Attorneys for Wilton Rancheria*

14

## <u>CERTIFICATE OF SERVICE</u>

I certify that Wilton Rancheria's Post-Hearing Brief was served via email on April 4, 2025,

to the following:


Anthony Miller, Arbitrator
Anthony.Miller@pepperdine.edu

Kristin L. Martin
McCracken, Stemerman & Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612
klm@msh.law


*/s/ Tisha A. Davis*
4901-8367-9538.1 / 124796.1001

# **Exhibit F**

## ARBITRATION PROCEEDINGS

| | | |
|---|---|---|
| In the Matter of the | ) | Anthony Miller |
|   Arbitration Between | ) | Arbitrator |
| | ) | 805/657-8794 |
| UNITE HERE | ) | |
| | ) | |
|       Union, | ) | |
| | ) | |
| And | ) | Award: Orders |
| | ) | |
| WILTON RANCHERIA | ) | |
| | ) | Date: June 17, 2025 |
|       Employer, | ) | |
| | ) | |
| _____ | ) | |

### COUNSEL FOR THE PARTIES

*For the Union*

Kristin L. Martin
McCracken, Stemerman & Holsberry, LLP
475 14th Street, Suite 1200
Oakland, CA 94612

*For the Company*

Steven G. Biddle, Esq.
Melissa L. Shingles, Esq.
Littler Mendelson, P.C.
2425 E. Camelback Rd., Ste. 900
Phoenix, AZ 85016

Ex. F-1

## INTRODUCTION

In my previous Award, dated April 28, 2025, I concluded that "a majority of Employees in the bargaining unit have 'designated the Union as their exclusive collective bargaining representative' and that the Memorandum of Agreement requires the Employer to 'recognize the Union as such representative of such Employees' and to engage in collective bargaining."   As part of that Award, I retained my jurisdiction in this matter to "resolve any issues that arise as a result of the conclusions that I have reached and to issue appropriate orders if the need arises." Both parties, UNITE HERE (Union) and Wilton Rancheria (Employer), have submitted responses to my decision.

As part of its submission, the Union has presented documents which indicated that, although they have requested recognition and the start of collective bargaining, neither has taken place.  As a result, the Union has made three requests in its response:

1. Order the Tribe, and its Operator Boyd Gaming, to commence "negotiations for a collective bargaining agreement . . . immediately and conducted diligently and in good faith to the end of reaching agreement expeditiously."

2. Release the Union from its obligation to comply with Paragraph 9 of the agreement until the Tribe and its Operator commence negotiations.

3. Order the Tribe to restore the Union's access to the Casino in accordance with Paragraph 5 of the Agreement.

In its response, the Employer has requested the opportunity to exam the authorization cards signed by the employees and to compare the signatures of the employees to the signatures on the authorization cards.  The Employer has also opposed each of the requests for orders made by the Union.   In addition, the Employer has also reiterated its argument that the Tribal Labor Relations Ordinance (TLRO) rather than the Memorandum between the parties controls this matter and requested that I present a reasoned explanation as to why the TLRO does not apply.

### RELEVANT PROVISIONS OF THE MEMORANDUM OF AGREEMENT

5. If the Union provides written notice to the Tribe or the Operator of its intent to organize Employees covered by this Agreement, the Tribe and the Operator shall provide access to its premises and to such Employees by the Union. The Union may engage in organizing efforts in nonpublic areas of the Casino during employees' non-working times (before work, after work, and during meals and breaks) and/or during such other periods as the parties may mutually agree upon. "Organizing" includes communicating with Employees before and after recognition of the Union as provided in Paragraph 7.

7. The Union is not presently recognized as the exclusive collective bargaining representative of the Employees. The Union may request recognition as the exclusive collective bargaining agent for such Employees. The arbitrator identified in Paragraph 11, or another person mutually agreed to by parties, will conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees. If that review establishes that a majority of such Employees has designated the Union as their exclusive collective bargaining representative or joined the Union, the Tribe and the Operator will recognize the Union as such representative of such Employees. The Tribe and the Operator will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this agreement. The parties agree that if any other person or entity petitions the National Labor Relations Board for any election as a result of or despite recognition of the Union pursuant to this Paragraph, (a) the parties will each request that the NLRB dismiss the petition on grounds of recognition bar or, if they have agreed to a collective bargaining agreement covering Employees at the time the petition is filed, on grounds of contract bar, (b) if the petition is not dismissed, the parties shall agree to a full consent election agreement under Section 1 02.62(c) of the NLRB's Rules and Regulations, and (c) the parties shall at all times abide by the provisions of this Agreement except that the Union may file unfair labor practice charges. Except as provided above, the parties will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration under Paragraph 11 shall be the exclusive remedy.

9. During the term of this Agreement, the Union will not engage in any strike, picketing or other adverse economic or public relations' activity at, or in connection with, the Casino, and the Tribe and the Operator will not engage in a lockout of the Employees. Notwithstanding the termination provision above, if the Tribe or the Operator recognizes any union besides Union as the exclusive collective bargaining representative of Employees, or any of them, this paragraph shall terminate immediately and without notice.

11. The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration. The Tribe's and the Union's representatives shall meet within fourteen (14) calendar days after the receipt of a panel of arbitrators from the Federal Mediation and Conciliation Service ("FMCS"). Selection of a sole and impartial arbitrator shall be made by the Tribe and the Union representatives each alternately striking, with Union making the first strike, one (1) name from a seven (7) member panel of arbitrators, received from the ("FMCS"), who are members of the National Academy of Arbitrators and who reside in California, Arizona, New Mexico or Nevada. The person whose name remains will be requested to serve as the impartial arbitrator. By mutual agreement, the parties may waive the use of the panel

3

named above and refer the matter in dispute to an arbitrator selected from any other source. The arbitrator shall have the authority to determine the arbitration procedures to be followed. The arbitrator shall also have the authority to order the noncompliant party to comply with this Agreement. The parties hereto agree to comply with any order of the arbitrator, which shall be final and binding. The United States District Court for the Eastern District of California shall have exclusive jurisdiction in any action concerning arbitration under this Agreement. The parties consent to the entry of any order of the arbitrator as the order or judgment of the Court, without entry of findings of fact and conclusions of law.

DISCUSSION

*Employer Access to Authorization Cards*

While the Union's request for orders lies at the heart of the present state of this dispute, I believe that the Employer's request to exam the authorization cards signed by the employees deserves to be discussed as a preliminary matter.  On this issue, the Employer has argued that that the validity and authenticity of some of the cards remains a question.  The Employer refers to my admission that I have no training in handwriting analysis and that there were differences as to what amounted to a signature.  The Employer also points out that there are situations in which the National Labor Relations Board will authorize a representative of the Employer to review authorization cards.  And, to give weight to the position of the Employer, I recognize that this is a situation in which authorization cards are being used to support an order to recognize the Union and to begin the negotiation process leading up to a collective bargaining agreement, and this situation is different from the use of authorization to justify an election.

Nevertheless, as the Arbitrator selected under Paragraph 11 of the Memorandum of Agreement, it is that Agreement which serves as the ultimate guide to my decisions.  Here, Paragraph 7 expressly states that the Arbitrator "identified in Paragraph 11, or another person mutually agreed to by parties, will conduct a review of Employees' authorization cards and membership information submitted by the Union."  The Agreement does not recognize anyone else to review the authorization cards, and there is certainly no authorization for the Employer to

4

review the cards.  And, I am unwilling to read that authorization into this agreement, especially in light of the sound public policy in protecting the employees from the possibility of retaliation based upon the exercise of their rights "to form, join, or assist labor organizations, to bargain collectively . . . ."[1]  I have seen no evidence of retaliation on the part of the Employer, and, indeed, in this case, the Employer has merely suggested Counsel for the Employer as the person who would inspect the authorization cards, someone that I would trust to isolate individuals from retaliation.  However, the problem here is more than just protection of employees from retaliation; rather the goal in this situation is to protect the employees from the fear or the perception, real or imagined, of possible retaliation.

While the Employer does acknowledge that the National Labor Relations Board "has long recognized that employees may be discouraged from signing union authorization cards if they knew the employer could see who signed the cards," the Employer asserts that this protection is not absolute and in some circumstances a balancing test is appropriate based upon three criteria: "(1) the request must be relevant to the proceeding; (2) the request must not be made for an illegal objective; and (3) the discovering party's interest in obtaining protected information must outweigh the employee's confidentiality interest under Section 7 of the Act."[2] The case sighted for this position is not an authorization card case, and its application to the present case is dubious.  Moreover, the application of this three-prong test does nothing to help the Employer's case: the interest of the Employer here is the same as every employer has in an authorization case, to see if the count is accurate.   If that interest were sufficient to outweigh the

---

[1] National Labor Relations Act, 29 U.S.C. § 157.  Rights which appear to me to be embodied as well in the Memorandum of Agreement.
[2] Employer's Supplemental Post-Hearing Brief At. 4.

confidentiality interest of the employees, it would mean simply that the employees have no confidentially. Clearly the interest of the employees outweighs that of the Employer.

In addition, in regard to this challenge to the authorization card count, it must be remembered that the Employer has agreed to the MOA, to a particular set of procedures for the authorization card count, to having a neutral Arbitrator count the authorization cards, to having this particular Arbitrator act as a neutral third party to review the cards; and, at no time prior to the result in this authorization card count, did the Employer suggest that the cards should be examined by a representative of the Employer. The result, in the end, is simply that the Employer's request to review the authorization cards is denied.

*Order to Recognize and Negotiate*

As mentioned above, the Union has requested that I "order the Tribe, and its Operator Boyd Gaming, to commence 'negotiations for a collective bargaining agreement . . . immediately and conducted diligently and in good faith to the end of reaching agreement expeditiously.'" In my Award of April 28, 2025 regarding the "Authorization Card Review," I concluded that a majority of employees in the bargaining unit have "designated the Union as their exclusive collective bargaining representative" and that the Memorandum of Agreement requires the Employer to "recognize the Union as such representative of such Employees" and to engage in "collective bargaining." In that award, I recognized that Paragraph 11 of the Memorandum of Agreement between the parties gave me the authority "to order compliance with the results of this process." At that time, I did not issue any orders, partially because of my, perhaps naïve, hope that the parties would enter into negotiations without such an order and, more importantly, because neither party was at that point "noncompliant" as required by Paragraph 11.

6

The Union has presented documentary evidence that the Union requested recognition and the commencement of collective bargaining. On August 28, 2025, Aamir Deen, the president of Local 49 requested in an email that negotiation "commence immediately." In an email response on May 2, 2025, Christina Kazhe, the attorney general for the Employer, stated that the Employer believes the Union's requests was premature.  At this time, it is clear that an order to recognize the Union and to begin the negotiations process is appropriate.

*Release from Paragraph 9*

The Union has also requested an order releasing the Union from "its obligation to comply with Paragraph 9 of the agreement until the Tribe and its Operator commence negotiations." Paragraph 9 of the Memorandum of Agreement prohibits the Union from engaging in strikes, picketing, or "other adverse economic or public relations' activity." The Union argues, not that there is any express provision of the Memorandum of Agreement which authorizes the arbitrator to negate the express language of Paragraph 9, but rather that the Arbitrator has the inherent power to formulate a remedy for a violation of the Memorandum of Agreement.   Since the Employer has violated Paragraph 7, requiring recognition, and Paragraph 8, requiring negotiations begin "immediately," the Arbitrator has jurisdiction to formulate a remedy. The Union has cited heavyweight authority for this position:

> Just as courts defer to labor arbitrators' interpretation of the contract, courts also defer to arbitrators' judgment about how to remedy the violations they find: "[W]hen it comes to formulating remedies" labor arbitrators "need flexibility in meeting a wide variety of situations." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Courts "have no authority to disagree" with an arbitrator's honest judgment about the appropriate remedy. *Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987).

Ex. F-7

The Employer has argued that an arbitrator has no authority to ignore the plain language of the Memorandum of Agreement, and indeed is prohibited from dispensing his own brand of industrial justice:

> Thus, when issuing an award, "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (*quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). In reviewing an arbitration award, a court is similarly bound by the express limitation on the arbitrator's authority and will not enforce an award where, for instance, the award does not draw its essence from the underlying agreement.

According to the Employer, nothing in the Memorandum of Agreement authorizes the arbitrator to excise Paragraph 9 from the Memorandum of Agreement.

In regard to the cases cited by both parties, I am confused as to the metaphor which should be used to describe them: are these cases at the heart of labor law or are they foundational bedrock on which labor and arbitration law are built?  Either way, these cases are controlling here.  Personally, as an arbitrator, I am always mindful that my award should draw its essence from the Agreement between the parties and that I am not free to "dispense my own brand of industrial justice."  And, I should add, that these limitations are not restrictive, they are liberating.  As a labor arbitrator, I do not want to govern the affairs of the parties, I merely want to resolve the dispute that they put before me.  And, I believe that the same is true of my fellow arbitrators.  Nevertheless, I also recognize, the courts, including the United State Supreme Court, have granted arbitrators broad powers to resolve the dispute put before them, including the power to formulate an appropriate remedy.

As I have said, perhaps more than once in the course of my dealings with the parties herein, my allegiance is to the application of the provisions of the Memorandum of Agreement.

At this time, abrogation of Paragraph 9 and removal of the limitations it places on the Union's right to engage in the concerted activities of striking and picketing is not appropriate.

*Restoration of Access*

The Union has also requested that the Employer "restore the Union's access to the Casino in accordance with Paragraph 5 of the Agreement." Paragraph 5, reproduced in full above, states that the Employer Operator "shall provide access to its premises and to such Employees by the Union. The Union may engage in organizing efforts in nonpublic areas of the Casino during employees' non-working times (before work, after work, and during meals and breaks). . . ." In an email dated June 21, 2023, Chris Gibase the "President, Chief Operating Officer" of the Employer's Casino revoked the access to the Casino by Union representatives for the purpose of organizing the employees: "based upon your assertion, there is no need to continue the card collection process, so the approved access to the property is no longer needed. We will ask security to collect all visitor badges that have been assigned to your team." In his email, Gibase did not reference the Memorandum of Agreement or cite any authority for his denial of access.

In its brief prepared in response to the Union's requests, the Employer asserted that it is beyond my authority to order access to the non-public areas of the Employer's property because the Union must make a "request for access" to the Tribal Gaming Commission. According to the Employer, the Union made such a request in the past and was granted permission to enter the non-public areas, and the Union must follow these procedures again.

In response, the Union as asserted that the Employer has gotten its facts wrong. According to the Union, its organizers are still licensed by the Tribal Gaming Commission. The Union has presented three documents which, according to the Union, establish that the Union representatives are appropriately licensed. The first is a copy of a letter dated October 12, 2023,

signed by Kendall C. Dixon as Director of Licensing and Compliance for the Wilton Rancheria Gaming Commission. This letter notifies the representatives of the Union that their Wilton Rancheria Gaming License has been "permanently approved," that the license will have to be renewed at some point, and mentions that a hard copy of the license certificate will be sent to the Union. A copy of a second letter from Dixon with the same date, albeit unsigned, sets forth the details of the license, provides individual license numbers for the Union representatives, and states that the expiration date of the License is October 14, 2025. And finally, the third document appears to be a copy of the license certificate which states that the License is "effective October 12, 2023 through October 14, 2025. On the surface it appears to me that at least for the present time, there is no problem with the Gaming Commission regarding access. I realize, however, that the documents presented by the Union have not been subject to evidentiary scrutiny, but that fact does not influence my decision here. It is not necessary for me to make any finding of fact in this situation because simply stated the argument presented by the Employer contains no evidence.

As I have stated several times, my responsibility is to resolve issues that arise in the application of the parties' Agreement. While I appreciate the information presented by the parties, my decision is based upon the language of Paragraph 5. While the reasons for the Employer's denial of access are not fully clear to me, the language of the Agreement is clear. The Employer "shall provide access to its premises" and the "Union may engage in organizing efforts in nonpublic areas of the Casino during employees' non-working times." More importantly, this provision expressly states that "'Organizing' includes communicating with Employees before and after recognition of the Union as provided in Paragraph 7." It is significant that the parties did not place any time limit on the access granted in Paragraph 5. Also, it is

Ex. F-10

reasonable to infer that this access played an important role in the Union's decision to agree to Paragraph 9 and to give up its legal rights to strike and to engage in picketing.  Indeed, it is not too farfetched to believe that Section 5 was the quid pro quo for Section 9.  The parties chose to put this language in this agreement, and this language controls. My decisions to enforce both Paragraphs 5 and 9 go hand in hand. While I am not prepared to say how long this right to access will ultimately last, my conclusion is that it certainly covers the period following the Employer's refusal to recognize the Union and initiate negotiations.

*MOA and TLRO*

As to the application of the Tribal Labor Relation Ordinance and my reasons for applying the Memorandum of Understanding rather than the TLRO, I believe that I have discussed these issues sufficiently in previous documents and meetings with the parties.  While I have not counted the number of times that I have discussed it, the Union has counted five times: in the Preliminary Decision dated December 18, 2024; in an email dated February 12, 2025; in the Interim Award dated February 20, 2025; in an email dated February 27, 2025; and in a bench decision on March 14, 2025.[3] Also, as the Union points out, Arbitrator Brand discussed Paragraph 2 "on pages 12, 14-15 and 18-19"[4] of his Award. I have adopted previously, and I do so again now, the Decision of Arbitrator Brand in this matter, his reasoning, and his conclusion that the Memorandum of Agreement applies to this dispute rather than the Tribal Labor Relation Ordinance.

### CONCLUSION AND ORDERS

Paragraph 11 of the Memorandum of Agreement signed by the parties authorizes the Arbitrator "to determine the arbitration procedures to be followed" and to "order the

---

[3] Union Letter Brief dated May 5, 2025.
[4] Union Letter Brief dated June 3, 2025.

Ex. F-11

noncompliant party to comply with this Agreement." After careful consideration of the positions of the parties and the materials presented by the parties, I have reached the following conclusions and orders:

- The request by the Employer to exam the authorization cards signed by the employees and to compare the signatures of the employees to the signatures on the authorization cards is denied.

- The request by Union to be released from its obligation to comply with Paragraph 9 of the agreement until the Tribe and its Operator commence negotiations is denied.

- The Employer is hereby ordered to recognize the Union immediately as the exclusive bargaining representative of the bargaining unit Employees and to commence good faith negotiations at once with the Union to the end of reaching a collective bargaining agreement.

- The Employer is hereby ordered to restore the Union's access to the Casino in accordance with Paragraph 5 of the Agreement.


Dated: June 17, 2025

_____

Anthony Miller
Arbitrator


12

# **<u>Exhibit G</u>**

| | |
|---|---|
| **From:** | Christina Kazhe <ckazhe@wiltonrancheria-nsn.gov> |
| **Sent:** | Friday, October 10, 2025 4:33 PM |
| **To:** | Aamir Deen |
| **Cc:** | D. Taylor; David Glaser; Josh Yeltman; Kristin Martin; Jaffer, Shaneeda |
| **Subject:** | RE: Bargaining |

Aamir,

Several of your assertions in the email, below, require clarification.  First, my client has not delayed anything.  Arbitrator Miller's award is not an enforceable order, and Wilton has exercised its right to petition for vacatur of that award in any event.  I understand that UNITE HERE intends to move to confirm that award at the same time.  We also have an appeal of Arbitrator Brand's decision pending before the Ninth Circuit.

Second, the Memorandum of Agreement ("MOA") does not require interest arbitration 120 days after an arbitration award.  Section 8 refers to 120 days from *recognition*, which, as you are aware, the Tribe has never done.  Regardless, the MOA has now expired, and Arbitrator Miller no longer has jurisdiction over any aspect of this matter.

Please direct any further correspondence to our attorney Shaneeda Jaffer who is copied here.

Thank you,
Christina



**Christina Kazhe**
Attorney General, Wilton Rancheria
ckazhe@wiltonrancheria-nsn.gov
9728 Kent Street | Elk Grove | CA | 95624

---

**From:** Aamir Deen <adeen@unitehere.org>
**Sent:** Monday, September 15, 2025 3:49 PM
**To:** Christina Kazhe <ckazhe@wiltonrancheria-nsn.gov>
**Cc:** D. Taylor <dtaylor@unitehere.org>; David Glaser <dglaser@unitehere.org>; Josh Yeltman <joshua.yeltman@skyriver.com>; Kristin Martin <klm@msh.law>; Jaffer, Shaneeda <sjaffer@beneschlaw.com>
**Subject:** RE: [EXTERNAL] RE: Bargaining

Ms. Kazhe:

        Your client has delayed long enough.  On June 17, 2025, Arbitrator Miller ordered the Tribe to recognize the Union immediately and to begin bargaining at once.  Our agreement provides for interest arbitration before the Agreement's sole arbitrator over any contract terms that remain resolved after 120 days.  Since your client is refusing to bargain, all contract terms will remain unresolved.  On October 15, 120 days will have passed since Arbitrator Miller issued his final order.  Please let me know whether you will cooperate in scheduling that arbitration hearing.  We are willing to stipulate that if the Ninth Circuit

Ex. G-1

were to vacate Arbitrator Brand's award (which we are confident that it will not), the interest-arbitration award will not go into effect.

If I do not hear from you, we will contact Arbitrator Miller directly to request that he schedule the hearing as soon as possible after October 15. I will wait three days for your response.

Thanks,
Aamir

**From:** Christina Kazhe <ckazhe@wiltonrancheria-nsn.gov>
**Sent:** Wednesday, September 10, 2025 4:33 PM
**To:** Aamir Deen <adeen@unitehere.org>
**Cc:** D. Taylor <dtaylor@unitehere.org>; David Glaser <dglaser@unitehere.org>; Josh Yeltman <joshua.yeltman@skyriver.com>; Kristin Martin <klm@msh.law>; Jaffer, Shaneeda <sjaffer@beneschlaw.com>
**Subject:** [EXTERNAL] RE: Bargaining

Dear Mr. Deen,

Sky River Casino does not now, nor has it ever, recognized UNITE HERE as the collective bargaining representative of its employees. We do not yet have a final non-appealable order in this matter as Wilton Rancheria's appeal of Arbitrator Brand's decision remains pending with the Ninth Circuit. Additionally, we are seeking to have a court vacate Arbitrator Miller's award. Moreover, the Memorandum of Agreement has now expired, and we doubt Unite Here's claim that it has majority support of Sky River's employees.

Please direct further correspondence regarding this issue to my attention.

Thank you.
Christina



**Christina Kazhe**
Attorney General, Wilton Rancheria
ckazhe@wiltonrancheria-nsn.gov
9728 Kent Street | Elk Grove | CA | 95624

---

**From:** Aamir Deen <adeen@unitehere.org>
**Sent:** Monday, August 25, 2025 12:20 PM
**To:** Christina Kazhe <ckazhe@wiltonrancheria-nsn.gov>
**Cc:** D. Taylor <dtaylor@unitehere.org>; David Glaser <dglaser@unitehere.org>; Josh Yeltman <joshua.yeltman@skyriver.com>; Kristin Martin <klm@msh.law>; Jaffer, Shaneeda <sjaffer@beneschlaw.com>
**Subject:** RE: [EXTERNAL] RE: Bargaining

You don't often get email from adeen@unitehere.org. Learn why this is important

Dear Ms. Kazhe:

On June 24, I emailed Chairman Tarango and Mr. Yeltman about scheduling negotiations. You responded on June 28 that you were reviewing and would respond soon. Two months have passed and you have not responded again. I must reiterate my request for bargaining dates. Keep in mind that our agreement requires

Ex. G-2

that we reach agreement within 120 days or proceed to arbitration over the contract terms. I would like to try to reach agreement but that will not happen if we don't start meeting promptly and on a regular basis. Please let me know your bargaining team's availability.


Thanks,

Aamir Deen



Sent via the Samsung Galaxy S22 5G, an AT&T 5G smartphone



-------- Original message --------
From: Christina Kazhe <ckazhe@wiltonrancheria-nsn.gov>
Date: 6/28/25 10:23 AM (GMT-08:00)
To: Aamir Deen <adeen@unitehere.org>
Cc: "D. Taylor" <dtaylor@unitehere.org>, David Glaser <dglaser@unitehere.org>, Josh Yeltman <joshua.yeltman@skyriver.com>, Kristin Martin <klm@msh.law>, "Jaffer, Shaneeda" <sjaffer@beneschlaw.com>
Subject: [EXTERNAL] RE: Bargaining

Dear Mr. Deen,

In an effort to ensure you would not face any issues accessing the casino, we inquired about the status of your badges and learned that they automatically expired in April, two years after they were first issued. Please contact the Gaming Commission directly to arrange for replacement badges. We have informed them that you will be reaching out and they are aware of the circumstances.

With respect to the other request raised in your email, below, we are reviewing same and will respond soon.

Thank you,
Christina



**Christina Kazhe**
Attorney General, Wilton Rancheria
ckazhe@wiltonrancheria-nsn.gov
9728 Kent Street | Elk Grove | CA | 95624

---

**From:** Aamir Deen <adeen@unitehere.org>
**Sent:** Tuesday, June 24, 2025 6:15:02 AM
**To:** Jesus Tarango <jtarango@wiltonrancheria-nsn.gov>; Josh Yeltman <joshua.yeltman@skyriver.com>

Ex. G-3

**Cc:** D. Taylor <dtaylor@unitehere.org>; David Glaser <dglaser@unitehere.org>
**Subject:** Bargaining

You don't often get email from adeen@unitehere.org. Learn why this is important

Dear Chairman Tarango and Mr. Yeltman:

Arbitrator Miller has now unambiguously ordered that Sky River Casino recognize UNITE HERE and begin negotiations.  We are available to meet for that purpose on the following dates:  6/30-7/22.  If you are not available on any of those dates, please suggest alternate dates.  Arbitrator Miller also ordered the restoration of the Union's access to the Casino in accordance with Paragraph 5 of the Agreement.  Our licensed representatives will be returning to the Casino and will follow the same procedures as before access was revoked.
Sincerely,
Aamir Deen

---

**From:** Aamir Deen
**Sent:** Monday, April 28, 2025 7:05 PM
**To:** jtarango@wiltonrancheria-nsn.gov; Josh Yeltman <joshua.yeltman@skyriver.com>
**Cc:** Kristin Martin <klm@msh.law>; D. Taylor <dtaylor@unitehere.org>
**Subject:** Bargaining

Dear Chairman Tarango and Mr. Yeltman:

Arbitrator Miller announced on April 28, 2025 that he determined that a majority of workers have designated UNITE HERE to be their exclusive collective bargaining representative, and that the Memorandum of Agreement now requires the Tribe, and Boyd Gaming, as its operator, to recognize UNITE HERE.  There is no need for either the Tribe or Boyd to do anything in that regard since "acts agreed to be done or directed to be done are considered as done at the time agreed or directed to be done." CJS Equity § 131.  What we must do is begin bargaining.  The agreement requires that bargaining "shall be commenced immediately and conducted diligently and in good faith to the end of reaching agreement expeditiously."  I will be UNITE HERE's chief negotiator.  Please let me know who will be the Tribe's and Boyd's negotiator(s).  The agreement further provides that if we cannot reach agreement within 120 days of recognition (i.e., August 26, which is 120 days after April 28), all unresolved issues shall be submitted to final and binding arbitration.  We would much prefer to reach agreement on contact terms, but if we have not reached agreement by August 28th, we will ask Arbitrator Miller to determine the contract terms.  With that goal in mind, as well as the agreement's command that bargaining be commenced immediately and conducted expeditiously, I will make myself available on any day this week, next week or the following week that you are available.  We can then set a schedule for regular bargaining sessions.

One remaining issue is access.  I expect that you will now restore our badged representatives access to the workplace as promised.  Please let me know whether you will do so.

Sincerely,

Aamir Deen
President
UNITE HERE Local 49

Ex. G-4